UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

MICHAEL D. MCKNIGHT, *as Trustee of the Stacia L. McKnight Revocable Trust*,

Plaintiff,

v.

65 DUNE ROAD LLC, THE GAETANO DEVELOPMENT CORP., STEVEN GAETANO, and MICHAEL GAETANO, individually,

Defendants.

---------------------------------------------------------------

**<u>MEMORANDUM & ORDER</u>**
19-CV-4172 (MKB)

MARGO K. BRODIE, United States District Judge:


I. Background ........ 4
  a. The purchase of the Residence ........ 5
  b. The identified issues at the Residence ........ 7
    i. Delamination of floors ........ 9
    ii. Glass windows and doors ........ 13
    iii. Pool deck ........ 18
    iv. Structural defects in the first-floor hallway ........ 19
    v. The Residence's lateral system ........ 24
    vi. The pool structure ........ 30
    vii. Radiant heating system ........ 33
    viii. Wood siding panels and weather resistant barrier ("WRB") ........ 34
    ix. Generator ........ 37
  c. Procedural background ........ 39
II. Discussion ........ 42
  a. Standard of review ........ 42
  b. Admissibility of the TT Report and Cao's conclusions ........ 44
    i. Unsworn report ........ 45
    ii. Hearsay challenge ........ 50
  c. Fraudulent inducement and fraudulent concealment ........ 57
    i. Flooring ........ 63

ii. Glass for windows and doors ........ 67
iii. Punitive damages ........ 70
d. GBL § 777-a breach of implied warranty claims ........ 75
i. Pool deck ........ 79
ii. Structural defects in the first-floor hallway ........ 83
iii. The Residence's lateral system ........ 86
iv. The pool structure ........ 89
v. Radiant heating system ........ 94
vi. Wood siding panels and WRB ........ 97
vii. Generator ........ 100
III. Conclusion ........ 104

Plaintiff Michael D. McKnight, in his capacity as Trustee of the Stacia L. McKnight Revocable Trust, commenced the above-captioned action on July 18, 2019, against Defendants 65 Dune Road LLC ("65 Dune"), the Gaetano Development Corp. ("Gaetano Development"), Michael Gaetano ("M. Gaetano") and Steven Gaetano ("S. Gaetano," and along with M. Gaetano, collectively, the "Gaetanos"), invoking diversity jurisdiction and alleging (1) breach of the implied statutory warranty pursuant to Section 777-a of the New York General Business Law ( "GBL" and "GBL § 777-a") against 65 Dune and Gaetano Development, (2) fraud and fraudulent inducement against 65 Dune and the Gaetanos, and (3) fraudulent concealment against 65 Dune and the Gaetanos.[1] (SAC ¶ 28–91.) Plaintiff alleges that he purchased a newly built oceanfront house at 65 Dune Road in East Quogue, New York (the "Residence"), from

[1] Plaintiff commenced the action on July 18, 2019, and filed an Amended Complaint on November 8, 2019. (Compl., Docket Entry No. 1; Am. Compl., Docket Entry No. 15.) In addition to the three causes of action listed, Plaintiff also brought a breach of contract claim against 65 Dune and breach of fiduciary duty against 65 Dune and M. Gaetano. (Am. Compl.) In its Memorandum and Order filed on November 16, 2020 (the "November 2020 Decision"), the Court dismissed these claims. (Nov. 2020 Decision, Docket Entry No. 23.) Following the Court's November 2020 Decision, Plaintiff filed a Second Amended Complaint ("SAC") on November 7, 2022, adding S. Gaetano as a Defendant. (SAC, Docket Entry No. 65.)

Defendants after entering into a contract of sale to purchase the Residence for $13,750,000 (the "Contract") and discovered significant defects in its construction when he took possession of it. (*Id.* ¶¶ 9–16, 20–21.) Plaintiff also alleges that Defendants actively concealed two defects to the Residence: that the windows were not ultraviolet ("UV")-protected and impact-resistant (as specified, and as is appropriate for an oceanfront property at risk of hurricanes), and that the wood floor was "delaminating." (*Id.* ¶¶ 13–27.) Plaintiff seeks rescission of the contract, disgorgement of amounts paid, and reimbursement of money he spent to date in connection with the Residence, believed to be in excess of $14,300,000.00, to be determined at trial. (*Id.* ¶ 91.)

On October 30, 2025, Plaintiff moved for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and Defendant opposed the motion.[2] On October 31, 2025, Defendants cross-moved for summary judgment pursuant to Rule 56, and Plaintiff opposed the motion.[3] For the reasons discussed below, the Court grants in part and denies in part both Plaintiff's partial motion for summary judgment and Defendants' motion for summary judgment.

[2] (Pl.'s Notice of Mot. for Partial Summ. J ("Pl.'s Mot."), Docket Entry No. 156; Pl.'s Mem. in Supp. of Pl.'s Mot. ("Pl.'s Mem."), appended to Pl.'s Mot., Docket Entry No. 156-2; Decl. of Michael G. Goldberg, Esq. in Supp. of Pl.'s Mot. ("Goldberg Decl."), Docket Entry Nos. 157–161; Defs.' Opp'n to Pl.'s Mot. ("Defs.' Opp'n"), appended to Defs.' Opp'n to Pl.'s 56.1 Stmt., Docket Entry No. 167-7; Decl. of Paul Angelides in Opp'n to Pl.'s Mot. ("Angelides Opp'n Decl."), appended to Defs.' Opp'n to Pl.'s 56.1 Stmt., Docket Entry No. 167-1; Decl. of Adam Cassel in Opp'n to Pl.'s Mot. ("Cassel Opp'n Decl."), appended to Defs.' Opp'n to Pl.'s 56.1 Stmt., Docket Entry No. 167-5; Pl.'s Reply in Supp. of Pl.'s Mot. ("Pl.'s Reply"), Docket Entry No. 162; Decl. of Michael G. Goldberg, Esq. in Supp. of Pl.'s Reply ("Goldberg Reply Decl."), appended to Pl.'s Reply, Docket Entry No. 162-2.)

[3] (Defs.' Notice of Cross-Mot. for Summ. J. ("Defs.' Mot."), Docket Entry No. 163; Decl. of David Feureisen, Esq. in Supp. of Defs.' Mot. ("Feureisen Decl."), appended to Defs.' 56.1 Stmt., Docket Entry No. 164-1; Defs.' Mem. in Supp. of Defs.' Mot. (Defs.' Mem."), appended to Defs.' 56.1 Stmt., Docket Entry No. 164-2; Pl.'s Opp'n to Defs.' Mot. ("Pl.'s Opp'n"), appended to Pl.'s Opp'n to Defs.' 56.1 Stmt., Docket Entry No. 166-1; Decl. of Michael G. Goldberg, Esq. in Opp'n to Defs.' Mot. ("Goldberg Opp'n Decl."), appended to Pl.'s Opp'n to Defs.' 56.1 Stmt., Docket Entry No. 166-2; Defs.' Reply in Supp. of Defs.' Mot. ("Defs.' Reply"), Docket Entry No. 165.)

## I. Background

The following facts are undisputed unless otherwise noted.[4]

[4] (Pl.'s 56.1 Stmt. ("Pl.'s 56.1"), appended to Pl.'s Mot., Docket Entry No. 156-1; Defs.' Opp'n to Pl.'s 56.1 ("Defs.' 56.1 Resp."), Docket Entry No. 167; Pl.'s Reply in Supp. of Pl.'s 56.1 ("Pl.'s 56.1 Reply"), appended to Pl.'s Reply, Docket Entry No. 162-1; Defs.' 56.1 Stmt. ("Defs.' 56.1"), Docket Entry No. 164; Pl.'s Opp'n to Defs.' 56.1 Stmt. ("Pl.'s 56.1 Resp."), Docket Entry No. 166.)

Where a party disputes a fact listed in the opposing side's 56.1 statement and fails to reference or include a citation to record evidence in support of their objection, the Court disregards those objections and deems the fact as admitted. *See* Fed. R. Civ. Pr. 56(c); Local Civ. R. 56.1; *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (explaining that Local Rule 56.1 should be interpreted to provide that "where there are no[ ] citations or where the cited materials do not support the factual assertions in the [s]tatements, the [c]ourt is free to disregard the assertion" (first alteration in original)), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009); *see also McGowan v. Stanley*, No. 23-7769, 2024 WL 5038633, at *2 (2d Cir. Dec. 9, 2024) (summary order) ("Facts set forth in a moving party's [56.1] statement 'will be deemed to be admitted . . . unless specifically denied and controverted' by the opposing party's response." (second alteration in original) (quoting Local Civ. R. 56.1)); *Aptive Env't, LLC v. Vill. of E. Rockaway*, No. 21-677, 2022 WL 211091, at *2 (2d Cir. Jan. 25, 2022) (summary order) ("So long as the moving party's Rule 56.1(a) statement includes citations to admissible evidence, '[i]f the opposing party then fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.'" (alteration in original) (quoting *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003))); *Markos v. Johnson Controls, Inc.*, No. 22-CV-6600, 2026 WL 587718, at *1 n.1 (S.D.N.Y. Mar. 3, 2026) ("Where a party purports to dispute the opposing party's statement of material fact but does not cite to admissible evidence controverting the statement, the [c]ourt will treat the statement as undisputed." (citing Local Civ. R. 56.1(d))); *Tevac, Inc. v. Dynamic eShop, Inc.*, No. 19-CV-3650, 2022 WL 4483439, at *3 (E.D.N.Y. Sep. 27, 2022) (deeming a fact admitted where the party "[f]ail[ed] to cite to record evidence to support [a] purported disputed fact"); *Vista Food Exch., Inc. v. Comercial De Alimentos Sanchez S de R L de C.V.*, 627 F. Supp. 3d 408, 412 n.1 (S.D.N.Y. 2022) (observing that a party controverting any assertion must "support its position by citing to admissible evidence in the record" (quoting *Pape v. Bd. of Educ. of Wappingers Cent. Sch. Dist.*, No. 07-CV-8828, 2013 WL 3929630, at *1 n.2 (S.D.N.Y. July 30, 2013))), *aff'd in part, vacated in part, remanded*, 147 F.4th 73 (2d Cir. 2025); *Ringel v. Cnty. of Nassau*, No. 18-CV-1930, 2021 WL 4316715, at *2 (E.D.N.Y. Sep. 22, 2021) ("In moving for summary judgment or answering such a motion, litigants in this District . . . must support [their] position by citing to admissible evidence from the record." (citing Local Civ. R. 56.1(a)–(b), (d))); *Genova v. Cnty. of Nassau*, No. 17-CV-4959, 2020 WL 813160, at *4 (E.D.N.Y. Feb. 19, 2020) ("[T]o specifically controvert a statement of material fact, a nonmovant is required to do so with specific citation to admissible evidence."), *aff'd*, 851 F. App'x 241 (2d Cir. 2021); *Genova v. Cnty. of Nassau*, 851 F. App'x 241, 244 (2d Cir. 2021) ("[Parties] who ignore their obligations under Local Rule 56.1 do so at their own peril.").

**a. The purchase of the Residence**

In or around June of 2014, the Gaetanos, as the sole principals, formed 65 Dune, a limited liability company organized under the laws of the state of New York and created as a special purpose entity ("SPE") for the "purposes of developing and constructing a 'spec house' located at" the Residence. (Defs.' 56.1 Resp. ¶¶ 1–3.) In 2014, 65 Dune purchased the property of the Residence for approximately $4,000,000 and shortly after began constructing the Residence. (*Id.* ¶¶ 4–5.) In or around September of 2016, prior to completion of construction, 65 Dune began marketing the Residence for sale through Phil Grossman of Brown Harris Stevens. (*Id.* ¶¶ 6–8.) Construction was subsequently completed in 2016, and 65 Dune obtained a certificate of occupancy. (*Id.* ¶ 9.) Following Brown Harris Stevens' and another broker's inability to sell the Residence, 65 Dune hired Bespoke Real Estate ("Bespoke") as its broker to market and sell the Residence in or around November of 2017. (*Id.* ¶¶ 10–15.) "Bespoke prepared its own marketing materials in connection with its representation of the Residence, including a brochure and listing, using prior marketing materials and information provided by 65 Dune."[5] (*Id.* ¶ 16.) The preparation of these marketing materials were "collected following [Bespoke's] normal process and procedure of compiling public information [about] the property, site visits, and so on," which for "every property . . . [requires] conversation and communication with the owner to understand details about their home." (*Id.* ¶ 17 (quoting Dep. Tr. of Zachary Vichinsky ("Vichinsky Tr.") 47:19–21, 48:7–10, annexed to Goldberg Decl. as Ex. 8, Docket Entry No. 157-8).) Zachary Vichinsky, a Bespoke representative, testified at his deposition that "[u]nder normal process," the Gaetanos would provide Bespoke with any of the information contained in

[5] Defendants clarify that the Gaetanos "[a]t no time . . . provide[d] any materials and information to Bespoke" "in their *individual* capacity." (Defs.' 56.1 Resp. ¶ 16 (emphasis added).) Defendants do not dispute whether the Gaetanos provided materials and information to Bespoke in their *official* capacities as principals of 65 Dune.

the marketing brochure. (Pl.'s 56.1 Reply ¶ 17 (quoting Vichinsky Tr. 47:22–48:6); *see also* Defs.' 56.1 Resp. ¶ 17.) Plaintiff asserts that S. Gaetano "approved Bespoke's marketing materials, including its brochure and listing . . . stat[ing] 'looks good,'" although Defendants dispute that S. Gaetano, "in his individual capacity, approved any of Bespoke's marketing materials." (Defs.' 56.1 Resp. ¶ 18.)

Plaintiff "first visited the Residence with his wife in the summer of 2018" along with Plaintiff's broker from Coach Realtors. (*Id.* ¶¶ 19–20.) On or around July 6, 2018, Plaintiff made an offer to purchase the residence which 65 Dune accepted. (*Id.* ¶¶ 22–23.) "Following negotiations regarding purchase price and other points, [Plaintiff] and 65 Dune entered into [the Contract], dated July 18, 2018, reflecting a negotiated purchase price of $13,750,000." (*Id.* ¶¶ 24–25.) "Paragraph 46 of the Rider to and Forming a Part of the Contract of Sale Dated July 18, 2018 (the 'Rider'), titled 'Implied Warranty,' states: 'Purchaser . . . acknowledges and agrees that the only warranty in connection with this newly contracted property is the *Housing Merchant Implied Warranty* under Section 777-a of the New York General Business Law, which shall be provided by [Gaetano Development], an active New York business corporation." (*Id.* ¶ 26.) The Gaetanos are the sole principals and shareholders of Gaetano Development and M. Gaetano signed the Rider on behalf of Gaetano Development. (*Id.* ¶¶ 27–29.) "During negotiations, [Plaintiff] demanded that [Gaetano Development,] an active entity[,] be added as a party to the Contract and the Rider and, specifically, be subject to the Implied Warranty" "[b]ecause 65 Dune was an SPE that would no longer be active after the Residence was sold."[6] (*Id.* ¶¶ 30–31.)

[6] Plaintiff asserts, and Defendants dispute, that at the time the Contract and Rider were negotiated and executed, "S. Gaetano knew . . . that since 2010 Gaetano Development had not been actively engaging in business and had no assets" and "Gaetano Development was

**b. The identified issues at the Residence**

"Prior to taking possession of the Residence, [Plaintiff and his wife] retained Joseph Schmitt of Schmitt Engineering PLLC, a civil engineer specializing in building and construction engineering, who regularly inspects houses in the Hamptons, to inspect the Residence on July 11, 2018." (*Id.* ¶ 34.) "Schmitt was recommended to Plaintiff by Defendants' real estate broker, Zachary Vichinsky." (*Id.* ¶ 35.) As part of the pre-purchase inspection report, "Schmitt's inspection did not reveal any of the defects at issue in this action" and found each of the relevant parts of the Residence to be in "good condition."[7] (*Id.* ¶ 37.)

The parties closed in August of 2018 and Plaintiff took possession of the Residence when he began to identify various issues at the Residence. (*Id.* ¶ 38.) Plaintiff's house manager, Jeremy Ryan, contacted S. Gaetano on multiple occasions notifying him of various issues,

---

nominated to stand behind the Implied Warranty . . . because the Gaetanos, at the time, intended to use their personal funds to capitalize Gaetano Development and guarantee paragraph 46 of the Rider's Implied Warranty." (*Id.* ¶¶ 32–33.) Defendants dispute "that Gaetano Development had not been actively engaging in business and had no assets since 2010," arguing "this statement mischaracterizes S. Gaetano's testimony and was made in response to improper and objectionable leading questions from Plaintiff's counsel." (*Id.*) Defendants cite to S. Gaetano's deposition arguing "[i]t was Plaintiff's counsel who stated that the Gaetano Development 'would be able to make good on the warranty claims because [the Gaetanos] would fund it.'" (*Id.* (quoting Dep. Tr. of Steven Gaetano ("S. Gaetano Tr.") 173:16–20, annexed to Goldberg Decl. as Ex. 22, Docket Entry No. 160-1).) Plaintiff argues that Defendants have failed to provide a valid basis to object to Plaintiff's stated fact because: (1) Defendants' response is inaccurate; (2) Defendants fail to explain how Plaintiff mischaracterizes S. Gaetano's testimony; and (3) leading questions are permissible during deposition under Federal Rules of Evidence 611. (Pl.'s 56.1 Reply ¶ 33.) Plaintiff notes that S. Gaetano was asked twice during his deposition whether the Gaetanos would "personally" fund Gaetano Development "so that it could make good on the warranty if required" and "in both instances, [S.] Gaetano answered in the affirmative." (*Id.* (quoting S. Gaetano Tr. 172:9–173:6).)

[7] The parties dispute whether invasive testing was required as part of Schmitt's home inspection. (Pl.'s 56.1 Reply ¶ 36.) However, the parties do not dispute that Schmitt's report stated that he made "an earnest effort . . . to discover all visible defects," Schmitt acknowledged during his deposition "that hidden defects could have existed but were not visible during his inspection and would not have been included in his report," and that he "answered in the negative when asked if he conducted 'any invasive testing during this inspection.'" (*Id.*)

including those with the floor, oven, and stove, for which Defendants did not offer to fix and/or pay to repair the issues. (*Id.* ¶¶ 39–40, 42.) "Once the [post-closing] escrow money was released," "communications ceased" between Defendants and Ryan. (*Id.* ¶ 41 (quoting Dep. Tr. of Jeremy Ryan ("Ryan Tr.") 73:17–74:6, annexed to Goldberg Decl. as Ex. 24, Docket Entry No. 160-34).)

Plaintiff retained Pryor Cashman LLP ("Pryor Cashman") in or around February of 2019. (*Id.* ¶ 43.) On or about February 26, 2019, in accordance with GBL § 777-a, Pryor Cashman sent to Defendants a notice of defects identified in the Residence. (*Id.* ¶ 44 (citing Feb. 26, 2019 Ltr. from M. Goldberg, annexed to Goldberg Decl. as Ex. 1, Docket Entry No. 157-1).) This letter included issues with the gas stove, limestone floors, pool generator, fireplace, UV windows, wood floors, stone floors, and outlets/lighting. (Feb. 26, 2019 Ltr. from M. Goldberg.) By letter dated March 12, 2019, Defendants responded outlining why each issue identified in the February 26, 2019 letter did "not meet the definition of 'defects' under Section 777-a," stated that the Property was "constructed in a skillful manner" and the items listed were "excluded from the statute," were mooted by the "as is" provision of the Contract, and ultimately Defendants refused to repair or reimburse Plaintiff for any of the identified issues. (Mar. 12, 2019 Ltr. to M. Goldberg, annexed to Goldberg Decl. as Ex. 2, Docket Entry No. 157-2.) On July 31, 2019, August 19, 2019, August 27, 2019, November 1, 2019, and September 10, 2024, Pryor Cashman sent additional notices to Defendants when new issues were later identified.[8] (Defs.' 56.1 Resp. ¶ 47.) Defendants never responded to these additional notices.

[8] Plaintiff commenced this litigation on July 18, 2019. (Defs.' 56.1 Resp. ¶ 46.)

### i. Delamination of floors

65 Dune installed "Eden Sand White Oak Engineered Wood Flooring manufactured by Porcelanosa in the Residence." (*Id.* ¶ 48.) In or around December of 2018, Plaintiff noticed that the floorboards showed evidence of delamination as the floors were "buckled" and Ryan similarly expressed "concern[s] about the wood flooring."[9] (*Id.* ¶ 51.) "The delamination process involves individual floorboard layers separating from the underlying substrate and curling up along the length of the floorboard." (*Id.* ¶ 50.) Plaintiff later observed concealed pin nails on the floorboards throughout the Residence, which he alleges were used "to mask prior delamination and hide the defect." (*Id.* ¶ 52.) "At the time, Defendants described these repairs as 'temporary' . . . and represented to Porcelanosa that they were 'repairing the more recently delaminated planks by nailing them down so they can continue to show the house[.]'"[10] (*Id.*

[9] Defendants dispute Plaintiff's characterization of testimony that these issues were the floors "delaminating." (Defs.' 56.1 Resp. ¶ 51.) Plaintiff argues that "Defendants have never disputed that the flooring suffered from delamination" and "[t]here is no question that [ ] [Plaintiff]'s testimony . . . and [ ] Ryan's observations . . . referred to delamination." (Pl.'s 56.1 Reply ¶ 51.) In addition, Plaintiff points to a text message sent by Ryan to Plaintiff expressing "concern[s] about the wood flooring" and attaching pictures of the delaminated floors. (*Id.* (citing Feb. 8, 2019 Text Messages, annexed to Goldberg Reply Decl. as Ex. 72 and appended to Pl.'s Reply, Docket Entry No. 162-3).) Defendants fail to cite to record evidence to support their argument and in fact, the record evidence contradicts the objection. S. Gaetano's own testimony thoroughly discusses the delamination occurring at the Residence and at no point during his deposition did he deny that the floors were not delaminating. (S. Gaetano Tr. 57:8–20; 177:9–22; 178:21–179:4; 189:25–190:15; 191:21–192:10; 206:16–210:9; 213:15–220:2; 230:3–20.) The Court therefore overrules the objection and deems the statement as admitted.

[10] "Defendants do not dispute the stated facts to the extent that Defendants used face nailing on the flooring" but otherwise are silent on their representations to Porcelanosa and that they used face nails to mask the delamination and hide the defect. (Defs.' 56.1 Resp. ¶ 52.) In their briefing, "Defendants admit that face nails and putty were used in connection to complete certain areas of the wood flooring" but dispute that this was an attempt to conceal any defects. (Defs.' Mem. 15.) In addition, Defendants note that Schmitt's pre-purchase inspection report found the flooring to be in good condition and that he did not observe any face nailing on the flooring at the time of the inspections. (*Id.*) The Court deems this a disputed fact.

(internal citations omitted).) On February 26, 2019, Plaintiff notified Defendants of the issue with the floorboard delamination and Defendants did not offer to remedy the issue. (*Id.* ¶¶ 53–54.)

In January of 2017, over a year before Plaintiff closed on the Residence, Defendants first observed that "some flooring [was] lifted at the corners." (*Id.* ¶ 55.) "Defendants initially replaced those delaminating floorboards using extra floorboards present at the Residence." (*Id.* ¶ 56.) In or around February of 2017, Defendants contacted Porcelanosa regarding the floor delamination issue, requesting that Porcelanosa reimburse Defendants for the defective floorboards, plus the cost of labor. (*Id.* ¶¶ 57–58.) In or around March of 2017, Defendants observed "a number of delaminated boards in a few different areas" around the Residence and submitted a claim to Porcelanosa. (*Id.* ¶ 59.) A Porcelanosa representative testified at his deposition that an internal email stating "we know it's our fault" "meant that [Porcelanosa] knew the delamination was a defect in the product."[11] (Pl.'s 56.1 Reply ¶ 60 (quoting Dep. Tr. of Charlie Driscoll ("Driscoll Tr.") 46:22–47:10, annexed to Goldberg Decl. as Ex. 9, Docket Entry No. 157-13).) Subsequently, 65 Dune and Porcelanosa began negotiating a settlement. (Defs.' 56.1 Resp. ¶ 61.) "During settlement negotiations, [65 Dune] advised Porcelanosa that they intended to remove and replace the wood floors and purchase flooring from an alternate vendor." (*Id.* ¶ 62.) In or around April of 2017, Porcelanosa offered 65 Dune $70,000 to resolve the flooring delamination claims, which Defendants rejected and "identified additional costs they would incur in removing and replacing the flooring, including: (1) 'moldings [which are] very difficult to remove and replace . . . [and] very labor intensive'; (2) the labor required to

[11] The parties dispute whether the "engineered hardwood floors supplied to the Residence came from a larger batch of defective wood flooring with delamination issues." (Defs.' 56.1 Resp. ¶ 60; Pl.'s 56.1 Reply ¶ 60.)

'dismantle[], store[ ] and then re-assemble[ ]' the closets; and (3) 'the aggravation factor to have to have our house floors torn apart and rebuilt again at the peak the [sic] selling season.'" (*Id.* ¶¶ 63–64.) Porcelanosa increased its settlement offer twice, ultimately to $121,479 which 65 Dune accepted and on or about April 18, 2017, the parties executed a Settlement Agreement, Release and Waiver (the "Settlement Agreement"). (*Id.* ¶¶ 65–66.) While Defendants dispute that "work [ ] needed to be done to replace the flooring" as they assert that they "believed, in good faith, that the wood floors were in good condition at the time of the sale of the Residence to Plaintiff," they do not dispute that they "never removed or replaced the wood floors at the Residence" despite their negotiation with Porcelanosa.[12] (*Id.* ¶ 67.) A Porcelanosa representative was asked

[12] Defendants cite to S. Gaetano's deposition testimony to support their assertion that they believed "the wood floors were in good condition at the time of the sale of the Residence to Plaintiff." (Defs.' 56.1 Resp. ¶ 67 (citing S. Gaetano Tr. 180:20–25).) Defendants continually cite to this portion of S. Gaetano's transcript to support this assertion and Defendants' general objections to many of Plaintiff's asserted undisputed facts. (*Id.* ¶¶ 69, 71, 76, 77.) Plaintiff argues in response that: (1) "the cited testimony of [S.] Gaetano does not support the asserted response that 'the wood floors were in good condition at the time of sale of the Residence to Plaintiff' and therefore violates Local Rule 56.1(d)"; and (2) S. "Gaetano's self-serving statement cited as an asserted fact cannot be the basis for defeating summary judgment." (Pl.'s 56.1 Reply ¶ 67.)

The Court agrees that the cited portion of S. Gaetano's transcript does not support that assertion. (*See* S. Gaetano Tr. 180:20–25 (explaining that Porcelanosa gave 65 Dune a refund for the flooring after which the Gaetanos questioned whether they would "tear up this whole floor" after the radiant heat was turned down and the delamination stopped).)

However, as to S. Gaetano's self-serving testimony, while Plaintiff is correct that such statements cannot be the basis for defeating summary judgment, *Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009) (where "'the only "evidence" cited in plaintiffs' brief is their own self-serving testimony' and [ ] the plaintiffs ha[d] 'made no attempt . . . to square their own speculative, and subjective, testimony with the hard evidence adduced during discovery,'" the court found that "[s]uch evidence [was] insufficient to defeat summary judgment" (third alteration in original)), it is also the case that "a district court may not discredit a witness's deposition testimony on a motion for summary judgment, because the assessment of a witness's credibility is a function reserved for the jury." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 725–26 (2d. Cir 2010) (declining to discredit the plaintiff's self-serving testimony). "In order for a district court to discredit a plaintiff's self-serving testimony, the testimony must be 'so replete with inconsistencies and improbabilities that no reasonable [fact-finder] would undertake the suspension of disbelief necessary to credit the allegations made in his complaint.'"

whether "Porcelanosa [would] have entered into the [S]ettlement [A]greement with 65 Dune and the Gaetanos if it knew that the Gaetanos were not intending to remove and replace the flooring" to which he responded he "would not think so, no." (Pl.'s 56.1 Reply ¶ 68 (quoting Driscoll Tr. 66:3–8).)

Defendants do not dispute that 65 Dune "never disclosed the floor delamination issues to [Plaintiff]," however they do dispute whether "65 Dune had any obligation to disclose any information concerning the Settlement Agreement . . . with Porcelanosa" due to a confidentiality provision in the Settlement Agreement. (Defs.' 56.1 Resp. ¶¶ 69, 70.) In addition, the parties dispute the cause of the delamination — Plaintiff asserts that the delamination was caused by the flooring originating "from a larger batch of defective wood flooring with delamination issues," (Pl.'s 56.1 ¶ 60), while Defendants assert that "the delamination was caused by the temperature

---

*Haust v. United States*, 953 F. Supp. 2d 353, 361 (N.D.N.Y. 2013) (alteration in original) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 252 (1986))); *see also Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011) (holding that a court's assessment of witness credibility should be confined to "certain extraordinary cases, where the facts alleged are so contradictory that doubt is cast upon their plausibility" (internal quotation marks omitted)), *cert. denied*, 565 U.S. 1260 (2012).

Plaintiff does not argue that S. Gaetano's testimony is "so replete with inconsistencies and improbabilities" that the Court should disregard his testimony. Instead, S. Gaetano has "presented a 'conflicting version[ ] of the events,' which is a matter 'for the [fact-finder], not for the court on summary judgment." *Haust*, 953 F. Supp. 3d at 362 (alterations in original) (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)); *see Healey v. Chelsea Res., Ltd.*, 947 F.2d 611, 620 (2d Cir. 1991) ("The fact that [ ] testimony may be self-serving goes to its weight rather than its admissibility."). Therefore, the Court will not discredit S. Gaetano's testimony for purposes of the motion for summary judgment, and the Court will not address Plaintiff's objections to S. Gaetano's testimony further. *See Knox v. CRC Mgmt. Co.*, 134 F.4th 39, 48 (2d Cir. 2025) ("[A]t summary judgment, [a party] is entitled to rely on his own testimony to establish his . . . claim." (last alteration in original) (quoting *Rentas v. Ruffin*, 816 F.3d 214, 221 (2d Cir. 2016))). However, Defendants must supply supporting evidence to raise a material issue of fact and ultimately survive Plaintiff's motion for summary judgment. *See Deebs*, 346 F. App'x at 656 (finding self-serving testimony was insufficient to "adduce sufficient evidence to raise a material issue of fact" and ultimately insufficient to defeat summary judgment).

for the radiant heat being set to over eighty degrees" by Plaintiff, (Defs.' 56.1 Resp. ¶¶ 72–78; S. Gaetano Tr. 177:9–179:19). Plaintiff vacated the Residence and coordinated for the replacement and removal of the wood flooring to remedy the delamination issue, which included taking at least some of the following actions[13]: "(1) remov[al] of some baseboards, doors, and extensive closet systems in all areas with wood floors; (2) remov[al] and dispos[al] of all wood flooring and plywood underlayment; (3) install[ation of] a new plywood subfloor; (4) purchase and install[ation of] new wood flooring; (5) reinstall[ation of] baseboards, doors and closet systems; and (6) re-paint[ing] all affected areas." (Defs.' 56.1 Resp. ¶¶ 79–80.)

#### ii. Glass windows and doors

"Pursuant to the 2010 New York State Building Code (NYSBC), the residence is located in a hurricane-prone, wind-borne debris region with a wind exposure category of C, and a minimum design wind speed of 120 mph." (*Id.* ¶ 81.) "Pursuant to the 2010 Residential Code for New York State (RCNYS) Section R301.2, window and door glass in hurricane-prone regions must be protected against wind-borne debris." (*Id.* ¶ 82.) RCNYS § R301.2 requires all exterior windows and doors to have "impact glass," that is glass that satisfies the requirements of the Large Missile Test of the American Society for Testing Materials ("ASTM") E1886 and E1996. (*Id.* ¶ 83 (citing Thorton Tomasetti's 65 Dune Road Expert Report ("TT Report") 21, Ex. A of Liling Cao Dep., annexed to Goldberg Decl. as Ex. 27-1, Docket Entry No. 160-82–

[13] Defendants dispute whether all of these actions were required to be taken and whether Plaintiff took *all* of these actions. (Defs.' 56.1 Resp. ¶ 80 ("Defendants dispute the purported items listed as 'required' of Plaintiff's [sic] for replacing the wood floor. The document referenced by Plaintiff's counsel [ ] is . . . an undated "rough summary" [and] . . . [i]t is unknown whether these actions were required or even taken[.]").)

85).[14]) "To satisfy ASTM E1996 and E1886, the windows and doors must be: (1) assembled using specific impact-resistant construction; (2) have storm shutters; or (3) have removable protection such as temporary plywood panels." (*Id.* ¶ 84 (citing TT Report 21).) In addition, "the assemblies must be made of impact glass and hurricane resistant metal frames." (*Id.* ¶ 85 (citing TT Report 21).) The parties dispute whether the interlayer thickness is a requirement of impact glass — Plaintiff contends that "impact glass must have an interlayer thickness of .090 inches," (Pl.'s 56.1 ¶ 86 (citing TT Report 21)), while Defendants argue that "thickness of an interlayer is 'only a parameter' [and] [t]here's a whole range of different parameters . . . that plays into the performance of the glass," (Defs.' 56.1 Resp. ¶ 86 (quoting Dep. Tr. of Alexey Nefedov ("Nefedov Tr.") 59:6–14, annexed to Goldberg Decl. as Ex. 28, Docket Entry No. 160-91)).

James McDonough of McDonough & Conroy Architects P.C. ("M&C"), the architect of

[14] Defendants, both in their 56.1 response and in their memorandum of law in opposition to Plaintiff's motion for summary judgment, object to the use of the conclusions contained in the TT Report and TT Rebuttal Report (defined within), prepared by Plaintiff's expert Liling Cao of Thorton Tomasetti, "on the ground that it is unsworn and therefore impermissible" to support Plaintiff's motion because "[i]t is well-settled" that Rule 56 of the Federal Rules of Civil Procedure require that the Court, on a motion for summary judgment, only consider evidence that would be admissible at trial. (*See, e.g.*, Defs.' 56.1 Resp. ¶ 83; Defs.' Opp'n 7–8.) For the reasons explained *infra*, the Court declines to preclude the TT Report and Cao's analysis and conclusions, *see infra* Section II.b, and the Court considers the TT Report and Cao's testimony in this Memorandum and Order. Therefore, the Court also deems admitted the facts that Defendants objected to based on the alleged inadmissibility of the TT Report, unless Defendants denied the facts on other grounds. *See Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 314 (2d Cir. 2008) ("An objection to the admissibility of a document is not the equivalent of a contention that the document's contents are untrue."); *Lee v. City of Syracuse*, 603 F. Supp. 2d 417, 430–31 (N.D.N.Y. 2009) (finding that "where plaintiff objects only to admissibility and provides no indication that the fact is untrue, the fact will be deemed admitted by plaintiff if it is admissible under the Federal Rules of Evidence"), *abrogated by Widomski v. State Univ. of N.Y. (SUNY) at Orange*, 748 F.3d 471 (2d Cir. 2014); *see also Demaio v. Conn. Dep't of Corr.*, No. 09-CV-2133, 2012 WL 892933, at *1 n.1 (D. Conn. Mar. 15, 2012) ("To the extent that the [p]laintiff's objections lack merit, this [c]ourt will therefore deem facts the [p]laintiff did not dispute . . . as admitted.").

record for the Residence, prepared architectural drawings and framing drawings that state that "all windows and doors are to be hurricane resistant" and "all glass shall be hurricane resistant unless noted otherwise." (*Id.* ¶ 87; *see also id.* ¶ 88.) In November of 2014, 65 Dune instructed Roboco, the general contractor, to seek pricing from Westhampton Glass for impact rated windows and glass doors for the Residence, which Westhampton Glass provided. (*Id.* ¶ 89.) After receiving the quote, 65 Dune directed Jim O'Brien of Roboco to follow up with Westhampton Glass to inquire "what was 'making the price extremely high'" and Westhampton Glass responded that the glass was "reasonably priced" although the "impact rating [was] bringing the cost up." (*Id.* ¶¶ 90–91.) Defendants did not purchase the impact windows and glass doors from Westhampton Glass. (*Id.* ¶ 92.) Instead, Defendants "hired subcontractor Architectural Industries to purchase and install the windows and glass doors at the Residence." (*Id.* ¶ 93.) Defendants "dispute that 65 Dune purchased non-impact windows and glass doors" as the contract with Architectural Industries "calls for Arcadia impact rated [glass], except for the large great room sliders," however Defendants do not dispute that they "paid substantially less" for the windows and glass doors they purchased than what was quoted by Westhampton Glass. (*Id.* ¶ 94.)

During Plaintiff's initial visit to the Residence, Bespoke's representative, Vichinsky, provided Plaintiff "with a brochure that contained a description of the windows and doors as 'Arcadia Impact Thermal Glass.'" (*Id.* ¶¶ 95–96.) The parties dispute: (1) what Vichinsky represented to Plaintiff with regard to whether the glass in the windows and doors were high impact, low light penetrating ("Low-E"), hurricane resistant, and/or UV-rated; (2) what Vichinsky represented to Plaintiff with regard to whether the glass in the windows and doors were "thermal impact"; (3) what Vichinsky represented to Plaintiff with regard to the particular building codes and impact glass requirements necessary to the area of the Residence; and (4)

whether Plaintiff relied on these representations as "important considerations" in Plaintiff's decision to purchase the Residence at the price he paid. (Pl.'s 56.1 Reply ¶¶ 97–101.) As to the information in the brochure, as explained above, Vichinsky testified that the source of the information relating to the windows was "[p]ublic information from the prior listing broker, site inspection and notation on the specific windows in the property, and specifications provided by the seller." (*Id.* ¶ 101.) Moreover, the brochure was prepared using "normal process" which included having a "conversation and communication with the owner to understand details about their home" and which was approved by the seller— in this case, the Gaetanos — prior to use.[15] (Pl.'s 56.1 Reply. ¶ 102.) "Despite these representations, ninety percent of the windows and doors installed in the Residence were either not thermal impact no[r] 'Low-E glass.'"[16] (Defs.' 56.1 Resp. ¶ 103 (citing TT Report 22–23).) Due to the Residence's location on the ocean and its large glass floor to ceiling windows and doors, the Residence was exposed to significant sunlight, facilitating the need for "Low-E" or "UV protection" or "UV resistant" glass which has low emissivity due to a coating which blocks UV light and infrared ("IR") light and reduced heat and glare and prevents fading and damage to interior materials due to exposure to sunlight. (*Id.* (citing TT Report 22–23).)

"Architectural Industries supplied and installed the Arcadia assemblies (windows and doors) at the Residence" — "[t]hree types of window assemblies were installed: four ULT-5500

---

[15] Defendants dispute that the Gaetanos, in their individual capacity, "provided the information contained within the marketing brochure to Bespoke" or approved any brochure from Bespoke. (Defs.' 56.1 Resp. ¶ 102.)

[16] As explained *supra* footnote 14 and *infra* Section II.b, the Court overrules Defendants' objection on the admissibility of the TT Report. Further, the Court deems this fact admitted as the cited record evidence does not discuss the type of glass used at the Residence, only what glass was "call[ed] for" in 65 Dune's contract with Architectural Industries. (Defs.' 56.1 Resp. ¶ 103.)

doors, one ULT 5520 door system and thirty-one T-200 windows." (*Id.* ¶ 104.) The ULT-5520 doors, the large sliding glass doors installed in the Great Room (the "Glass Slider"), were not comprised of impact glass. (*Id.* ¶ 105.) This is reflected in the Arcadia shop drawings which were approved by S. Gaetano. (Annotated Extract, Ex. 17 to S. Gaetano Dep., annexed to Goldberg Decl. as Ex. 64, Docket Entry No. 161-33.) Defendants do not dispute the fact that the Glass Slider was non-impact rated and because of its non-impact nature, the Glass Slider would need protection during a hurricane. (Defs.' 56.1 Resp. ¶ 106.) Thirty-one T-200 windows were installed at the residence (the "T-200 Windows"), none of which have impact glass or "Low-E," as reflected in the Arcadia shop drawings which were approved by S. Gaetano. (*Id.* ¶¶ 107–08.) The product literature of Viracon, the glass manufacturer for the installed windows, explains that "an interlayer thickness of 0.090 inches is required for hurricane resistance." (*Id.* ¶ 110.) Plaintiff's expert determined that "the T-200 windows and Glass Sliders were 'non-impact' with a 'Low-E' coating, and with a .035 interlayer" which is "thinner than what is required for an impact glass interlayer" and "does not meet [building] code requirements." (*Id.* ¶ 111 (citing TT Report 26).) "Only the ULT-5500 doors (which comprise 4 out of 36 windows and/or doors installed at the Residence) are impact resistant and 'Low-E.'" (*Id.* ¶ 112.)

The building codes require either "impact glass or plywood covered windows and doors" and to get a certificate of occupancy, the Residence needed to have plywood available. (*Id.* ¶¶ 115–16.) O'Brien of Roboco testified that he told S. Gaetano that there was plywood cut-outs in the basement of the Residence for "some" of the windows and doors "[n]ot the whole house." (*Id.* ¶¶ 113–15, 117.) Later when the certificate of occupancy inspector visited the Residence, O'Brien testified that he saw approximately twenty sheets of plywood cut-outs in the garage of the Residence. (*Id.* ¶¶ 117, 118.) O'Brien also testified that plywood "might have" been moved "underneath the house" at a time when the garage was being cleaned out. (*Id.* ¶ 119.) "There

would have been no need for such plywood cutouts (to get a [certificate of occupancy] or for any other reason) if the windows and doors at the Residence were impact glass that met [applicable building code]." (*Id.* ¶ 120 (citing TT Report 21).) Therefore, the "plywood cut-outs should have remained at the Residence to protect the windows and doors in an event of a hurricane."[17] (*Id.* ¶ 121.) However, Plaintiff testified that no plywood cut-outs were found at the Residence and S. Gaetano testified that "he did not recall seeing any plywood cut-outs at the Residence." (*Id.* ¶¶ 122–124.)

Defendants retained Alexey Nefedov of Laufs Engineering Design ("LED") as their expert "to determine if the glass products used at 65 Dune can be considered sufficient under the previous test reports without conducting [ ] additional testing." (Pl.'s 56.1 Reply ¶ 125.) LED concluded that "the glass used [for the windows and doors at the Residence] will behave similarly of that of impact missile rated glass." (*Id.* ¶ 127.) Plaintiff's expert provides various reasons why LED's conclusion is either not applicable, supported, or scientifically reliable and ultimately contends that "LED provides a hypothetical statement without factual or numerical support." (*Id.* ¶¶ 126–46.)

**iii. Pool deck**

The rear deck at the Residence "was constructed atop bea[m]s set on a series of pilings and sits more than 20 feet above ground. (Defs.' 56.1 Reply ¶ 298.) "Deck hangers are installed below the deck boards, hold the boards in place and are intended to prevent uplift in wind events." (*Id.* ¶ 299.) "Moreover, because the deck is outside and the Residence was built on the ocean, there is a highly corrosive environment." (*Id.* ¶ 300.) Defendants' expert, Paul

---

[17] Defendants dispute this fact but cites O'Brien's testimony that the plywood was for "some" of the windows and doors but not the "whole house." (Defs.' 56.1 Resp. ¶ 121.) This does not contradict or even discuss whether the plywood cut-outs should have remained at the house in case of a hurricane, and therefore the Court deems this fact as admitted.

Angelides, and S. Gaetano concede that the incorrect joist hangers and nails (to secure the hangers) were used in construction with the pool deck. (*Id.* ¶¶ 301–02; *see also* ¶ 306.) The "hangers and nails used on the deck of the Residence were not [] hot-dipped galvanized" and therefore in violation of the Town for Southhampton Code § 167-17(f), which requires "all metal connectors and fasteners used in exposed locations [to] be steel, hot-dipped galvanized after fabrication," and did not meet the manufacturer's specifications. (*Id.* ¶ 303 (citing TT Report 17); *see also* TT Report 15, 18.) In addition, the wrong size nails were used, in contravention of both the manufacturer's requirements and the Town Code for Southhampton, which "result[ed] in insufficient capacity to prevent uplift in high wind events." (*Id.* ¶¶ 308–12.) In addition, the hangers and nails were rusty and degrading, damaging and compromising the integrity of the wood supports upon which the deck boards lay. (*Id.* ¶¶ 304, 313.) Defendants initially "claimed that the hangers and nails were fine, and refused to take action," and upon being sent notice of the issue, they "refused to address the issue or take any corrective action." (*Id.* ¶¶ 305, 315.) Defendants and Angelides later "acknowledged the issue" after being presented with evidence that the hangers and nails were not compliant with the Town Code for Southhampton. (*Id.* ¶ 307.)

After initially trying to replace the nails and hangers, Plaintiff replaced the pool deck. (*Id.* ¶¶ 316, 318.) "Defendants dispute that the deck needed to be replaced and claim that there was a less expensive solution that should have been undertaken, working underneath the deck and alternatively removing the nails or sawing off the nail heads and using proper nails and hangers." (*Id.* ¶ 317; *see also id.* ¶¶ 313, 319–37.)

**iv. Structural defects in the first-floor hallway**

After 65 Dune purchased the land on which the Residence was ultimately built, S. Gaetano, a licensed architect, prepared preliminary design drawings for the Residence. (Pl.'s

56.1 Reply ¶ 147.) 65 Dune hired McDonough of M&C to serve as architect of record for the Residence, given McDonough's experience in the Hamptons, and S. Gaetano relied upon M&C "to ensure that [any architectural] drawings were compliant with all local codes and ordinances and would be approved by the local building department." (*Id.* ¶¶ 149, 150.) M&C prepared architectural drawings for the Residence using the preliminary designs prepared by S. Gaetano. (*Id.* ¶¶ 152–54.) The Town of Southhampton Building Department issued a permit for the construction of the Residence based on the architectural drawings prepared by M&C. (*Id.* ¶ 155.) After preparing the architectural drawings, M&C "did not have further involvement in the design, re-design or construction of the Residence," aside from issuing minor revisions to the architectural drawings not relevant to this litigation. (*Id.* ¶ 157.)

On or about December 18, 2014, 65 Dune hired John Condon and Condon Engineering, P.C. ("Condon") to serve as the structural engineer for the Residence. (*Id.* ¶ 158.) Condon prepared structural drawings for the Residence using M&C's architectural drawings which complied with all local building codes. (*Id.* ¶ 159.) Using Condon's structural drawings, S. Gaetano prepared framing drawings for construction of the Residence. (*Id.* ¶ 160.) "McDonough testified that it was not typical to have his plans re-drawn, which S. Gaetano did, and he did not check or review [S.] Gaetano's subsequent drawings." (*Id.* ¶ 161.) Following the issuance of the construction permit by the Town of Southhampton Building Department, S. Gaetano and Condon "continued to modify" the framing drawings and structural drawings. (*Id.* ¶ 162.)

Roboco retained PDP Home Improvement Corporation ("PDP") as a subcontractor to frame the Residence. (*Id.* ¶ 163.) Peter Petracca, President of PDP, obtained and relied exclusively on S. Gaetano's framing drawings to frame the Residence; Petracca did not recall seeing or using M&C's architectural drawings or Condon's structural drawings. (*Id.* ¶¶ 164–66.)

M&C's architectural drawings, submitted to the Town of Southhampton Building Department, were never amended by any Defendant or their agents nor did anyone notify the Town of Southhampton that the Residence was not constructed in accordance with the approved architectural drawings. (*Id.* ¶ 167; *see also id.* ¶ 171.) "In addition, there are no as-built drawings for the Residence." (*Id.* ¶ 168.)

After purchasing the Residence, Plaintiff "noticed what appeared to be a hump that developed over time running the length of the middle of the first-floor hallway." (*Id.* ¶ 169.) The following is undisputed: (1) the hump's existence, which was observed and acknowledged by several parties; (2) the height of the hump exceeds the permitted deflection as allowed under the 2010 [NYSBC]); and (3) the defect was "structural in nature and caused by what has been described as [S.] Gaetano's 'design negligence.'" (*Id.* ¶ 170; TT Report 10–15.) The modified framing and structural drawings included various alterations to the first-floor framing plan as outlined in M&C's architectural drawings, such as, calling for different and lighter materials, reducing the sizes of the sections and framing, and eliminating certain framing materials, in an effort to save money. (Pl.'s 56.1 Reply ¶¶ 171–72, 175; *see also id.* ¶¶ 173–82.) These changes impacted: (1) the joists in the hallway by reducing the depth of the joist, changing the material from steel to wood, and changing the designation of the east wall from load bearing to non-load bearing; and (2) the girder running the length of the center of the hallway, built on top of the drilled pilings, by reducing the depth of the center girder and changing from using a steel center beam to a laminated veneer lumber ("LVL") center beam. (*Id.* ¶¶ 173–82, 194–200, 221.)

Regarding the changes to the center girder, the structural and framing drawings, namely, changed the material of the center girder from steel to LVL. (*Id.* ¶¶ 173–82.) Moreover, the Residence, was framed differently than what was called for in both Condon's structural drawings and S. Gaetano's framing drawings — for example, the Residence was constructed with only two

timber girders instead of four LVL girders. (*Id.* ¶¶ 182–85.) Thorton Tomasetti "conducted an independent analysis of the girders based on NYSBC" and concluded that the two timber girders installed "were structurally insufficient to support the loads at that location and does not meet the [2010 NYSBC requirements]." (*Id.* ¶ 186 (citing TT Report 18).)

Defendants' counsel retained Paul DiLandro of DiLandro Andrews Engineering PLLC, an engineering firm, to provide a rebuttal expert report on the first-floor hallway structural issues. (*Id.* ¶ 187.) DiLandro confirmed that the architectural drawings called for a steel girder, the structural and framing drawings called for four LVL girders, and that the Residence was actually framed using two wood girders. (*Id.* ¶ 188.) DiLandro's report "did not comment 'on the ability of the center girder to support the house'" nor did Dilandro make any "representations regarding meeting [2010 NYSBC requirements]." (*Id.* ¶ 189.) "DiLandro admitted at his deposition that he could not issue findings confirming whether the as-built conditions were sufficient because: (i) the sufficiency of the two 4 x 12 timber girders would depend on the type of wood actually used when the Residence was constructed; (ii) he informed Defendants' counsel that he required that information in order to issue an opinion; (iii) he was told by Defendants' counsel that the type of wood would be provided; (iv) he was never actually told what wood was used." (*Id.* ¶ 190.)

As to the changes to the floor joists supporting the east wall of the first-floor hallway, the structural and framing drawings: (1) reduced the depth of the floor joists, creating more shallow sections and resulting in greater deflection under the same load; (2) changed the east wall to be non-load bearing, meaning not intended to carry floor loads from above, and the structural and framing drawings neglected to include gap details to prevent unintentional load path; and (3) changed to use single joists, instead of double, which results in half of the strength and stiffness in the joists and ultimately, causes overload, deflection and bending in the direction the load is

being pushed. (*Id.* ¶¶ 194–207.) The TT Report concluded that these changes to the floor joists, in addition to those to the center girder, resulted in the appearance of a hump and were "insufficient to safely support the [2010 NYSBC] prescribed loads," and therefore "did not meet the 2010 NYSBC standards." (*Id.* ¶¶ 221, 224.) This conclusion is supported by testimony from Condon and McDonough. (*Id.* ¶¶ 222–23.) In rebuttal, Defendants' counsel retained Angelides "to serve as an expert witness in connection with the issue of the hump in the hallway." (*Id.* ¶ 225.) "Angelides testified that he could not form an opinion because to assess the issue he needed to know the 'size, configuration and arrangement of the structural members to include those of the beams, girders, joints, the wall on their side of the hallway . . . ,' [he] requested the information and as-built drawings from Defendants' counsel, and that this information was not provided to him." (*Id.* ¶ 225 (quoting Dep. Tr. of Paul Angelides ("Angelides Tr.") 54:8–68:24, annexed to Goldberg Decl. as Ex. 25, Docket Entry No. 160-68).) "Angelides testified that he had concerns regarding the structure, and that it was possible that he was not asked to render an opinion on the hump because his opinion would be unfavorable to Defendants." (*Id.* ¶ 226 (citing Angelides Tr. at 60, 68:25–69:10, 104:21–105).) "Defendants [also] consulted with Adam Cassel as an expert with regard to the hump," and he "testified [ ] he expressed concerns regarding the cause of the hump to [D]efendants and discussed potential causes including the change by Defendants from a load bearing wall to a non-load bearing wall." (*Id.* ¶ 227.) Lastly, "DiLandro was retained to provide an expert rebuttal report with respect to the sufficiency of the joists along the east wall of the first floor hallway, and was Defendants' only expert to submit an expert report on the subject." (*Id.* ¶ 228.) "DiLandro issued a report noting that he had conducted a structural analysis on the load being transferred from the second floor and the first floor joists, and was able to conclude that the joists along the east wall were adequate and met [2010 NYSBC] allowed stresses and deflections." (*Id.* ¶ 229.) However, DiLandro recognized

that further evaluation needed to be done because his calculations and analysis were based on "generic materials" and assumptions, and not the specific data of the Residence, which he acknowledged was different from the generic data he used. (*Id.* ¶¶ 230–36.) "DiLandro stated that if he had obtained the information on the actual joists, girders and hangers[,] it was possible the test results would have failed." (*Id.* ¶ 234.) When questioned whether the Residence's joists in the east wall were sufficient, DiLandro testified that he was "not able to answer [ ] without completing those calculations." (*Id.* ¶ 231.) TT prepared a rebuttal report "which incorporated all of DiLandro's numbers, methodologies and calculations, and corrected the errors and omissions by DiLandro."[18] (*Id.* ¶ 237 (citing TT Rebuttal Report, annexed to Decl. of Liling Cao ("Cao Decl.") as Ex. B and to Goldberg Reply Decl. as Ex. 73-2, Docket Entry No. 162-7).) When confronted with the TT Rebuttal Report, DiLandro acknowledged it revealed a failing test report and testified that "after reviewing TT's revisions[,] that the connectors of the joists to the girder possibly fail." (*Id.* ¶¶ 238–39.) "No additional or corrected calculations were ever provided by DiLandro." (*Id.* ¶ 241.)

**v. The Residence's lateral system**

"Lateral systems are components used in construction that provide resistance to lateral loads or forces like those that occur from wind." (Pl.'s 56.1 Reply ¶ 243 (citing TT Report 7).) "The systems include sheer walls (internal walls within the structure comprised of plywood panels) that provide rigidity, tie downs (which anchor various components together and to the ground, providing stability and structural integrity), hold downs (steel connectors that resist tension loads and prevent uplift forces from destabilizing structures), and strapping (connecting

[18] Defendants object to the use of the TT Rebuttal Report. (*See, e.g.*, Defs.' 56.1 Resp. ¶¶ 238–40.) The Court addresses the objection *infra* and finds the TT Rebuttal Report to be admissible. *See infra* footnote 28; *see also infra* Section II.b.

the foundation to the structure, each floor to the next, and the top floor to the roof to reinforce the structure, ensure stability and prevent uplift in wind events)." (*Id.*) Therefore, "[l]ateral systems serve the crucial purpose of securing structures and materials and preventing movement or displacement due to various forces like wind and seismic activity." (*Id.* ¶ 244.) "Residential Buildings in New York State are required to be designed with an adequate lateral-load capacity by [the NYSBC]" and "[t]he 2010 NYSBC, which governs wind design . . . , provides that, 'building, structures and parts thereof shall be designed to withstand the minimum wind loads prescribed[.]'" (*Id.* ¶ 245 (last alteration in original) (quoting 2010 NYSBC § 1609.1 (2010)).) As the Residence is located "directly on the ocean in Long Island, New York," which is "in a hurricane prone region with wind exposure category C," the NYSBC requires a minimum design wind speed of 120 miles per hour ("mph") be used for the lateral system design. (*Id.* ¶¶ 246–47 (citing 2010 NYSBC § 1609.2).)

65 Dune hired Condon as the structural engineer for the project. (*Id.* ¶ 248.) Condon's work included reviewing the architectural drawings prepared by M&C, the architect of record for the Residence, and the structural framing design prepared by S. Gaetano, and "make[ing] adjustments to the frame and add[ing] necessary structural elements and information to ensure sufficient lateral stability for the Residence in accordance with the applicable [laws]." (*Id.* ¶¶ 149, 249.) The framing drawings prepared by S. Gaetano "did not incorporate most of the structural details required to meet the governing design load in the [NYSBC] (including the 120 mph design wind speed), and specifically did not include tie downs, sufficient strapping and the other combination of components that need to be incorporated for lateral stability." (*Id.* ¶ 254.) Condon's contract required that the Residence "be designed for the resistance against shear and 120 mph wind loading, and additional connection details [ ] be provided as necessary, including moment frame details, structural steel design and specifications, addition strapping etc." and in

accordance, Condon's structural drawings were designed to meet 2010 NYSBC requirements. (*Id.* ¶¶ 250, 251.) Condon testified that his structural drawings "incorporated additional details . . . intended to address the deficiencies in [S.] Gaetano's drawings and address code requirements, including increased column sizes, moment frames, shear walls, and straps" and specifically "incorporated detail for shear walls, hold downs, tie downs, strapping etc., including specific call-outs for hardware (hold-downs at shear walls for example) to be used in construction." (*Id.* ¶¶ 252, 253.) S. Gaetano's framing drawings "intended to incorporate by reference the structural details set forth in Condon's [s]tructural [d]rawings, and contained a note which stated, '[s]tructural drawings prepared by Condon Engineering are to be used in conjunction with these framing drawings." (*Id.* ¶ 255.)

Petracca, President of subcontractor PDP, testified that "he framed the Residence using [S.] Gaetano's [f]raming [d]rawings" and "did not recall" seeing any structural drawings, such as those prepared by Condon. (*Id.* ¶¶ 163, 256 (citing Dep. Tr. of Peter Petracca ("Petracca Tr."), annexed to Goldberg Decl. as Ex. 17, Docket Entry No. 158-87).) Petracca testified that he did not recall receiving Condon's structural drawings from anyone, including neither from Roboco nor S. Gaetano, and that he "did not receive any instructions from Condon or anyone else regarding the framing of the Residence." (*Id.* ¶¶ 257, 259 (citing Petracca Tr. at 203:24–208:8).) S. Gaetano did not confirm whether PDP received Condon's structural drawings as he did not know what Roboco's relationship was with PDP. (*Id.* ¶ 258.) Petracca testified that "he did not have professional experience constructing shear walls or knowledge as to whether tie downs needed to be used," "had limited experience and knowledge regarding the use of strapping," could not "recall how he constructed many sections of the house in terms of any of the various components for lateral stability," and could not "recall if he had used hold-downs at all during construction, let alone the specific hold-downs called out by Condon to be placed in the specific

locations set forth on the [s]tructural [d]rawings." (*Id.* ¶¶ 260–63.) However, Petracca testified that he did recall how certain portions of the Residence were framed and testified that some of those portions did not comply with the requirements laid out by Condon's structural drawings and NYSBC, including required straps, plywood in shear walls, and fasteners. (*Id.* ¶¶ 264–65.)

Plaintiff retained Patrick Moore to "suggest test holes locations throughout the [R]esidence in specific locations where parts of the lateral structure would need to have been located (and particularly where specified by Condon's drawings), and to make site visits to review structural framing exposed at the test holes."[19] (*Id.* ¶ 266.) Moore took "most of the" photographs of the test holes and found that "multiple elements of the lateral system included in the [s]tructural [d]rawings [were] not included in the Residence," such as the tie downs for shear walls and the strapping in "critical areas." (*Id.* ¶¶ 267–69.) The TT Report analyzed the lateral stability systems and "concluded that the Residence lacked requisite lateral stability systems

---

[19] Plaintiff relies on the observations and opinions of Patrick Moore. (Pl.'s 56.1 ¶¶ 266–69.) Defendants object to Plaintiff's reliance on Moore's conclusions for various reasons, but mainly whether he is qualified to be an expert witness and can opine on these issues. (*Id.*) Plaintiff explains that Moore is not a "consulting expert," as Defendants claim, but instead is a fact witness. (Pl.'s Reply 5.) Plaintiff is entitled to rely on the observations of Moore as stated in his deposition, and his conclusions based on his perception and experience, being careful that Moore's conclusions do not stray into the province of an expert. *See United States v. Stanley*, No. 23-CR-27-02, 2025 WL 2165001, at *8 (D. Conn. July 30, 2025) ("Observations rationally based on a [lay] witness's perception and bolstered by a witness's professional experience are admissible under Rule 701 [of the Federal Rules of Evidence]."); *Diaz v. Calabrese*, No. 13-CV-1531, 2014 WL 6883517, at *5 n.5 (E.D.N.Y. Dec. 4, 2014) (finding that a witness was "a competent fact witness who may testify about his observations, measurements, and other first-hand factual knowledge," which would be "considered as fact evidence presented by a lay witness competent to report on such observations," for which the "measurements and photographs of the deck" did "not include any 'expert' opinions or conclusions"). Defendants' objections to the reliability of Moore's testimony, for example, that "Moore did not even take notes as to any of his purported findings, or what was shown by each of the 'field probes' or test pit photos," (Pl.'s 56.1 ¶ 268), is an issue for impeachment at trial to be decided by the fact-finder. *See* discussion and case law *infra* footnote 30. Defendant further objects to Plaintiff's expert Cao's reliance on Moore's observations, but, as discussed *infra*, the Court rejects this objection. *See infra* Section II.b.

required for life, health and safety, was not constructed in accordance with the 2010 NYSBC, and must be remedied." (*Id.* ¶ 271 (citing TT Report 9–10 ("The lateral system of the Subject Property does not confirm to 2010 NYSBC and fails to resist the code-prescribed wind loads . . .. The non-conformance of the lateral system would result in a lateral instability of the building which must be thoroughly inspected and remediated.")).)

Defendants initially "hired four different experts to submit reports in this case" and, as conceded by Defendants, none "opined on the issue of lateral stability, and none of the four testified on the subject at their depositions." (*Id.* ¶ 273.) In response, Defendants' counsel retained DiLandro "to provide expert testimony as it relates [to] the existing conditions at [the Residence]." (*Id.* ¶ 274 (first alteration in original).) DiLandro's rebuttal report included a single paragraph on lateral stability, which only relates to the strapping of the roof rafters and did "not address any other elements relating to lateral stability." (*Id.* ¶¶ 275, 277 (citing DiLandro Report 1–3, annexed to DiLandro Tr. as Ex. 1 and to Goldberg Decl. as Ex. 31-1, Docket Entry Nos. 160-100, 160-101, 160-102, 160-103, 160-104); *see also* Dep. Tr. of Paul DiLandro ("DiLandro Tr.") 99:23–100:21, annexed to Goldberg Decl. as Ex. 31, Docket Entry No. 160-99 (DiLandro confirmed at his deposition that his rebuttal report did not address lateral stability).) With regard to the roof strapping, DiLandro's expert report "attaches a calculation of roof strapping details and indicates that "if the roof strapping installed at the [R]esidence conformed with the plans, it would meet building code requirements." (Pl.'s 56.1 Reply ¶ 279 (emphasis omitted) (quoting DiLandro Report 1).) "DiLandro later stated that the plans used by Petracca did not call for the model product DiLandro relied upon in his calculations, and that he was aware that [ ] Petracca could not recall what product was used." (*Id.* ¶ 280 (citing DiLandro Tr. 107:8–109:20).) At his deposition, "DiLandro was shown documents produced in discovery, including a photograph of the actual roof strapping installed at the Residence," and he "stated

that the strapping depicted in the photograph did not follow what was required in his [r]ebuttal [r]eport" and therefore, his conclusions were not applicable.[20] (*Id.* ¶¶ 281–82 (citing DiLandro Tr. 112:3–117:15).) Moreover, DiLandro testified that "he was not aware of . . . how the roof was actually strapped" nor did he personally verify that the strapping actually installed was the same as what was provided and what he used to generate his rebuttal report. (*Id.* ¶ 283 (citing DiLandro Tr. 1225–123:16, 124:5–12:5).) At his deposition, DiLandro stated that he was not "able to answer" whether the lateral stability of the Residence provided a safe structure for Plaintiff and his family to occupy in a hurricane "with the information [he had] available" and that he did "not have enough information to say that [the Residence] would be safe in a hurricane." (*Id.* ¶ 284 (citing DiLandro Tr. 192:3–11).)

On January 12, 2016, Condon, as engineer, issued a conformance letter to the Town of Southhampton Building Department, affirming that the Residence complied with 2010 NYSBC § 705.4, which laid out specifications for the lateral system. (*Id.* ¶¶ 285, 286, 287, 289.) The letter stated "[b]ased on our observations and to the best of my knowledge the building structure, hurricane strapping, and framing appears to be constructed in conformance with our structural

[20] Defendants "dispute the stated facts to the extent they mischaracterize DiLandro's testimony." (Defs.' 56.1 Rep. ¶¶ 281–282.) However, Defendants' fail to explain why. Not only does this violate Local Rule 56.1(d), but the Court reviewed the deposition transcript and disagrees. To the extent Defendants make this same objection to subsequent statements in Plaintiff's 56.1 without explanation or supporting evidence and the Court includes the "disputed" facts in this section, the Court applies this same analysis and reaches the same conclusion. Therefore, these facts are deemed admitted. *See Weber v. City of New York*, 973 F. Supp. 2d 227, 234 n.1, 236 n. 3 (E.D.N.Y. 2013) (deeming admitted facts that the opponent objected to, not disputing the existence of the document cited but disagreeing with the characterizations of the document or content within, without citing to other evidence after reviewing the evidence in the record and Local Rule 56.1); *see also Johnson v. Conn. Dep't of Admin. Servs.*, 972 F. Supp. 2d 223, 229 (D. Conn. 2013) ("Where the [p]laintiff has objected to [the] [d]efendant's facts but has failed to support her objection with any admissible evidence in the record, where the record itself does not support [the p]laintiff's denials, or where the [p]laintiff has neither admitted nor denied a fact and where the record supports such fact, those facts are deemed to be admitted."), *aff'd*, 588 F. App'x 71 (2d Cir. 2015).

plans and in accordance with the Building Code of New York State." (*Id.* ¶ 290.) However, only the architectural plans were filed with the Town of Southhampton and not Condon's structural drawings which included the specifications of 2010 NYSBC. (*Id.* ¶ 291.) During his deposition, after discussing the current structure of the house compared to the plans from which he based his letter, Condon stated that given the new information, his affirmation in his letter that the Residence's structure was in accordance with the NYSBC was not accurate. (Dep. Tr. of John Condon ("Condon Tr.") 180:4–182:9, annexed to Goldberg Decl. as Ex. 20, Docket Entry No. 159-16; *see also* Pl.'s 56.1 Reply ¶¶ 292–97.)

**vi. The pool structure**

Pristine Pool Construction Corp. ("Pristine") constructed the pool at the Residence. (Pl.'s 56.1 Reply ¶ 351.) As explained by Greg Darvin, the principal of Pristine, pools, such as the one at the Residence, "that are in close proximity to a corrosive environment, such as the ocean, must be designed in compliance with certain code requirements." (*Id.* ¶¶ 353–34.) The American Concrete Institute ("ACI") 318-05 "requires that, in high corrosive environments (*e.g.*, oceanfront environments), there must be a specific amount of concrete protection around the pools' interior and exterior shells." (*Id.* ¶ 355.) Specifically, ACI 318-05 § 7.7.5 requires a minimum concrete cover, which is "the distance between the rebar (steel reinforcement bars that are embedded within the concrete structure of a swimming pool, and which provide necessary support for the pool structure) and the outer surface of the concrete," for reinforcement of 2 inches for walls and slabs (such as the interior shell) and 2.5 inches for all other parts (such as the exterior shell). (*Id.* ¶ 356.)

At his deposition, Darvin testified that the "pool drawings appear to have been prepared by an engineer named Drew Bennett." (*Id.* ¶ 358.) Pristine constructed the pool "in accordance with Bennett's drawings," "which called for 1-inch concrete cover of the reinforcement on the

inside of the wall and slab, and a 3/4 inch cover on the outside of the wall and slab" in violation of ACI requirements. (*Id.* ¶¶ 359–60.) Darvin testified that he was unaware of any ACI requirements or what is recommended in a corrosive environment. (Dep. Tr. of Greg Darvin ("Darvin Tr.") 206:16–207:18, annexed to Goldberg Decl. as Ex. 16, Docket Entry No. 158-60; Pl.'s 56.1 Reply ¶ 362.)

"After obtaining possession of the Residence, [Plaintiff] observed signs of water leaks and corrosion at the pool" such as "rust stains appearing on the outer wall of the pool structure, from rusting rebar inside the concrete." (Pl.'s 56.1 Reply ¶ 352.) Moreover, the pool has subsequently "experienced several visible issues/problems, including active leaks below the pool, organic growth, signs of corrosion and rust bleeding through the exterior finish, cracked stucco finishes, efflorescence and staining on exterior of the infinity pool drain trough, adjacent exterior walls and underside of pool." (*Id.* ¶ 364.) These issues were observed and testified to by several witnesses, including Plaintiff's expert, Cao, and Defendants' expert, Angelides. (*Id.* ¶¶ 366–67.) Overall, Cao concluded that the "moisture infiltration [ ] caused damage to the exterior finishes and structure," which was "likely caused by a combination of insufficient thickness of the pool shell and inadequate installation of the waterproofing" of the pool's interior, and the "pool was constructed in contravention of ACI requirements and thus violated the [b]uilding [c]ode." (*Id.* ¶¶ 367–68.)

Defendants' counsel retained Angelides as an expert in connection with the pool. (*Id.* ¶ 369.) Angelides testified that the pool's drawings did not comply with ACI requirements. (Angelides Tr. 213:2–14.) Angelides' report explained that the "sufficiency of the concrete cover should be verified using non-destructive methods," (Pl.'s 56.1 Reply ¶ 370), "to determine the extent of [the concrete cover] that meets or does not meet the ACI requirements and scope of

needed corrective work."[21] (Angelides Report 3, annexed to Angelides Opp'n Decl. as Ex. C, appended to Defs.' Opp'n, Docket Entry No. 167-4.) However, Angelides testified that he did not perform the suggested tests and therefore could not confirm the thickness of the cover and whether it was in compliance with ACI requirements. (Pl.'s 56.1 Reply ¶ 371; Angelides Tr. 213:20–214:5.) In addition, Angelides testified that he had no reason to believe that the pool was not built in conformity with Pristine's documents, which called for 1 inch inside and 3/4 of an inch outside, and he had not spoken to anyone at Pristine. (Pl.'s 56.1 Reply ¶ 372; Angelides Tr. 214:13–23.) Further, Angelides confirmed that the remedy called for in the TT Report would be appropriate if it were found that the pool did not have sufficient cover. (Pl.'s 56.1 Reply ¶ 373; Angelides Tr. 214:24–215:7.)

Angelides' report also concluded that "[c]onsidering the age of the pool, insufficient cover should have manifested in widespread rust staining" but, during his inspections, he "observed efflorescence and rust staining on the exterior side of the drainage trough only" and "calcium deposits [ ] on the walls and underside of the pool." (Angelides Report 3.) In addition, he "did not observe any cracked stucco finishes or rust stains on the interior of the pool" or any "[a]ctive leaks, rust stains [or] organic growth." (*Id.*; *see* Angelides Tr. 216:18–217:24 (confirming his observations).) However, Angelides confirmed that his first visit to the pool was after the pool had already been repaired, he did not ask for pictures from before the pool was repaired, and he did not know whether the "widespread rust staining" was present before the pool was repaired." (Pl.'s 56.1 Reply ¶ 374; Angelides Tr. 215:24–216:24.) When Angelides was

---

[21] Similar to footnote 20, Defendants' object to the stated facts to the extent they mischaracterize Angelides' testimony or his report. (Defs.' 56.1 Resp. ¶ 370.) However, Defendants' fail to explain why. Not only does this violate Local Rule 56.1(d), but the Court reviewed the deposition transcript and disagrees. Therefore, the facts are deemed admitted. *See supra* footnote 20 for supportive case law.

shown the photographs taken prior to repair, which he had not seen, Angelides testified to observing "a lot of calcification" and efflorescence caused by leaks and which would be considered a defective building condition needing repair. (Pl.'s 56.1 Reply ¶¶ 377–78; Angelides Tr. 218:5–222:16.) In addition, in viewing photographs he had not seen before, Anglides testified to observing rust stains and cracked stucco which would require investigation, need to be repaired, and could constitute a defective condition in a pool constructed less than eight years prior. (Pl.'s 56.1 Reply ¶¶ 375–77; Angelides Tr. 221:7–229:22.)

**vii. Radiant heating system**

A hydronic radiant floor hearing system, which "circulates water through embedded tubes to provide heating" as "an alternative to electric radiant floor hea[t]ing," was installed by Arenz Heating & Cooling at the Residence. (Pl.'s 56.1 Reply ¶¶ 338–40.) Arenz Heating & Cooling typically installed radiant floor heating systems according to what was "recommended or decided by the architect or the engineer."[22] (Dep. Tr. of Charles Beck ("Beck Tr.") 41:20–42:11, annexed to Goldberg Decl. as Ex. 11, Docket Entry No. 157-57; *see also* Pl.'s 56.1 Reply ¶ 341.) The heating system was "designed and installed using 1/2 inch Uponer hePEX (the piping that runs the water)" and these "pipes were stapled to the subfloor, and spaced nine to twelve inches apart with one-inch by six-inch wood sleepers in between." (Pl.'s 56.1 Reply ¶ 342.) "No underlayment was installed between the sleepers, such as poured concrete or Warmboard (a subfloor used for radiant hea[t])." (*Id.* ¶ 343.) "The finished wood flooring was then installed directly above the [h]eating [s]ystem and fastened to the wood sleepers." (*Id.*)

[22] Plaintiff's statement of disputed fact is "[i]n accordance with its standard practice, Arenz [Heating & Cooling] followed Steven Gaetano's direction, as architect, in designing and installing the [h]eating [s]ystem," which Defendants object to as a mischaracterization. (Pl.'s 56.1 ¶ 341; Defs.' 56.1 Resp. ¶ 341.) While Defendants do not explain further, upon its review, the Court includes Charles Beck's actual testimony which does not reference S. Gaetano.

Plaintiff "experienced issues with the performance and efficiency of the [h]eating [s]ystem during the first winter at the Residence." (*Id.* ¶ 344.) "Upon investigation (namely, when the defective wood flooring was being removed and replaced), it was discovered that the [h]eating [s]ystem was not designed or installed in accordance with the manufacturer's specifications," and "[t]his failure resulted in inefficiencies and suboptimal performance." (*Id.* ¶ 345 (citing TT Report 31–32).) Specifically, the Uponor Complete Design Assistance Manual "recommends pouring a concrete underlayment over the top of the piping" because "[w]ithout the underlayment, it is difficult for the [h]eating [s]ystem to transfer heat to the floor above" as "the heat dissipates in the large cavity between the piping and sleepers." (*Id.* ¶ 346.) Uponor, in an email, "emphasized the necessity of the underlayment installation surrounding the tubing to ensure efficiency of the [h]eating [s]ystem" as "failure to do so could result in a reduction of the [h]eating [s]ystem's efficiency and performance." (*Id.* ¶ 347.) Plaintiff's expert, Michael Minkoff, "a general contractor who regularly constructs high-end luxury residences," testified that "Defendants' design and installation of the [h]eating [s]ystem expressly violated [ ] the manufacturer's specifications." (Pl.'s 56.1 Reply ¶ 348; Pl.'s Mem. 31 n. 27.) Angelides, Defendants' expert, agreed that the heating system was not installed per manufacturer specifications and also testified "[t]hat the as-installed radiant floor heating system was not installed for the optimal amount of heat transfer that it could be," calling it "inefficient" if it was being used as the "primary means of heat in the building." (*Id.* ¶ 350; Angelides Tr. 123:14–125:13.)

**viii. Wood siding panels and weather resistant barrier ("WRB")**

"A WRB is a critical component of a building's exterior, as it acts as a shield against water, air and moisture intrusion," and "it prevents bulk air from entering the exterior walls, while also allowing water vapor to pass through for drying." (Pl.'s 56.1 Reply ¶ 380 (citing TT

Report 35).) The WRB is also described as "a membrane, often a synthetic material, that is installed behind the siding to protect the building's structure from the elements." (*Id.* ¶ 381 (citing TT Report 35).) "If a WRB is not installed, or installed incorrectly, water can penetrate the exterior sheathing of a building, trapping water within a wall system and leak into the interior of the structure." (*Id.* ¶ 382 (citing TT Report 35).)

The Residence's architectural drawings call for "a BlueskinVP 160 vapor permeable barrier membrane (which is a type of WRB) at the exterior walls." (*Id.* ¶ 383.) The TT Report observed that "[u]pon removing the siding, . . . a ZIP system was installed instead." (*Id.* ¶ 384.) "A ZIP system is comprised of wood structural panels with a protective overlay that functions as an integrated WRB." (*Id.*) "The effectiveness of the ZIP System depends on careful application of tape to seal the areas which are typically susceptible to water intrusion, such as corners, joists, penetrations and window openings." (*Id.* ¶ 386 (citing TT Report 35).) "In addition, per the manufacturer's installation requirements, the ZIP System sheathing is not designed for exposure to UV light for more than 180 days, as the assembly deteriorates upon extended UV exposure." (*Id.* ¶ 387.) Cao only observed "black [z]ip [f]lashing tape around the window opening and at the joist between the exterior sheathing panels, and a yellow fabric drainage mat covering the sheathing." (*Id.* ¶ 385.)

"Section R702.2.2 of the [RCNYS] requires the horizontal wood siding panels to be lapped over each other with a minimum of 1/2 inch to prevent penetration of air, water and moisture." (*Id.* ¶ 388.) Plaintiff contends that the evidence, both testimonial and photographic,

shows that the installation of the wood siding panels did not meet RCNYS § R702.2.2 requirements because there were "open gaps in the siding."[23] (*Id.* ¶ 389.)

Overall, the TT Report concludes that water infiltrated the Residence because of: (1) improper installation of the WRB which violated the manufacturer's recommendation as sill flashing was missing at the window openings; and (2) failure to install the wood siding in accordance with applicable code as the wood siding was not installed with 1/2 inch overlap required by RCNYS § R702.2.2. (*Id.* ¶¶ 390–92.) Moreover, the TT Report explains that as a result of the wood siding gaps, the "WRB was visible through the siding assembly, leading to excessive UV exposure . . . [which] cause the WRB to deteriorate and lose its efficacy, permitting water infiltration into the Residence." (*Id.* ¶ 392.) These conclusions are supported by documentary evidence and a visual inspection conducted by Thorton Thomasetti. (*Id.* ¶ 393.)

Defendants' counsel retained Angelides to submit a rebuttal expert opinion on the WRB and wood siding panel issues. (*Id.* ¶ 394.) In response to the TT Report's conclusion that the WRB was "not installed per the manufacturer's recommendations and sill flashing was missing at the window openings," Angelides commented "[c]ondition not observed" and "[d]etailed evidence not provided in the TT [R]eport." (*Id.* ¶ 396; Angelides Report 3.) In response to the TT Report's statement that "[i]f the [WRB] was visible through the siding assembly, the installed lap joint would be larger than the acceptable minimum overlap stipulated in [RCNYS] . . . [l]eading to UV exposure of the WRB," Angelides commented "[d]uring my May 4, 2023 and

[23] Defendants object to this conclusion, and many others in this section, disputing "the conclusions contained in the TT Report on the ground that it is unsworn and therefore impermissible in support of Plaintiff's instant motion." (Defs.' 56.1 Resp. ¶ 389; *see also id.* ¶¶ 379–93.) As explained *infra* Section II.b, the Court concludes that Plaintiff may rely on the TT Report. However, Defendants dispute this conclusion, and many others in this section, by offering a rebuttal report and expert testimony from Angelides which they allege contradicts the TT Report. Therefore, the Court considers these conclusions and stated facts as disputed.

March 30, 2024 inspections, I did not observe the condition whereby the [WRB] was visible through the lap joints" and attached a photo "which shows a typical area of the wooden siding along the east side of the building." (Pl.'s 56.1 Reply ¶ 395; Angelides Report 3–4.) In addition, Angelides commented that the "TT Report provided no photographs showing the [WRB] to be visible through the lap joints" and that photographs included in the TT Report showed "a witness mark . . . indicating that an overlap existed that would conceal the [WRB] at the lap joints" and that "the WRB had been covered by a yellow drainage mat . . . [which] would otherwise obscure the WRB from UV exposure." (Angelides Report 4.) At his deposition, Angelides confirmed his conclusions and affirmed that they were limited to the portion of the WRB and wood siding he reviewed. (Angelides Tr. 230:23–238:5; *see also* Pl.'s 56.1 Reply ¶ 404.) Specifically, Angelides looked at wood lap siding on only two of four sides of the Residence, only at eye level despite the wood lap siding starting at ground level and continuing to the roof, and only externally as he did not remove any boards (which he conceded would have been helpful) or check underneath the boards to observe whether the waterproof membrane was intact (which he conceded he did not know if the waterproof membrane was intact). (Angelides Tr. 231:19–232:23; *see also* Pl.'s 56.1 Reply ¶¶ 397–402.) In addition, Angelides confirmed that he did not do any further investigation to determine whether the membrane was intact or the flashing was installed properly in the windows such as speaking to the Gaetanos, Roboco (the general contractor), or the installing company. (Angelides Tr. 236:18–237:10; *see also* Pl.'s 56.1 Reply ¶ 403.)

**ix. Generator**

The generator at the Residence is a "Kohler 48RLC residential system" and "sits on a mechanical platform on the first floor." (Pl.'s 56.1 Reply ¶ 406.) "The platform and generator are fully enclosed by the second floor living space, the first-floor mechanical room and perimeter

breakaway walls." (*Id.* ¶ 407.) The 2010 Fuel Gas Code ("FGCNYS") § 616.1 requires that "permanently installed equipment powered by internal combustion engines and turbines shall be installed in accordance with the manufacturer's installation instructions and [National Fire Protection Association's ('NFPA')] 37," the standard for the installation and use of stationary combustion engines and gas turbines. (*Id.* ¶ 408.) The Residence's generator is "powered by an internal combustion generator." (*Id.* ¶ 409.) "The subject generator [ ] can only be installed outside because it was not designed with a ventilation system for indoor installation." (*Id.* ¶ 410.) "Kohler's installation manual explicitly and repeatedly states that the subject generator should be installed outdoors only and provides no alternate solution of using vent pipes for indoor installation." (*Id.*) Kohler's "manual does not provide an alternate solution of using vent pipes for indoor installation, as was done by Defendants." (*Id.* ¶ 411.) "Proper ventilation for the generator is critical, not only to dissipate heat, but also to remove toxic gases like carbon dioxide that are deadly and can infiltrate living spaces" and "[w]ithout ventilation, the generator creates a life safety issue and violates applicable [ ] 2010 FGCNYS code and the manufacturer's specifications." (*Id.* ¶ 412.) In addition, "Kohler['s] installation manual specifies. . . that the generator must be set over a noncombustible surface and a minimum distance of 5 feet from combustible material for any generators per NFPA 37." (*Id.* ¶ 416 (internal quotation marks omitted).)

Plaintiff "learned of the generator's illegal placement when trying to get it serviced" because "Kohler would not service the generator due to its interior location and the installation of an illegal exhaust pipe." (*Id.* ¶ 413 (internal quotation marks omitted).) "Defendants were aware prior to sale of the Residence that the generator could not be vented" because "Arenz Heating & Cooling notified [S.] Gaetano and [M.] Gaetano in or around July [of] 2016 that the subject generator could not be vented and was not 'meant to have a ducted flue system.'" (*Id.* ¶

414.) Petracca testified that when "Roboco tried to improperly vent the generator, it caused a fire on the back utility deck" which subsequently had to be rebuilt as a result of the fire. (*Id.* ¶ 415 (internal quotation marks omitted).) Moreover, "[t]he generator sits on non-fireproof material (i.e., Trex decking), which according to the manufacturer literature, would not provide the required fire resistance." (*Id.* ¶ 417.)

S. Gaetano testified that he spoke with Generac "which claimed the installed generator could be vented." (*Id.* ¶ 418.) However, Kohler, not Generac, manufactured the generator. (*Id.* ¶ 419.) Plaintiff argues that "Defendants' position that the generator can be vented and installed on the interior of the Residence" is based on evidence of S. Gaetano's conversation with Generac and therefore is irrelevant to Defendants' conclusion. (*Id.* ¶¶ 418–19.)

**c. Procedural background**

Plaintiff commenced this action by filing the Complaint on July 18, 2019. (Compl.) On November 8, 2019, Plaintiff filed an Amended Complaint. (Am. Compl.)

On December 6, 2019, Defendants moved to dismiss the Amended Complaint for failure to state a claim. (Defs.' Mot. to Dismiss, Docket Entry No. 20.) By Memorandum and Order filed on November 16, 2020, the Court dismissed Plaintiff's (1) breach of contract claim against 65 Dune, (2) breach of warranty claim as it concerned the deck refrigerator and ice machine, and (3) breach of fiduciary duty claims, and denied Defendants' motion as to the remaining aspects of Plaintiff's breach of warranty claim against both 65 Dune and Gaetano Development and to Plaintiff's fraud claims. (Nov. 2020 Decision.) On November 30, 2020, Defendants filed their Answer to the Amended Complaint. (Answer, Docket Entry No. 26.) On October 28, 2022, Plaintiff moved to file a Second Amended Complaint, (Pl.'s First Mot. to Amend, Docket Entry No. 59), which Magistrate Judge Peggy Kuo granted, (Order dated Nov. 3, 2022), and on November 7, 2022, Plaintiff filed the Second Amended Complaint, (SAC).

On June 17, 2024, the parties each requested a pre-motion conference on their anticipated motions for summary judgment. (Pl.'s Letter Mot. for Summ. J. and Proposed Complaint, Docket Entry No. 115; Defs.' Letter Mot. for Summ. J., Docket Entry No. 116.) Plaintiff also requested a pre-motion conference on his anticipated "motion[] . . . to file a Third Amended Complaint." (Pl.'s Letter Mot. for Summ. J. and Proposed Complaint.) On August 26, 2024, the Court denied the parties' requests for pre-motion conferences and directed the parties to confer and file a proposed briefing schedule for their respective motions for summary judgment. (Order dated Aug. 26, 2024.) The parties sought clarification as to Plaintiff's request regarding his anticipated motion to amend the SAC. (Joint Letter Request for Clarification, Docket Entry No. 122.) On October 24, 2024, after a pre-motion conference on Plaintiff's request to amend the SAC, the Court granted Plaintiff leave to file a motion to amend the SAC. (Minute Entry dated Oct. 8, 2024; Order dated Oct. 24, 2024.) By Memorandum and Order filed on April 22, 2025, the Court denied Plaintiff's motion to amend the SAC. (Mem. & Order dated Apr. 22, 2025, Docket Entry No. 139.)

On October 30, 2025, Plaintiff moved for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and Defendants opposed the motion. (*See* Pl.'s Mot.; Pl.'s Mem.; Defs.' Opp'n; Pl.'s Reply.) Plaintiff argues he is entitled to partial summary judgment on his claims for: (1) fraudulent inducement and fraudulent concealment related to the flooring and glass windows and doors at the Residence, (Pl.'s Mem. 5–14); and (2) GBL § 777-a breach of implied warranty claims related to the pool deck, structural defects in the first-floor hallway, lateral system, pool, radiant heat system, wood siding panels and WRB, and the generator, (*id.* at 15–35). Plaintiff does not move for summary judgment on several issues

underlying Plaintiff's breach of warranty claim,[24] the issue of the amount of damages[25] or on his "cause of action" for recission and disgorgement against 65 Dune.[26] (Pl.'s Mem. 3; Pl.'s Opp'n 14; *see also* SAC ¶¶ 85–91.)

On October 31, 2025, Defendants cross-moved for summary judgment pursuant to Rule 56, and Plaintiff opposed the motion. (Defs.' Mot.; Defs.' Mem.; Pl.'s Opp'n; Defs.' Reply.) Defendants argue they are entitled to summary judgment on all causes of action, including Plaintiff's claims for: (1) fraudulent concealment and inducement, (Defs.' Mem. 10–17); (2) punitive damages for both fraud claims, (*id.* at 17–20); (3) breach of warranty claims because Plaintiff failed to provide evidence of damages and Plaintiff relies on inadmissible expert analysis, (*id.* at 21–24, 24–27); and (4) recission of the Contract, (*id.* at 27–29).[27]

[24] The SAC's allegations underlying Plaintiff's breach of warranty claim include issues involving the: (1) stove and outdoor grills; (2) pool system; (3) pool structure; (4) window installation; (5) window glass; (6) WRB and wood siding panels; (7) firebox and fireplace; (8) stone floors; (9) delaminating floors; (10) structural issues of the first-floor hallway; (11) radiant heating system; (12) pool deck; (13) technology system; and (14) generator. (SAC ¶¶ 21, 34–48.) Plaintiff moves for summary judgment on eight of these issues. (*See* Pl.'s Mem.) The outstanding issues not addressed in Plaintiff's motion for partial summary judgment, which include the stove and outdoor grills, pool system, window installation, firebox and fireplace, stone floors, and technology system, remain pending because, as Plaintiff acknowledges, "factual issues exist that will require a trial." (Pl.'s Mem. 3.)

[25] *See infra* footnote 32.

[26] *See infra* footnote 27.

[27] Plaintiff "elected not to oppose Defendants' motion for summary judgment with respect to his cause of action for recission." (Pl.'s Opp'n 25 n. 22.) Therefore, the Court dismisses Plaintiff's "fourth cause of action" for recission of the Contract and disgorgement of the proceeds of the Residence's sale upon recission as it is unopposed. (*See* SAC ¶¶ 85–91.)

## II. Discussion

### a. Standard of review

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Colwell v. Sig Sauer, Inc.*, 177 F.4th 382, 390 (2d Cir. 2026) (quoting *id.*); *Bellin v. McDonald*, 177 F.4th 167, 181 (2d Cir. 2026) (quoting same); *Delshah 60 Ninth, LLC v. Free People of PA LLC*, 175 F.4th 192, 197 (2d Cir. 2026) (quoting *Galloway v. Cnty. of Nassau*, 141 F.4th 417, 422–23 (2d Cir. 2025)). The court must "constru[e] the evidence in the light most favorable to the nonmoving party," *Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022) (alteration in original) (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir. 2011)), and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Koral v. Saunders*, 36 F.4th 400, 408 (2d Cir. 2022) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). *See Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 122 (2d Cir. 2024) ("In determining whether there is a genuine dispute as to a material fact, we must resolve all ambiguities and draw all inferences against the moving party." (quoting *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127 (2d Cir. 2013))); *see also Eckhart v. Fox News Network, LLC*, No. 25-1538, 2026 WL 1113472, at *1 (2d Cir. Apr. 24, 2026) (summary order) (quoting same).

The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Suarez v. Morton*, 170 F.4th 33, 58 (2d Cir. 2026) (quoting *Lara-Grimaldi v. Cnty. of Putnam*, 132 F.4th 614, 633 (2d Cir. 2025)); *Vista Food Exch., Inc. v. Comercial De Alimentos Sanchez S De R L De C.V.*, 147 F.4th 73, 88 (2d Cir. 2025) (quoting *Rupp v. City of Buffalo*, 91 F.4th 623, 634 (2d Cir. 2024)); *Kee v. City of New York*, 12 F.4th 150, 166–67 (2d Cir. 2021) (quoting *Kaytor v. Elec. Boat Corp.*, 609

F.3d 537, 545 (2d Cir. 2010)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see Chislett v. N.Y.C. Dep't of Educ.*, 157 F.4th 172, 183 (2d Cir. 2025) ("A dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" (quoting *id.*)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Chislett*, 157 F.4th at 183 (quoting *Anderson*, 477 U.S. at 248). The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Anderson*, 477 U.S. at 252; *see Solid 21, Inc. v. Breitling U.S.A., Inc.*, 96 F.4th 265, 276 (2d Cir. 2024) ("The mere existence of a scintilla of evidence in support of the non-movant's position will be insufficient; there must be evidence on which the trier of fact could reasonably find for the non-movant." (quoting *Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 960 (2d Cir. 1996))). "The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000); *see Miller v. N.Y. State Police*, No. 20-3976, 2022 WL 1133010, at *1 (2d Cir. Apr. 18, 2022) (summary order) (The court's function is to decide whether, "after resolving all ambiguities and drawing all inferences in favor of the nonmovant, a reasonable jury could return a verdict for the nonmovant." (first citing *Anderson*, 477 U.S. at 248; and then citing *Garcia*, 706 F.3d at 127, 129)). "Summary judgment should be granted only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Chislett*, 157 F.4th at 183 (quoting Fed. R. Civ. P. 56(a)); *see Capitol Recs., LLC v. Vimeo, Inc.*, 125 F.4th 409, 418 (2d Cir. 2025) ("[A] genuine dispute as to a material fact precludes summary judgment 'where the evidence is such that a reasonable jury could decide in the non-movant's favor.'" (quoting *Lucente v. Cnty. of*

*Suffolk*, 980 F.3d 284, 296 (2d Cir. 2020))), *amended on reh'g in part*, 151 F.4th 13 (2d Cir. 2025).

When there are cross-motions for summary judgment, the court is "not required to grant judgment as a matter of law for one side or the other." *Ricci v. DeStefano*, 530 F.3d 88, 109–10 (2d Cir. 2008) (quoting *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)); *accord Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *DeStefano*, 530 F.3d at 110 (quoting *Schwabenbauer v. Bd. of Educ. of the City Sch. Dist. of the City of Olean*, 667 F.2d 305, 314 (2d Cir. 1981)).

**b. Admissibility of the TT Report and Cao's conclusions**

Defendants oppose the use of the conclusions contained in the TT Report, prepared by Plaintiff's expert Liling Cao of Thorton Tomasetti, arguing the TT Report should not be considered in its entirety and any claims that rely on the TT Report should be dismissed.[28] (Defs.' Opp'n 7–11; Defs.' Mem. 24–27.) Defendants advance two reasons: (1) because the TT Report is unsworn, it is therefore impermissible, (Defs.' 56.1 Resp. ¶ 83; Defs.' Opp'n 7–8); and (2) because the TT Report and Cao's expert analysis "relies upon hearsay information" provided by Patrick Moore, who Defendants allege is Plaintiff's "consulting expert," which Cao "simply adopted, without independently verifying," it is an impermissible vehicle for inadmissible evidence, (Defs.' Opp'n 8–11; Defs.' Mem. 4–5, 24–27.)

---

[28] Defendants also object to the use of the TT Rebuttal Report in their 56.1 response. (*See e.g.*, Defs.' 56.1 Resp. ¶¶ 237–39.) However, Defendants' briefing discusses only the TT Report and it is unclear to the Court that the TT Rebuttal Report was previously unsworn and/or relies on allegedly hearsay information such as Moore's observations. Regardless, to the extent Defendants' objections also apply to the TT Rebuttal Report, the Court's analysis and conclusion admitting the TT Report apply to the TT Rebuttal Report for the same reasons.

Plaintiff argues that both of Defendants' arguments fail and that the TT Report and Cao's analysis are admissible. (*See* Pl.'s Reply 2–6.) First, Plaintiff contends that the unsworn TT Report is admissible because Cao has both subsequently cured the defect by submitting a sworn expert report and because Cao ratified the TT Report at her deposition. (*Id.* at 2–4.) Second, Plaintiff argues both that an expert is allowed to base her findings on facts or data, such as witness observations in combination with photographs, in forming an opinion and that Cao did not rely on Moore's findings, although his observations were consistent with all objective facts and are not considered hearsay because he was deposed by Defendants as a fact witness. (*Id.* at 4–6; *see also* Pl.'s Opp'n 20–25.)

**i. Unsworn report**

Defendants' object "on the ground that [the TT Report] is unsworn and therefore impermissible" to support Plaintiff's motion because "[i]t is well-settled" that Rule 56 of the Federal Rules of Civil Procedure requires that the Court, on a motion for summary judgment, only consider evidence that would be admissible at trial. (*See, e.g.*, Defs.' 56.1 Resp. ¶ 83; Defs.' Opp'n 7–8; *see also* Defs.' Opp'n 19–21.)

Plaintiff argues that in accordance to "well-settled" law in the Second Circuit, a court may consider an unsworn expert report in connection with a motion for summary judgment where the report was ratified at the expert's deposition or where any deficiency is later cured by submission of a declaration or affidavit by the expert verifying the contents of the report. (Pl.'s Reply 2–4.) Plaintiff contends that the TT Report meets both of these requirements — Cao was "deposed at length and repeatedly affirmed the contents of her reports" and she "submitted a declaration verifying the contents of her reports." (*Id.* at 4; Pl.'s 56.1 Reply ¶ 83; *see* Cao Decl., annexed to Goldberg Reply Decl. as Ex. 73, Docket Entry No. 162-4; *see also* Ltr. re. Service of Defs.' Reply Mem. of L. in Supp. of Summ. J., Docket Entry No. 153.)

At summary judgment, "the district court properly considers only evidence that would be admissible at trial," as required by Rule 56. *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998); *see Nambiar v. Cent. Orthopedic Grp., LLP*, 158 F.4th 349, 362 (2d Cir. 2025) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." (alteration in original) (quoting *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009))); *In re Enf't of Philippine Forfeiture J. Against All assets of Arelma, S.A.*, 153 F.4th 142, 167 (2d Cir. 2025) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment, and a district court deciding a summary judgment motion has broad discretion in choosing whether to admit evidence." (alteration in original) (quoting *Picard Tr. for SIPA Liquidation of Bernard L. Madoff Inv. Sec. LLC v. JABA Assocs. LP*, 49 F.4th 170, 181 (2d Cir. 2022))); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008) ("In ruling on a motion for summary judgment, the district court may rely on 'any material that would be admissible or usable at trial.'"); *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("[O]nly admissible evidence need be considered by the trial court in ruling a motion for summary judgment."). Applying this rule, "[c]ourts in this Circuit have uniformly held that unsworn expert reports do not satisfy the admissibility requirements of [Federal Rule of Civil Procedure] 56(e), and cannot be used to defeat a summary judgment motion without additional affidavit support." *Scalercio-Isenberg v. Port Auth. of N.Y. & N.J.*, No. 16-CV-8494, 2019 WL 13111939, at *1 (S.D.N.Y. Sep. 6, 2019) (second alteration in original) (quoting *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 352 (S.D.N.Y. 2005))); *see Haner v. Cnty. of Niagara*, No. 19-CV-754, 2024 WL 3540645, at *8 n.3 (W.D.N.Y. July 25, 2024) (quoting *id.*); *Fed. Trade Comm'n v. RCG Advances, LLC*, 695 F. Supp. 3d 368, 394 n.8 (S.D.N.Y. 2023) (quoting *Berk*, 380 F. Supp. 2d at 352); *see also Capobianco v. City of New York*, 422 F.3d 47,

55 (2d Cir. 2005) (acknowledging that unsworn expert statements are inadmissible hearsay on a motion for summary judgment); *Valdes v. Brooks*, No. 19-CV-617, 2021 WL 4803699, at *4 n.3 (S.D.N.Y. Oct. 13, 2021) (holding an "unsworn expert cannot be used to defeat a motion for summary judgment"), *aff'd*, 2023 WL 309611 (2d Cir. Jan. 19, 2023); *Cornell Rsch. Found., Inc. v. Hewlett-Packard Co.*, No. 01-CV-1974, 2007 WL 4349135, at *19 (N.D.N.Y. Jan. 31, 2007) (finding that the great weight of authority supports the position that unsworn expert reports "constitute inadmissible hearsay and thus are not worthy of consideration on a motion for summary judgment"), *report and recommendation adopted sub nom. Cornell Univ. v. Hewlett-Packard Co.*, 2007 WL 2791120 (N.D.N.Y. Sep. 24, 2007). "[S]ubsequent verification or reaffirmation of an unsworn expert's report, either by affidavit or deposition, allows the court to consider the unsworn expert's report on a motion for summary judgment." *Richardson v. Corr. Med. Care, Inc.*, No. 22-210, 2023 WL 3490904, at *2 (2d Cir. May 17, 2023) (summary order); *see also Monahan v. City of New York*, No. 20-CV-2610, 2023 WL 2138535, at * 4 (S.D.N.Y. Feb. 21, 2023) ("Unsworn letters and reports may be admissible only when the opinions expressed in such documents are reaffirmed by deposition testimony."); *New Old Music Grp., Inc. v. Gottwald*, 122 F. Supp. 3d 78, 86 n.5 (S.D.N.Y. 2015) (considering expert reports on a summary judgment motion because the defendants "have since filed declarations from their experts verifying their reports under penalty of perjury").

Second Circuit case law holds that unsworn report can be remedied either by: (1) subsequent depositions where an expert affirms the contents of her report; or (2) submitting a declaration verifying the contents of her report. *See Richardson*, 2023 WL 3490904, at *2. Cao has remedied the deficiency through both methods and therefore, the Court declines to exclude the TT Report.

First, Cao has reaffirmed her opinion extensively during her deposition. Not only was the TT Report introduced and admitted as an exhibit during her deposition, but she was questioned by Defendants' counsel about the TT Report, to which she testified were her opinions and about the bases that formed her opinions. (Pl.'s 56.1 Reply ¶ 83; *see* Dep. Tr. of Liling Cao ("Cao Tr."), annexed to Goldberg Decl. as Ex. 27, Docket Entry No. 160-81; TT Report.) This oral affirmation of the TT Report is sufficient to cure the unsworn TT Report. *See Richardson*, 2023 WL 3490904, at *2 (holding the district court erred in disregarding an expert's report where the expert "reaffirmed his opinion during his deposition"); *Watson v. N.Y. Doe 2*, No. 19-CV-533, 2025 WL 2662306, at *6 n. 7 (S.D.N.Y. Sep. 17, 2025) (overruling objection and considering an unsworn expert report because the expert ratified her report during her deposition), *appeal withdrawn sub nom. Watson v. Illinois Doe 1*, No. 25-2569, 2026 WL 1051983 (2d Cir. Feb. 26, 2026).

Second, Cao has submitted the Cao Decl., adopting the TT Report, swearing that the "TT Report contains [her] findings and opinions regarding the design, construction and conditions of the Residence," and explaining that the TT Report includes her "Professional Engineer Seal" "which serves as a declaration" that she had the qualifications to conduct the analysis and form the opinions found within, had personal knowledge of the matters, and took responsibility for the opinions within. (Cao Decl. ¶¶ 5, 7, 8.) This is sufficient to remedy the initial unsworn nature of the TT Report. *See Dingeldey v. VMI-EPE-Holland B.V.*, No. 15-CV-916A, 2022 WL 3227625, at *5 (W.D.N.Y. Apr. 13, 2022) (holding the unsworn expert report was cured by the submission, in further support of summary judgment, of a declaration from the expert attesting to his credentials, opinions, and basis for his opinions), *report and recommendation adopted sub nom. Dingeldey v. VMI Holland B.V.*, 2025 WL 841012 (W.D.N.Y. Mar. 18, 2025); *Doe v. City of New York*, No. 15-CV-117, 2018 WL 6095847, at *4 (S.D.N.Y. Nov. 21, 2018) (considering an

unsworn expert report on a motion for summary judgment where the plaintiff later filed an affidavit from the expert swearing to his opinions in the report because the court was "follow[ing] the longstanding practice of allowing a party to cue the defect of an unsworn expert opinion submitted in connection with a motion for summary judgment by subsequently filing an affidavit").

Defendants rely on this Court's decision in *Reza v. Khatun (Reza I)*, No. 09-CV-233, 2017 WL 3172816 (E.D.N.Y. July 25, 2017), where the Court "decline[d] to consider [the d]efendants' unsworn expert report on summary judgment." *Id.* at *2. However, Defendants neglect to acknowledge that the Court's decision was premised on the lack of a sworn affidavit accompanying the expert report and that the Court later reconsidered the motion for summary judgment which included considering the defendants' expert report following a refiled expert report that included a sworn affidavit from the expert. *See Reza v. Khatun (Reza II)*, No. 09-CV-233, 2017 WL 11700559, at *4, *7 (E.D.N.Y. Dec. 22, 2017). The Court's holding on the TT Report is consistent with the case law cited in *Reza I*, stating that "[c]ourts in this Circuit have uniformly held that unsworn expert reports do not satisfy the admissibility requirements of Fed. R. Civ. P. 56(e), and cannot be used [on] a motion for summary judgment *without additional affidavit support*." *Reza I*, 2017 WL 3172816, at *2 (alterations in original) (emphasis added). Defendants otherwise fail to cite to other case law and cannot overcome the significant Second Circuit case law contrary to their argument.[29] Therefore, the Court overrules Defendants' objection to the TT Report and, to the extent that Defendants also object to the TT Rebuttal

[29] Defendants do not raise this argument in their papers in support of their motion for summary judgment nor their reply brief. (*See generally* Defs.' Mem.; Defs.' Reply.)

Report, the Court also denies Defendants' objection to the TT Rebuttal Report. *See supra* footnote 28.

**ii. Hearsay challenge**

First, Defendants argue that "Cao simply adopted, without independently verifying, the unlicensed Moore's conclusory and verbal recollection as to what he observed years earlier in the test pits to conclude that the [Residence] was structurally deficient." (Defs.' Opp'n 10, 20–21.) Specifically, Defendants contend that Cao reviewed photographs of probe holes made years earlier at the Residence and spoke to Moore over the phone to clarify what the photos showed, "verbally impart[ing] the information to Cao" as he "did not take any notes or prepare a report regarding his inspection." (*Id.* at 9, 21.) However, Cao later admitted "that the photographs she examined were inconclusive regarding the extent of what was allegedly missing," forcing her to rely on Moore's claims. (*Id.* at 11; Defs.' Mem. 27.) Therefore, Defendants argue that Cao is impermissibly acting "as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as a basis of [her] testimony." (Defs.' Opp'n 10 (quoting *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 638 F. Supp. 3d 227, 254 (E.D.N.Y. 2022)), 21; *see also* Defs.' Mem. 24–27.) Second, Defendants argue that "Moore's verbal communications to Plaintiff's trial expert do not constitute facts or data that an engineering expert would reasonably rely on 'in informing an opinion on the subject.'"[30] (Defs.' Opp'n 10 (quoting Fed. R. Evid. 703); Defs.' Reply 13.)

---

[30] Defendants' attempt to argue that "Moore's recollections and unrecorded conclusions [] are inherently unreliable and should not be permitted." (Defs.' Mem. 27.) The credibility of a fact witness is an issue for impeachment during his testimony, not an issue for summary judgment. *See Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005) ("[T]he general rule [is] that district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage[.]"); *Trombetta v. Novocin*, No. 18-CV-993, 2024 WL 689144, at *3

First, Plaintiff argues that Defendants' argument is "entirely factually misleading." (Pl.'s Reply 5.) Plaintiff argues that Defendants' argument to exclude the TT Report fails because: (1) "not only was the TT Report not 'entirely based' on Moore's testimony, Cao testified under oath that she did not rely on Moore's statements at all in reaching her expert conclusion"; (2) Moore's observations "were consistent with all of the objective facts of this case"; (3) "given that Moore was deposed by Defendants under oath about his own personal observations, these statements are definitively not hearsay"; and (4) "Moore acted as a fact witness, not a consulting expert," which Defendants are aware of because they served a subpoena on Moore through which he produced documents and appeared for a deposition. (*Id.* at 4–5.) Second, Plaintiff argues that Defendants' legal argument is "contrary to black-letter law" because Rule 703 of the Federal Rules of Evidence "allows an expert to base an opinion on 'facts or data in the case that the expert has been made aware of,' even if those underlying facts are not themselves admissible." (*Id.* at 5 (quoting Fed. R. Evid. 703).) Overall, Plaintiff argues that Defendants are mistaken that even if "limited information objected to was improper and somehow undermined the expert opinion on the narrow issue . . . that the entire claim must also be dismissed." (Pl.'s Opp'n 20–21.)

"The admission of expert testimony is governed by Federal Rule of Evidence 702." *Waldman v. Palestine Liberation Org.*, 171 F.4th 575, 594 (2d Cir. 2026); *see also Bustamante v.*

---

(S.D.N.Y. Feb. 20, 2024) ("Credibility of a fact witness is not a legitimate basis to preclude the consideration of the witness's evidence in the summary judgment context, or at trial if summary judgment is denied."), *reconsideration denied*, No. 18-CV-0993, 2025 WL 1066210 (S.D.N.Y. Mar. 7, 2025), *appeal docketed*, No. 25-817 (2d Cir. Apr. 8, 2025); *see also Bailey v. City of New York*, 79 F. Supp.3d 424, 439 (E.D.N.Y. 2015) ("It is axiomatic that courts do not normally weigh evidence or assess credibility on summary judgment. 'These determinations are within the sole province of the jury.'" (internal citations omitted) (quoting *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996))). In view of the fact that Defendants received discovery from Moore and deposed him, and the parties anticipate Moore being called as a fact witness, Defendants may make this argument at trial.

*KIND, LLC*, 100 F.4th 419, 427 (2d Cir. 2024) (explaining that "Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony," but that "a judge . . . should also be mindful of other applicable rules" (citation omitted)). Rule 702 of the Federal Rules of Evidence was recently amended, and this new amendment took effect December 1, 2023. The rule now provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702; *Rutledge v. Walgreen Co.*, 182 F.4th 168, 183(2d Cir. 2026) (quoting Fed. R. Evid. 702). "The district court plays the role of gatekeeper, determining whether the expert's testimony is reliable and relevant." *Faison-Williams v. United States*, No. 24-1404, 2025 WL 974831, at *3 (2d Cir. Apr. 1, 2025) (summary order) (citing *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002)); *see Waldman*, 171 F.4th at 594 ("The law assigns district courts a 'gatekeeping' role in ensuring that expert testimony satisfies the requirements of Rule 702." (quoting *United States v. Farhane*, 634 F.3d 127, 158 (2d Cir. 2011))); *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020) ("While the proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied, . . . the district court is the ultimate gatekeeper." (alteration in original) (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007))); *see also Richardson v. Corr. Med. Care, Inc.*, No. 22-210, 2023 WL 3490904, at *2 (2d Cir. May 17, 2023) (summary order) ("The proponent of expert testimony bears the burden

of establishing admissibility, with the district court serving a gatekeeping role to ensure that the 'expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" (quoting *Williams*, 506 F.3d at 160)).

Prior to permitting a person to testify as an expert under Rule 702, the court must make the following findings: (1) the witness is qualified to be an expert; (2) "the opinion is based upon reliable data and methodology"; and (3) the expert's testimony on a particular issue will "assist the trier of fact." *Nimely v. City of New York*, 414 F.3d 381, 396–97 (2d Cir. 2005) (quoting Fed. R. Evid. 702); *see also Rutledge*, 182 F.4th at 184 ("In addition to confirming that experts are qualified to offer testimony, Rule 702 charges district courts with the 'task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993))); *Bustamante*, 100 F.4th at 427 ("Under this rule, the [d]istrict [c]ourt . . . is charged with the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." (emphasis, internal quotation marks, and citations omitted)); *United States v. Napout*, 963 F.3d 163, 187–88 (2d Cir. 2020) (explaining that the court is tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand" (quoting *Daubert*, 509 U.S. at 597)); *United States v. Cruz*, 363 F.3d 187, 192 (2d Cir. 2004) (quoting same).

Case law from courts in the Second Circuit confirms that it is entirely permissible for an expert, like Cao, to consider facts, information and observations from other witnesses, such as the photographs and Moore's statements, in reaching her conclusion. *See Gussak Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94–95 (2d. Cir. 2000) ("[A]n expert may rely on data that she did not personally collect."); *Tedone v. H.J. Heinz Co.*, 686 F. Supp.2d 300, 311 (S.D.N.Y. 2009) (holding that an expert's findings which used photographs and anecdotal evidence provided by the parties, coupled with the expert's knowledge, "provide[d] adequate factual support to allow

his testimony to pass through the 'gate' and come before the fact finder"); *Zapata v. Down Equip. Corp.*, No. 04-CV-4054, 2006 WL 8461377, at *3–4 (S.D.N.Y. Apr. 7, 2006) (finding that an engineering expert's opinion was not inadmissible where the expert relied on photographs and other information that he personally did not collect and where the expert did not personally conduct his own test, as the methods which he relied upon themselves were subject to testing); *see also* Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed" and the information relied upon need not be admissible if "experts in the particular field would reasonably rely on those kinds of facts or data."). Defendants fail to cite any case law that contradicts these findings or otherwise factually supports their arguments. (*See generally* Defs.' Mem. 24–27; Defs.' Reply 13–15; Defs.' Opp'n 8–11.)

Further, Defendants provide no factual support for their argument that Cao is simply a "conduit" of Moore's non-expert opinions — their argument appears to be a bald conclusory statement based upon the fact that Cao consulted with Moore when reviewing photographs of the Residence involving the probe holes and test pits and Cao's concession that the photographs were inconclusive. (*See* Defs.' Mem. 25–26.) Defendants otherwise ignore Cao's deposition testimony and the TT Report which describe the work she conducted and ultimately how she reached her conclusions, which involved considering and weighing information and data from multiple sources, including site visits, Defendants' own construction documents and communications, various reports, other witness testimony, and more. (*See generally* Cao Tr.; TT Report.) Moreover, Cao explicitly testified that her discussions with Moore were limited to learning of his factual observations and that a report of Moore's findings would not have been relevant to her scope of work. (Pl.'s 56.1 Resp. ¶ 46; *see* Cao Tr. 15:12–16, 17:4–9, 17:16–25, 20:19–22.) *Cf. Auther v. Oshkosh Corp.*, No. 09-CV-527, 2013 WL 5272959, at *3–4

(W.D.N.Y. Sep. 16, 2013) (deeming the expert report inadmissible where there was no factual evidence to indicate that the expert "attempted to validate the conclusions reached by [others] or drew upon their testing to reach *his own* conclusions").

Defendants' argument centers around the question of whether Cao independently verified Moore's work. (*See* Defs.' Mem. 26–27.) However, all of the cited case law, including numerous out of circuit cases, involve opinions developed by an expert using the opinions of another expert. (*See id.*; *see also* Defs.' Opp'n 20–21.) It is not clear to the Court, nor does Plaintiff concede, that Moore is intended to be an expert witness — no expert report or other required materials have been submitted. (*See* Pl.'s Opp'n 21 n.18 (explaining that Moore will be called as a fact witness at trial).) However, even if Moore was to be considered an expert, the TT Report and Cao's deposition clearly demonstrate that her opinion is not simply an aggregate or recitation of Moore's opinions and that Cao independently verified the underlying work. *See* discussion *supra*; *Bocoum v. Daimler Trucks N.A. LLC*, No. 17-CV-7636, 2022 WL 902465, at *20, *25 (S.D.N.Y. Mar. 28, 2022) (finding that "even if is were the case that [the expert] had relied on [another expert's] findings," the expert's opinions were independent findings based on his own analysis which was permitted because "[e]xpert witnesses are entitled to rely on facts, opinions and data developed or prepared by another so long as the expert in the end gives his own opinion instead of simply aggregate[ing] or recit[ing] the opinions of others" (third, fourth, and fifth alterations in original)); *U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 134 (S.D.N.Y. 2015) (finding that the expert was permitted to consider another expert's report as long as he considered his own analysis and the facts of the case in forming an opinion).

Regardless, because Defendants deposed Moore, his observations and his conversation with Cao can be relied upon by Cao in forming her opinions. *See Castaldi v. Land Rover N. Am.,*

*Inc.*, 363 F. App'x 761, 762 (2d Cir. 2009) ("There is no question that an expert witness . . . may rely on deposition testimony in forming an opinion."); *SourceOne Dental, Inc. v. Patterson Cos.*, No. 15-CV-5440, 2018 WL 2172667, at *8 (E.D.N.Y. May 10, 2018) ("An expert may properly consider deposition testimony to marshal facts to which the expert then applies his expertise.").

Lastly, Defendants' attempt to argue that Cao's reliance on Moore's statements is "completely unreliable and should not be permitted." (Defs.' Mem. 27.) Given the Court's finding that Cao is entitled to rely on the facts and information provided, any question regarding Cao's methodology and how she reached her conclusions is an issue for impeachment, not an issue for summary judgment, as it goes to the weight of the evidence and not its admissibility. *See Ram Krishana Inc. v. Mt. Hawley Ins. Co.*, No. 22-CV-3803, 2025 WL 371016, at *13 (S.D.N.Y. Feb. 3, 2025) ("'[I]t is not uncommon for experts to rely on interviews with third parties in forming their opinions,' and challenges to such inputs properly go to weight, rather than admissibility." (alteration in original) (quoting *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 355 (S.D.N.Y. 2023))); *Qureshi v. Costco Wholesale Corp.*, No. 20-CV-4086, 2022 WL 16757952, at *2 (E.D.N.Y. Nov. 8, 2022) (holding that where an expert's conclusions were "grounded in assumptions and inferences based on facts provided by others," the expert's analysis was not rendered inadmissible though the "[d]efendant may explore on cross-examination whether the facts underlying those assumptions [were] correct and the inferences [were] appropriate"); *U.S. Bank Nat'l Ass'n*, 112 F. Supp. 3d at 134 ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."). Defendants, at trial, may question Cao regarding the extent she relied on Moore's statements, which impacts the weight of her testimony.

The Court therefore declines to exclude the TT Report and Cao's expert analysis, and declines to dismiss Plaintiff's claims supported by both.

**c. Fraudulent inducement and fraudulent concealment**

Plaintiff argues he is entitled to summary judgment on his fraud claims in connection with both the defective flooring and the non-thermal impact and "Low-E" window and door glass. (Pl.'s Mem. 6–8, 9–14; *see also* Pl.'s Opp'n 2–12.) With regard to Defendants' alleged omission and concealment of the defective flooring installed at the Residence, Plaintiff argues that the evidence shows that: (1) "[t]he flooring at the Residence was defective and Defendants were indisputably aware of the defect"; (2) Defendants had a duty to disclose the defects and they not only failed to make the required disclosure but "chose to pocket the settlement funds [from the settlement with Porcelanosa] and then actively concealed the defect by directing their [general contractor] (Roboco) to use pin nails to temporarily fix the cupping and then putty to hide that repair." (Pl.'s Mem. 8.) As to Defendants' alleged misrepresentation and concealment of the fact that the glass used in the windows and doors at the Residence were not impact-resistant or UV-protected, Plaintiff argues that the evidence shows that: (1) despite New York State regulations requiring hurricane-resistant glass, in "an effort to save money, Defendants elected not to purchase 'Low-E' or impact glass windows and doors" and ultimately, the glass used at the Residence was not thermal impact or "Low-E"; (2) the Residence's brochure and listing agents, Bespoke, marketed the Residence as having "thermal," "impact" and "Low-E" qualities of the glass, which Defendants knew to be false; (3) Plaintiff relied upon these representations when purchasing the Residence; and (4) "Defendants took steps to actively conceal their fraudulent misrepresentations" by removing the plywood cut-out pieces that were required by statute and which were present when the Residence was inspected to obtain its certificate of occupancy. (*Id*. at 9–14.)

Defendants argue they are entitled to summary judgment on Plaintiff's fraud claims in connection with both the defective flooring and window and door glass. (Defs.' Mem. 10–17; Defs.' Opp'n 11–17; Defs.' Reply 2–9.) In addressing their alleged omission and concealment of the defective flooring, Defendants argue that "Plaintiff has failed to establish that 65 Dune or its principals knowingly made any material misrepresentations or omissions" because: (1) Plaintiff testified that "he never even met or spoke to the principals of 65 Dune"; (2) "[it] is [ ] undisputed that the principals of 65 Dune were contractually precluded from revealing to any third party (which includes Plaintiff) the information regarding their . . . Settlement Agreement . . . with Porcelanosa"; (3) Defendants "believed, in good faith, that the wood floors were in good condition at the time of the sale of the [Residence] to Plaintiff," which was confirmed by Plaintiff's own engineer's pre-purchase inspection; and (4) Defendants "determined that misuse of the radiant heating was the cause of any delaminating flooring." (Defs.' Opp'n 13–14; *see also* Defs.' Mem. 10–12, 15.) As to Defendants' alleged misrepresentation and concealment of the fact that the glass used in the windows and doors at the Residence were not impact-resistant or UV-protected, Defendants argue that Plaintiff has failed to establish that: (1) Plaintiff relied on any representations in the brochure or by Bespoke's agent; (2) there indeed was a misrepresentation, arguing the window and door glass at the Residence is "impact rated"; (3) the Gaetanos, in their personal capacity, made any misrepresentations and/or approved of the brochure; and (4) the Gaetanos intended to defraud by actively taking steps to conceal the fraud by arranging for the disposal of the plywood cut-outs.[31] (Defs.' Mem. 13–14; Defs.' Opp'n 14–

[31] Defendants also argue that they are entitled to summary judgment on Plaintiff's fraudulent inducement cause of action because of the specific disclaimer in paragraph 45 of the Rider, signed by Plaintiff, that disclaims Plaintiff's reliance on the marketing materials and statements made by the real estate broker. (Defs.' Mem. 10–11; Defs.' Opp'n 11.) Defendants argue that paragraph 45 of the Rider acts as a merger clause, "contractually extinguishing

15.) In addition, Defendants argue that Plaintiff has failed to present admissible evidence of damages on his fraud claim and therefore, Defendants are entitled to summary judgment on both the fraudulent inducement and concealment claims.[32] (Defs.' Mem. 16–17; Defs.' Reply 8–9.)

---

Plaintiff's fraud in the inducement claims upon closing of title and delivery of the deed to Plaintiff." (Defs.' Mem. 11.) Plaintiff argues that this defense fails, relying on the Court's November 2020 Decision. (Pl.'s Reply 7; November 2020 Decision 23–26.) The Court agrees with Plaintiff — it already addressed and dismissed this argument, finding that the "as-is" provision in the Contract of Sale did not preclude an examination into whether there was fraud either in inducement of the contract or based on misrepresentation. (November 2020 Decision 23–26 (first citing *Gilpin v. Oswego Builders, Inc.*, 930 N.Y.S.2d 120, 123–24 (App. Div. 2011); then citing *Bando v. Achenbaum*, 651 N.Y.S.2d 74, 76 (App. Div. 1996); then citing *George v. Lumbrazo*, 584 N.Y.S.2d 704, 705 (App. Div. 1992); then citing *17 E. 80th Realty Corp. v. 68th Assocs.*, 569 N.Y.S.2d 647, 648 (App. Div. 1991); and then citing *Rodas v. Manitaras*, 552 N.Y.S.2d 618, 619 (App. Div. 1990)).)

[32] As Plaintiff argues, Defendants incorrectly "conflate the quantum of damages with the fact of damages." (Pl.'s Opp'n 12.) Defendants fail to dispute that Plaintiff suffered damages as a result of the delamination of the flooring and the fact that the windows were not "Low-E" nor impact glass. (*See generally* Defs.' Reply 8–9; Defs.' Mem. 16–17.) Instead, Defendants challenge the lack of evidence, which they argue is entirely missing, as to the full amount Plaintiff was allegedly damaged due to Defendants' fraud. (Defs.' Reply 9 ("We still do not know how much Plaintiff actually even paid Minkoff [for the alleged repairs].").) While the Court does not understand why Defendants did not address this issue during discovery, Plaintiff has shown that he has suffered cognizable damages, such as those associated with replacing the delaminating flooring and either replacing the windows and doors and/or purchasing plywood cut-outs. (*See, e.g.*, Defs.' 56.1 Resp. ¶¶ 79–80; Pl.'s 56.1 Resp. ¶¶ 14, 27, 28, 34, 39; *see also* Pl.'s Opp'n 13–14 (noting that "Plaintiff has yet to replace the windows and remaining doors [aside from the Glass Slider] in the Residence"); Defs.' 56.1 Resp. ¶ 106 (Defendants do not dispute the fact that the Glass Slider was non-impact rated and because of its non-impact nature, the Glass Slider would need protection during a hurricane.).) The Court therefore denies Defendants' request for dismissal of Plaintiff's fraud claims based on an alleged lack of proof of damages. *See Mohammed Fezzani v. Dweck*, 779 F. App'x 815, 817–18 (2d Cir. 2019) (finding Supreme Court precedent "does not require [p]laintiffs to *prove* damages to survive summary judgment" on his fraud claims (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986))); *Fid. Bank, Nat. Ass'n v. Avrutik*, 740 F. Supp. 222, 239 n.14 (S.D.N.Y. 1990) (denying summary judgment finding that while the party "may not at trial succeed in demonstrating the elements of fraud, including damages, they have presented enough evidence of such fraud to avoid summary judgment" where the evidence showed that a "rational fact finder might conclude . . . that [they] were injured"); *see also Zurich Am. Life Ins. Co. v. Nagel*, 590 F. Supp. 3d 702, 718 (S.D.N.Y. 2022) ("For purposes of summary judgment, plaintiffs need not, however, prove the exact amount of such damages.").

Lastly, Defendants argue that Plaintiff has failed to prove that Defendants can be held liable for punitive damages under the law, and therefore, his claim for punitive damages must be dismissed. (Defs.' Mem. 17–20; Defs.' Reply 9–12.)

"There are two species of claims for fraud in New York: '[f]raud by affirmative misrepresentation, or actual fraud, and fraud by omission, or fraudulent concealment . . . .'" *Somnia, Inc. v. Change Healthcare Tech. Enabled Servs., LLC*, No. 19-CV-8983, 2021 WL 639529, at *5 (S.D.N.Y. Feb. 16, 2021) (alterations in original) (quoting *Wiedis v. Dreambuilder Invs., LLC*, 268 F. Supp. 3d 457, 466 n.3 (S.D.N.Y. 2017))); *see Koch v. Greenberg*, 626 F. App'x 335, 337–38 (2d Cir. 2015) (discussing the plaintiff's two fraud theories under New York law of fraudulent misrepresentation and fraudulent concealment (first citing *Dallas Aerospace, Inv. v. CIS Air Corp.*, 352 F.3d 775, 784 (2d Cir. 2003) (defining fraudulent misrepresentation); and then citing *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995) (defining fraudulent concealment))).

"Under New York law, [t]he essential elements of a cause of action for fraud are representation of a material existing fact, falsity, scienter, deception, and injury." *Meridian*

---

In addition to arguing that they are entitled to summary judgment, Defendants argue that Plaintiff should be denied summary judgment because he "has failed to present admissible evidence on damages on both his fraudulent inducement and fraudulent concealment claims." (Defs.' Opp'n 16–17.) Defendants make the same argument in connection with Plaintiff's implied warranty claims. (*See* Defs.' Opp'n 17–25.) However, Plaintiff's motion is only a partial motion for summary judgment, stating that there are "certain claims where factual issues exist that will require a trial, and issues concerning damages are contested." (Pl.'s Mem. 3; *see, e.g.*, Pl.'s Opp'n 14 (arguing that it is undisputed that Plaintiff was damaged by Defendants' fraud and therefore he is "entitled to recover for the damages [he] proves at trial"); Pl.'s Mem. 19 (arguing that summary judgment should be granted on the alleged deck defects, "leaving a dispute over the expense of the repair as the only issue for trial").) The Court construes this as Plaintiff moving for summary judgment on the issue of liability only, not on the issue of the amount of damages incurred by Plaintiff. This determination on the amount of damages Plaintiff suffered, as well as any outstanding factual questions that remain following this Memorandum and Order, are to be determined by a fact-finder at trial.

*Horizon Fund, LP v. KPMG (Cayman)*, 487 F. App'x 636, 641 (2d Cir. 2012) (internal quotation marks, footnote, and emphasis omitted) (alteration in original) (quoting *N.Y. Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 318 (1995)); *Cargo Logs. Int., LLC v. Overseas Moving Specialists, Inc.*, 723 F. Supp. 3d 212, 226 (E.D.N.Y. 2024) ("Under New York law, the essential elements of a fraud claim include representation of a material existing fact, falsity, scienter, deception, and injury." (internal quotation marks omitted) (quoting *Manning v. Utils. Mut. Ins. Co*., 254 F.3d 387, 400 (2d Cir. 2001))); *see also Cortes v. 21st Century Fox Am., Inc.*, 751 F. App'x 69, 72 (2d Cir. 2018) (stating the elements of a fraudulent misrepresentation claim). Specifically, "[t]o state a claim for fraud under New York law, a plaintiff must allege (1) a material misrepresentation or omission of fact; (2) which the defendant knew to be false; (3) which the defendant made with the intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Pauwels v. Deloitte LLP*, 83 F.4th 171, 189–90 (2d Cir. 2023) (quoting *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395, 402 (2d Cir. 2015)); *see also Welch v. Bio-Reference Lab'ys, Inc.*, No. 25-494, 2026 WL 683189, at *2 (2d Cir. Mar. 11, 2026) (summary order) (quoting same); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 259 (2d Cir. 2021) (same); *GEM Advisors, Inc. v. Corporación Sidenor, S.A.*, 667 F. Supp. 2d 308, 333 (S.D.N.Y. 2009) ("The second element of fraud in New York is intent to defraud, or scienter, which includes knowledge of the falsity of the representation." (citing *Banque Arabe et Internationale D'Investissement*, 57 F.3d at 153)).

Similarly, "fraudulent concealment[, or fraud by omission,] requires proof of: (1) failure to discharge a duty to disclose; (2) an intention to defraud, or scienter; (3) reliance; and (4) damages." *TVT Recs. v. Island Def Jam Music Grp.*, 412 F.3d 82, 90–91 (2d Cir. 2005) (citing *Brass v. Am. Film Tech., Inc.*, 987 F.2d 142, 152 (2d Cir. 1993)); *see Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007) ("Where a defendant . . . seeks to show

fraud by omission, it must prove [in addition to the fraud elements] that the plaintiff had a duty to disclose the concealed fact."); *Banque Arabe et Internationale D'Investissement*, 57 F.3d at 153 (same). Despite the distinction between misrepresentation and omission of fact, many courts generally consider fraudulent inducement and fraudulent concealment to be similar causes of action and often address them together. *See e.g.*, *Henderson v. Golden Corral Franchising Sys., Inc.*, 663 F. Supp. 3d 313, 332 (S.D.N.Y. 2023) ("The elements of claims for fraudulent inducement and fraudulent omission are nearly identical under New York law."); *see also Weida Freight Sys., Inc. v. Jetson Elec. Bikes LLC*, 831 F. Supp. 3d 220, 224 (E.D.N.Y. 2026) ("Under New York state law, the elements of both fraud and fraud in the inducement permit an omission to serve as a basis for such claim[.]").

"At the summary judgment stage, a plaintiff must offer enough evidence to allow a reasonable jury to find by clear and convincing evidence that each of the elements is met." *Loreley Fin. (Jersey) No. 3 Ltd.*, 13 F.4th at 259–60 (citing *Merrill Lynch & Co.*, 500 F.3d at 181); *see also Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006) ("[T]he five elements of a fraud claim must be shown by clear and convincing evidence."). "Clear and convincing evidence is evidence that satisfies the factfinder that it is highly probable that what is claimed actually happened and it is evidence that is neither equivocal nor open to opposing presumptions." *Loreley Fin. (Jersey) No. 3 Ltd.*, 13 F.4th at 260 (quoting *Seon v. N.Y. State Dep't of Motor Vehicles*, 74 N.Y.S.3d 20, 25 (2018), *rev'd on other grounds*, 35 N.Y.3d 1032 (2020)).).

In the SAC, Plaintiff alleges both fraudulent inducement (also known as common law fraud) and fraudulent concealment causes of action in relation to both the flooring and the window and door glass issues. (SAC ¶¶ 53–84.) As to fraudulent inducement, Plaintiff alleges: (1) Defendants were aware that the wood flooring used throughout the Residence was

delaminating and defective prior to the sale of the Residence to Plaintiff but never informed Plaintiff or attempted to remedy the issue, (*id*. ¶¶64–74); and (2) Vichinsky, a broker with Bespoke Real Estate, acting as a real estate broker for 65 Dune, knowingly and continually represented (both through personal statements and marketing materials) that the windows and doors at the Residence were hurricane resistant, being made of impact glass, and UV resistant, being made of "Low-E" glass, when they in fact were not, (*id.* ¶¶ 55–63). As to the fraudulent concealment claim, Plaintiff alleges Defendants, as sellers, had a duty to disclose[33]: (1) the known issues with the floors delaminating and actively concealed the defective condition by using pin nails and putty and failing to mention Defendants' settlement with Porcelanosa to Plaintiff, (*id*. ¶¶ 78–82); and (2) the known fact that despite being advertised as high impact and "Low-E," the glass used in almost all of the windows and doors were neither and Defendants actively concealed this by failing to correct the misrepresentations and arranging for the disposal of plywood cut-outs required for non-impact resistant glass to obtain a certificate of occupancy, (*id.* ¶¶ 77–79). The Court addresses both causes of action in each respective section for flooring and glass for windows and doors.

**i. Flooring**

The evidence shows various undisputed material facts, namely that: (1) Defendants knew of the issue with the floors delaminating (lifting or buckling) in January of 2017, a year before the Residence was sold to Plaintiff, (Defs.' 56.1 Resp. ¶¶ 55–60); (2) Defendants negotiated a

[33] Defendants do not dispute that they had a duty, as seller, to disclose information concerning the Residence. (*See generally* Defs.' Mem. 10–17; Defs.' Reply 2–9.) Instead, they argue that both causes of action fail because Plaintiff fails to establish there was a material misrepresentation or omission of fact, which Defendants made with the intent to defraud, upon which Plaintiff relied upon, and for which Plaintiff suffered damages. (*See* Defs.' Mem. 10–17; Defs.' Reply 2–9.) Therefore, the Court does not address the duty element for fraudulent concealment further.

settlement with Porcelanosa pertaining to the defects in the flooring which caused the floors to delaminate and for which Porcelanosa increased the amount given to Defendants by approximately $50,000, for a total of $121,479, based on their representation that they would have to remove and replace the flooring which would be difficult and labor intensive, (*id.* ¶¶ 60, 63–66); (3) Defendants never replaced the flooring at the Residence, (*id.* ¶¶ 67, 69, 70); and (4) Plaintiff observed "concealed pin nails on the floorboards throughout the Residence" and Defendants admit to using "face nails and putty . . . in connection to complete certain areas of the wood flooring, (*id.* ¶ 52; Defs.' Mem. 15.). Moreover, Defendants admit that while they previously believed the Residence contained defective flooring, they later "determined that misuse of the radiant heating was the cause of any delaminating floors" and concede that "a mistake may have been made as delamination of the flooring occurred after Plaintiff's purchased the [Residence.]" (Defs.' Mem. 13.)

However, the evidence also shows numerous disputed issues of material fact which preclude the Court from granting summary judgment to either party, including: (1) the cause of the delamination — the wood being part of a defective batch or the Plaintiff's use of radiant heating, (Pl.'s 56.1 ¶ 60; Defs.' 56.1 Resp. ¶¶ 72–78); (2) when the actual cause of the delamination was discovered, prior to the sale of the Residence or the Porcelanosa settlement or after Plaintiff started residing at the Residence; (3) whether Defendants took action, such as using pin nails and putty or blaming Plaintiff's use of radiant heating, to specifically conceal the delamination and defective wood, (Defs.' 56.1 Resp. ¶ 52); (4) given Defendants' duty to disclose information about the Residence, whether Defendants could have or should have asked Porcelanosa whether they could reveal their settlement and/or could have or should have revealed to Plaintiff the conditions of the wood which underlie the settlement despite the

confidentiality provision found within the Settlement Agreement,[34] (*id.* ¶ 70); (5) whether Defendants should have replaced the floors but instead pocketed the settlement money and left the defective floors in place, (*id.* ¶¶ 62–68); (6) if the Gaetanos took any action in their personal capacity involving the flooring issues, (*see* Pl.'s Mem. 7 (asserting that evidence shows the Gaetanos acted in their personal capacity without any reference or citation to an undisputed material fact)); (7) whether any Defendant believed the floors to be in good shape at the time of the sale to Plaintiff,[35] (*see, e.g.,* Defs.' 56.1 Resp. ¶ 67); and (8) whether Plaintiff's professional

---

[34] Plaintiff argues that Defendants cannot rely on the confidentiality provision to protect them from having engaged in fraud. (Pl.'s Reply 8–9; Pl.'s Opp'n 4–6.) Defendants argue that "Plaintiff seeks to impose duties upon the Defendants which do not exist" and the Gaetanos "had no legal duty to disclose the confidential agreement that 65 Dune entered into with the flooring manufacturer to Plaintiff, or any prospective buyer of the [Residence]." (*See* Defs.' Mem. 12–13; Defs.' Reply 3.) Instead, "[it] is undisputed that the principals of 65 Dune were contractually precluded from revealing to any third party (which includes Plaintiff) the settlement with Porcelanosa and, pursuant to paragraph 4 of the agreement, "information concerning the [f]looring." (Defs.' Reply 3–4.)

Defendants do not dispute that 65 Dune, as seller, had a duty to disclose information concerning the Residence, however, they argue that the Gaetanos were prohibited from disclosing the settlement or the information concerning the flooring that underlie the settlement. "[S]ettlement agreements are not to be used as a device . . . [to] take away the legal rights of [ ] a nonparty." *Davis v. Blige*, 505 F.3d 90, 102–03 (2d Cir. 2007) (first alteration in original); *see also Oasis Med., Inc. v. I-Med Pharma USA Inc.*, No. 23-MC-206, 2023 WL 6301728, at *10 (S.D.N.Y. Sep. 1, 2023) ("Just as the parties to a settlement agreement cannot render it undiscoverable by inserting a confidentiality clause, neither can the parties to a mediation create their own privilege — enforceable against third parties — by contract alone." (internal citations omitted)). As the Court finds that a dispute of material fact exists that precludes summary judgment, including whether Defendants fraudulently concealed the facts about the allegedly defective flooring which they knew about at the time of the Porcelanosa Settlement Agreement and which underlie the settlement itself, the Court finds that the confidentiality provision of the Settlement Agreement does not preclude a jury from finding that Defendants are liable for fraudulent inducement and/or fraudulent concealment.

[35] *See supra* footnote 12. While Plaintiff repeatedly argues that S. Gaetano's testimony cannot be the basis either for granting summary judgment and/or denying summary judgment, (Pl.'s Mem. 8 n.4; Pl.'s Opp'n 6 n.3), Defendants have presented other evidence to support S. Gaetano's testimony which create a dispute of material fact. Specifically, Defendants point to Plaintiff's engineer's pre-purchase inspection report of the Residence which notes no issues with the flooring and a Porcelanosa representative's testimony that he had heard of radiant heating

engineer who examined the flooring and prepared a detailed pre-purchase inspection report observed the defects, pin nails, and putty and whether he believed the floors to be in "good condition" prior to Plaintiff's purchase of the residence, (Pl.'s 56.1 Reply ¶ 52).

These disputed facts preclude the Court from making a determination on any of the elements for fraudulent inducement and fraudulent concealment, and ultimately create a question of legal liability. In particular, the disputed material facts impact whether: (1) Defendants knew whether the wood used at the Residence was defective and that defective wood caused the delamination issue; (2) Defendants took active steps to conceal the defect, such as by using pin nails and putty to cover the issue, blaming Plaintiff's use of radiant heating for the issue, and/or concealing their settlement with Porcelanosa; and (3) Defendants, as a seller of the Residence, had a duty to disclose information concerning the delamination, the alleged defective wood batch, and/or the settlement with Porcelanosa. *See Meridian Horizon Fund, LP*, 487 F. App'x at 641 (listing elements for fraudulent inducement); *TVT Recs.*, 412 F.3d at 90–91 (listing elements for fraudulent concealment). Therefore, the Court denies summary judgment to both parties on the fraudulent concealment and inducement claims as they relate to the flooring at the Residence.

---

being proposed as a possible contributing factor to delamination. (Defs.' Reply 5–6.) Given this supporting evidence, the Court will not discredit S. Gaetano's deposition testimony and reserves this assessment for the jury. *See Russo v. Nat'l Grid, USA*, No. 23-CV-3954, 2026 WL 1492969, at * 9 (E.D.N.Y. May 28, 2026) (declining to discredit "self-serving testimony" just because it was self-serving); *Lewis v. Hanson*, No. 18-CV-12, 2022 WL 991729, at *8–10 (N.D.N.Y. Mar. 31, 2022) (declining to discredit self-serving testimony given that the weight of other evidence could allow the jury to credit the testimony); *see also Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 726 (2d. Cir 2010) (declining to discredit the plaintiff's self-serving testimony because it was "not contradictory or rife with inconsistencies"); *Healey*, 947 F.2d at 620 ("The fact that [ ] testimony may be self-serving goes to its weight rather than its admissibility."); *United States v. Gonzalez*, 111 F. Supp. 3d 416, 424 (S.D.N.Y. 2015) (discrediting self-serving testimony "except insofar as that testimony is either corroborated by other evidence or is intrinsically reliable"); *cf. Brooks v. Dash*, 454 F. Supp. 3d 331, 338 (S.D.N.Y. 2020) (discrediting self-serving testimony that "not only lacked credibility but also was not corroborated by a single piece of documentary evidence"), *aff'd*, 852 F. App'x 40 (2d Cir. 2021).

*See Volt Electric NYC Corp. v. A.M.E., Inc.*, 586 F. Supp. 3d 262, 294–96 (S.D.N.Y. 2022) (denying summary judgment on sub-contractor plaintiff's fraud claim against contractor defendant because of numerous factual disputes); *M&T Morg. Corp. v. White*, 736 F. Supp. 2d 538, 561–70 (E.D.N.Y. 2010) (adopting report and recommendation) (denying summary judgment on fraud claims finding genuine disputes of material fact existed as to various elements of fraud alleged by purchasers against vendor); *cf. Aktas v. JMC Dev. Co.*, 877 F. Supp. 2d 1, 24 (N.D.N.Y. 2012) (granting summary judgment and dismissing fraudulent inducement and fraudulent concealment claims where the homeowner plaintiff "failed to specify or come forward with any proof to substantiate the broad allegations of fraud contained in the complaint" against subcontractor defendant).

**ii. Glass for windows and doors**

The evidence shows various undisputed material facts, namely that: (1) the windows and doors at the residence were required, under New York State Law, to satisfy ASTM E1886 and E1996, meaning they must be made of impact glass and hurricane resistant metal frames, or else have removable protection such as temporary plywood panels if not, (Defs.' 56.1 Resp. ¶¶ 81–85); (2) M&C, the architect of record for the Residence, prepared architectural drawings and framing drawings that state that "all windows and doors are to be hurricane resistant" and "all glass shall be hurricane resistant unless noted otherwise," (*id.* ¶ 87); (3) despite seeking and receiving pricing from Westhampton Glass for impact rated windows, which was "extremely high" due to the "impact rating," Defendants did not purchase the impact windows and glass doors from Westhampton Glass but instead from Architectural Industries, (*id.* ¶¶ 89–93); (4) the contract with Architectural Industries "calls for Arcadia impact rated [glass], except for the large great room sliders," (*id.* ¶ 94); (5) Defendants "paid substantially less" for the windows and glass doors they purchased than what was quoted by Westhampton Glass, (*id.*); (6) because the

building codes require either "impact glass or plywood [ ]cover windows and doors" for non-impact glass, the Residence needed to have plywood available, (*id.* ¶¶ 115–16); (7) plywood cut-outs were available at some point such that the residence could obtain a certificate of occupancy, but testimony from all sides notes that they could not find such cut-outs at the Residence at a later time, (Pl.'s 56.1 Reply ¶¶ 113–22); (8) the Glass Slider was non-impact rated and would need protection during a hurricane, (Defs.' 56.1 Resp. ¶ 106); and (9) Plaintiff's expert determined that the "ninety-percent" of the glass used in the other doors and windows were non-impact glass or 'Low-E,'" (*id.* ¶¶ 103, 106–12), while Defendants' expert determined that "the glass used [for the windows and doors at the Residence] will behave similarly of that of impact missile rated glass," (*id.* ¶ 127).

However, the evidence also shows numerous disputed issues of material fact which preclude the Court from granting summary judgment to either party, including: (1) whether "impact glass" must have an interlayer thickness of .090 inches or that the "thickness of an interlayer is 'only a parameter'" in determining what glass is considered "impact glass," (Pl.'s 56.1 Reply ¶ 86; Defs.' 56.1 Resp. ¶ 86); (2) whether "65 Dune purchased non-impact windows and glass doors" as the contract with Architectural Industries "calls for Arcadia impact rated [glass], except for the large great room sliders," (Defs.' 56.1 Resp. ¶ 94); (3) what Vichinsky represented to Plaintiff with regard to whether the glass in the windows and doors were high impact, "Low-E", hurricane resisting, UV-rated, and/or "thermal impact," (*id.* ¶¶ 97–101); (4) whether the Gaetanos, in their individual capacity, "provided the information contained within the marketing brochure to Bespoke" and/or that the Gaetanos, in their individual capacity, approved any brochure from Bespoke, (*id.* ¶ 102); (5) what Vichinsky represented to Plaintiff with regard to the particular building codes and impact glass requirements necessary to the area of the Residence, (*id.* ¶¶ 99, 102); (6) whether Plaintiff relied on these representations as

"important considerations" to Plaintiff's decision to purchase the Residence at the price he paid, (Pl.'s 56.1 Reply ¶¶ 97–101); and (7) what happened to the plywood-cut outs at the Residence and whether Defendants explicitly removed them to conceal the alleged fraud,[36] (*id.* ¶¶ 113–24).

These outstanding disputed facts impact the determination of many of the elements of fraudulent inducement and concealment — what, if any, representations were made about the glass used at the Residence, who made and/or approved of those representations, and if Plaintiff relied upon these misrepresentations; whether the glass used at the Residence was or was not impact-rated; and whether Defendants, knowing about the alleged fraudulent misrepresentation, took steps to conceal the fraud, such as removing the plywood cut-outs. These questions preclude the Court from granting summary judgment to either party on Plaintiff's claims for fraudulent inducement and concealing regarding the glass used in the windows and doors at the Residence. *See Volt Electric NYC Corp.*, 586 F. Supp. 3d at 294–96 (denying summary judgment on sub-contractor plaintiff's fraud claim against contractor defendant because of numerous factual disputes); *M&T Morg. Corp.*, 736 F. Supp. 2d at 561–70 (denying summary judgment on fraud claims finding genuine disputes of material fact existed as to various elements of fraud alleged by purchasers against vendor); *cf. Aktas*, 877 F. Supp. 2d at 24 (granting

[36] Plaintiff argues the "*only* evidence cited in opposition with respect to disposal of the cutouts is [S.] Gaetano's deposition testimony that he did not 'tell anyone to remove the cutouts' from the Residence," which is self-serving and thus cannot, alone defeat summary judgment." (Pl.'s Reply 10; *see* Pl.'s 56.1 Reply ¶¶ 67, 124.) However, Plaintiff fails to cite to any evidence that substantiates his theory that the Gaetanos specifically removed or discarded the plywood cut-outs to conceal their alleged fraud. (*See generally* Pl.'s 56.1 Reply ¶¶ 113–24.) The evidence demonstrates that there were plywood cut-outs at the Residence at the time of the certificate of occupancy inspection, but later they could not be found. It is unclear to the Court whether this was a result of intentional deceit or was accidental, and Plaintiff fails to provide evidence establishing the answer. Therefore, the Court finds this to be a question of material fact to be determined by the fact-finder as both parties fail to substantiate their claims with supporting evidence.

summary judgment and dismissing fraudulent inducement and fraudulent concealment claims where the homeowner plaintiff "failed to specify or come forward with any proof to substantiate the broad allegations of fraud contained in the complaint" against subcontractor defendant).

Therefore, in addition to the outstanding question of the amount of damages incurred by Plaintiff, a fact-finder must determine the outstanding disputed material facts and determine whether Defendants are liable for fraudulent inducement and fraudulent concealment of the alleged issues with both the flooring and the windows and doors.

**iii. Punitive damages**

Defendants argue that "Plaintiff's claims for punitive damages, appearing in his second and third causes of action[ for fraud,] should be dismissed as a matter of law." (Defs.' Mem. 17.) Defendants contend that, as a matter of law, "punitive damages are not recoverable in a fraud cause of action unless the acts in question were part of a pattern directed at the public generally" and Plaintiff has failed to provide any evidence supporting that the alleged fraudulent representations "could even remotely be considered part of a public pattern." (*Id.* at 17–19.) Specifically, Defendants argue that Plaintiff fails to include the word "public" in the SAC, fails to allege or plead facts to support "a scheme to defraud the general public," and fails to reference "any sales of other homes or wide-ranging, public oriented business practices," but instead focuses solely on the "specific sale" of the Residence to Plaintiff. (*Id.* at 20.)

First, Plaintiff argues that "there is *no* public wrong requirement absent a contractual relationship between the parties; and in this case there is no contractual relationship between Plaintiff . . . and the Gaetano[s]." (Pl.'s Opp'n 15.) Plaintiff therefore argues that it is not

required to prove a public wrong.[37] (*Id.*) Second, Plaintiff concedes that there is a contractual relationship between Plaintiff and 65 Dune, however, he contends that "there is significant evidence in this case demonstrating that 65 Dune's . . . conduct was directed at the public" as it "fraudulently advertis[ed] the Residence to the general public, not Plaintiff." (*Id.* at 16.) Plaintiff argues this is sufficient under case law. (*Id.* (citing *Langenberg v. Sofair*, No. 03-CV-8339, 2006 WL 3518197, at *5 (S.D.N.Y. Dec. 7, 2006)).)

"To state a claim warranting punitive damages [for fraud] under New York Law, a plaintiff must allege the following: '(1) defendant's conduct must be actionable as an independent tort; (2) the tortious conduct must be of [an] egregious nature . . . ; (3) the egregious conduct must be directed to plaintiff; and (4) it must be part of a pattern directed at the public generally." *Kruglov v. Copart of Conn., Inc.*, 771 F. App'x 117, 120 (2d Cir. 2019) (second and third alterations in original) (quoting *N.Y. Univ.*, 87 N.Y.2d at 316); *see also Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 225 (2d Cir. 2017) (quoting same); *BDG Gotham Residential, LLC v. W. Waterproofing Co.*, No. 19-CV-6386, 2024 WL 5201596, at * (S.D.N.Y. Dec. 23, 2024) (noting same elements to "obtain punitive damages on a tort claim arising from a contractual relationship"). "Because the purpose of punitive damages 'is not to remedy private wrongs but to vindicate public rights,' a defendant's conduct must 'involve[ ] a fraud evincing a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations.'" *Kruglov*, 771 F. App'x at 120 (alterations in original)

[37] Defendants admit that there is no contractual relationship between Plaintiff and the individual members of 65 Dune (the Gaetanos) and no contractual relationship between the real estate broker and the individual members of 65 Dune (the Gaetanos). (Defs.' Reply 10 n.3.) Therefore, Defendants argue that "although [they] deny that any misrepresentations were made as to the windows, should the [trier of fact] conclude that the broker made misrepresentations in this regard, these would not be attributable to the Gaetanos individually, eliminating any punitive damages claims as against the Gaetanos." (*Id.*)

(quoting *Rocanova v. Equitable Life Assurance Soc'y of the U.S.*, 83 N.Y.2d 603, 613 (1994)); *see also Coughlan v. Jachney*, 473 F. Supp. 3d 166, 198 (E.D.N.Y. 2020) (quoting *id.*); *Walker v. Sheldon*, 10 N.Y.2d 401, 404 (1961) ("Punitive or exemplary damages have been allowed in cases where the wrong complained of is morally culpable, or is actuated by evil and reprehensible motives, not only to punish the defendant but to deter him, as well as others who might otherwise be so prompted, from indulging in similar conduct in the future."). "[A]lthough '[p]unitive damages are refused in the "ordinary" fraud and deceit case,' they are recoverable 'where the fraud, aimed at the public generally, is gross and involves high moral culpability.'" *Coughlan*, 473 F. Supp. 3d at 198 (second alteration in original) (first quoting *Kruglov*, 771 F. App'x at 120; and then quoting *Walker*, 10 N.Y.2d at 405). "However, where . . . there is no contractual relationship between the parties . . . , [the p]laintiff need not establish that [the d]efendant's conduct amounted to a public wrong for its fraudulent inducement claim." *Geis Constr. S., LLC v. Delahunt*, No. 20-CV-3834, 2024 WL 3694147, at *7 (E.D.N.Y. June 12, 2024) (emphasis omitted), *report and recommendation adopted*, 2024 WL 3342437 (E.D.N.Y. July 9, 2024); *see also Plymouth Res., LLC v. Norse Energy Corp. USA*, No. 10-CV-909, 2011 WL 13234819, at *6 (N.D.N.Y. Mar. 10, 2011) ("In claims for fraud that include fraudulent inducement claims, where there is no contractual long-standing relationship between the parties, the plaintiff may recover punitive damages without establishing a public wrong.").

Plaintiff seeks punitive damages for his causes of action for fraudulent inducement and fraudulent concealment allegedly committed by 65 Dune and M. Gaetano and S. Gaetano, individually. (SAC ¶¶ 75, 84.) As both parties admit, Plaintiff does not have a contractual relationship with the Gaetanos and therefore, Plaintiff need not prove their alleged fraud was "part of a pattern directed at the public generally." *Kruglov*, 771 F. App'x at 120. Defendants do not argue that Plaintiff is otherwise not entitled to punitive damages against the Gaetanos.

(*See generally* Defs.' Mem.; Defs.' Reply.) *See also Cooper v. City of New Rochelle*, 925 F. Supp. 2d 588, 613 (S.D.N.Y. 2013) ("Generally, the issue of whether to award punitive damages is an issue for the jury to decide based on an evaluation of the plaintiffs['] proof of sufficiently serious misconduct."). Therefore, Plaintiff may pursue punitive damages against the Gaetanos in their individual capacities.

However, as Plaintiff and 65 Dune share a contractual relationship, Plaintiff must prove a pattern of wrong directed at the public to be entitled to seek punitive damages against 65 Dune. *See Kruglov*, 771 F. App'x at 120. Accepting the facts in the light most favorable to Plaintiff, the Court cannot conclude that the alleged fraud was part of a larger pattern of fraud directed at the public. The record lacks any allegations or evidence suggesting that 65 Dune, a single purpose entity that was created for the purpose of selling the Residence, attempted to commit any other fraud to constitute a "pattern." In addition, the record lacks evidence that 65 Dune directed fraud at the broader public aside from the allegation that 65 Dune's broker's brochure and marketing materials contained fraudulent misrepresentations. Plaintiff attempts to argue that because 65 Dune marketed the residence to the public, he has sufficiently established this prong. Even if Plaintiff were correct,[38] despite being contradicted by case law, he has failed to prove a

---

[38] Plaintiff cites only to one case in support of his argument, *Langenberg v. Sofair*, No. 03-CV-8339, 2006 WL 3518197, at *5 (S.D.N.Y. Dec. 7, 2006). In *Langenberg*, the court held first that the plaintiff "may recover punitive damages without establishing a public wrong." *Id.* However, if it were required, the court found that the plaintiff would be able to satisfy the requirement because the plaintiff "was not the only person to whom [the defendant] told lies as part of his investment fraud scheme," which included making "numerous false statements in filings with the Securities and Exchange Commission and [ ] promotional materials." *Id.*

First, this case, while not explicitly overruled, is one of the many cases where New York courts found meeting the "public harm" requirement unnecessary. *See Mayline Enters., Inc. v. Milea Truck Sales Corp.*, 641 F. Supp. 2d 304, 311–12 (S.D.N.Y. 2009) (explaining the history of these decisions). However, the Second Circuit has concluded that these cases are against the weight of the authority on the issue and courts in the Circuit have since held that showing public harm is a requirement. *TVT Recs. v. Island Def Jam Music Grp.*, 412 F.3d 82, 94 & n.12 (2d Cir.

pattern. *See Pyskaty*, 856 F.3d at 226–27 (affirming the district court's dismissal of the plaintiff's request for punitive damages because the case involved plaintiff's single purchase of a car, rejecting the plaintiff's claim that it was part of a pattern of conduct directed at the public because the car was "unsafe to drive and inoperable on public streets" and the sale was an "isolated transaction"); *United States ex rel. Evergreen Pipeline Constr. Co. v. Merritt Meridian Constr. Corp.*, 95 F.3d 153, 161 (2d Cir. 1996) (dismissing punitive damages claim where the plaintiff only alleged a single incident perpetrated against the public which was insufficient to "evince[] a pattern of conduct harming the general public"); *Mayline Enters., Inc. v. Milea Truck Sales Corp.*, 641 F. Supp. 2d 304, 312 (S.D.N.Y. 2009) (finding the while the plaintiff's argument that the defendant fraudulently "held [the truck] out for sale to the general public," the plaintiff "ha[d] still proven only a single incident of odometer alteration"); *Ventus Networks, LLC v. Answerthink, Inc.*, No. 05-CV-103016, 2007 WL 582736, at *3 (S.D.N.Y. Feb. 22, 2007) (dismissing the plaintiff's punitive damages claim where plaintiff was fraudulently induced to purchase a software system because the fraudulent conduct was "an isolated transaction" and was not a public harm as the plaintiff failed to allege that the defendant set out to defraud the general public or otherwise "directed its allegedly fraudulent conduct towards the general public"). Therefore, the Court finds that Plaintiff has not established that 65 Dune's fraudulent conduct was "part of a pattern directed at the public generally," and therefore, he cannot recover punitive damages against 65 Dune. *Kruglov*, 771 F. App'x at 120.

---

2005); *see, e.g.*, *Ventus Networks, LLC v. Answerthink, Inc.*, No. 05-CV-103016, 2007 WL 582736, at *3 (S.D.N.Y. Feb. 22, 2007) (requiring a plaintiff to prove public harm to be entitled to punitive damages). Second, even if the Court were to find this case persuasive to support Plaintiff's argument that 65 Dune's fraud was directed at the public, the case undermines his argument with respect to 65 Dune's alleged "pattern" of fraud. In *Langenberg*, the defendant's fraud perpetrated amongst many parties and through many lies. In comparison, Defendants' fraud is pled and allegedly substantiated only with the Residence. Therefore, *Langenberg* does not impact the Court's analysis on the pattern of fraud element required for punitive damages.

**d. GBL § 777-a breach of implied warranty claims**

Plaintiff moves for summary judgment on his claims for breach of the implied statutory warranty under GBL § 777-a against 65 Dune and Gaetano Development.[39] (Pl.'s Mem. 15–35.) In support, Plaintiff argues that he is entitled to judgment because he has met his burden of establishing all of the elements required under GBL § 777-a, "through documents, deposition testimony, expert reports and the like," for the following "defects" at the Residence: (1) pool deck; (2) structure of the first-floor hallway, including to the center steel girder and floor joists spanning the east wall; (3) lateral system; (4) pool; (5); radiant heat system; (6) wood siding panels and WRB; and (7) generator. (*Id.*; Pl.'s Reply 12.) Specifically, Plaintiff contends that the "Residence is riddled with defects covered by the [i]mplied [w]arranty incorporated into the Contract," none of which were "visible upon inspection," caused by "Defendants' shoddy and faulty construction," and for which "Plaintiff provided Defendants with the requisite notice and an opportunity to inspect and repair" which they "ignored" and "ultimately . . . reject[ed]." (Pl.'s Mem. 15.) Therefore, Plaintiff argues that "the burden shifts to Defendants to raise a triable issue of fact" which they fail to do. (Pl.'s Reply 12–20.) However, Plaintiff does not move for summary judgment on the amount of damages, only on the issue of liability. *See supra* footnote

[39] In the November 2020 Decision, the Court addressed the parties' arguments regarding whether 65 Dune, in addition to Gaetano Development who was listed in the Rider's warranty as guarantor, can be held liable for breach of implied warranty under GBL § 777-a. (November 2020 Decision 7–11.) The Court ultimately held that "[a]t [the motion to dismiss] stage of the litigation, the Court cannot determine the partes' intent" and therefore "denie[d] Defendants' motion to the extent it argues that the builder 65 Dune is not a warrantor based on the [c]ontract." (*Id.* at 11.) In their respective briefing to the cross-motions for summary judgment, neither party addresses this issue. Therefore, the Court does not discuss the issue further and instead will analyze whether Plaintiff is entitled to summary judgment on the issue of both 65 Dune and Gaetano Development's liability.

32. (*See, e.g.*, Pl.'s Mem. 19 (arguing that summary judgment should be granted on the alleged pool deck defects, "leaving a dispute over the expense of the repair as the only issue for trial").)

Defendants argue that triable issues of material fact exist as to all of Plaintiff's breach of implied warranty claims, which bars summary judgment. (Defs.' Opp'n 17–25.) Specifically, Defendants present arguments with respect to the following alleged "defects": (1) pool deck; (2) structure of the first-floor hallway; (3) pool; (4) radiant heating system; (5) wood siding panels and WRB; and (6) generator.[40] (*Id.*) Defendants neglect to include a section with regard to the lateral system. (*See generally id.*) Moreover, Defendants argue that Plaintiff fails to provide evidence of his damages for certain claims for breach of implied warranty and therefore, those causes of action should be dismissed and Plaintiff precluded from offering evidence of damages.[41] (Defs.' Mem. 21–24; Defs.' Reply 12–13; *see also* Defs.' Opp'n 24–25.)

---

[40] In addition, Defendants move for summary judgment and for dismissal of Plaintiff's implied warranty claims because Plaintiff relies on impermissible expert analysis, (Defs.' Mem. 4–5, 21–27). The Court has already addressed and denied this argument. *See supra* Section II.b.

[41] Defendants spend an entire section of briefing, and several paragraphs of their opposition, arguing that Plaintiff has failed to provide actual evidence of his damages for certain implied warranty claims, such as the "second-floor deck" and radiant heating system, and therefore, the claims should be dismissed and/or Plaintiff subsequently precluded from offering evidence of damages. (Defs.' Mem. 21–24; Defs.' Reply 12–13; *see also* Defs.' Opp'n 24, 25.) Most of the dispute centers around Minkoff, Plaintiff's general contractor and expert witness, the repairs he allegedly undertook at the Residence and the agreement, or lack thereof, between Minkoff and Plaintiff. (*See* Defs.' Mem. 21–24; Defs.' Reply 12–13.) As discussed *supra* footnote 32, Defendants appear dissatisfied over the evidence of certain damages Plaintiff produced during discovery and the Court again questions why this remains an issue when it should have been addressed during discovery. Indeed, Defendants never brought a discovery motion on this issue prior to mentioning it in their briefing for this motion for summary judgment. Moreover, Defendants now appear to threaten a motion under Rule 37 of the Federal Rules of Civil Procedure, asking for the Court to sanction Plaintiff for his alleged failure to produce evidence of damages. (*See* Defs.' Mem. 23.) Plaintiff argues that he has proffered sufficient evidence of his damages in connection with his implied warranty claims which Defendants "selectively ignore." (Pl.'s Opp'n 17–20.) In addition, Plaintiff correctly explains that Defendants' cited case law involves situations where a party disobeys a court's discovery order, but Defendants have never brought a motion for discovery and the Court has never issued

Under GBL § 777-a, Housing Merchant Implied Warranty, the warrantor warrants that (a) "one year from and after the warranty date the home will be free from defects due to a failure to have been constructed in a skillful manner;" (b) "two years from and after the warranty date the plumbing, electrical, heating, cooling and ventilation systems of the home will be free from defects due to a failure by the builder to have installed such systems in a skillful manner;" and (c) "six years from and after the warranty date the home will be free from material defects." GBL § 777-a(1). For a building to be "[c]onstructed in a skillful manner," the builders' "workmanship and materials [must] meet or exceed the specific standards of the applicable building code" or, where no code applies, "meet or exceed the standards of locally accepted building practices." *Id.* at § 777(3). A material defect is "actual physical damage to the [ ] load-

---

a discovery order as to damages or even as to any discovery dispute generally. *See Knic Knac Agencies v. Masterpiece Apparel*, No. 94-CV-1073, 1999 WL 156379, at *5–6 (S.D.N.Y. Mar. 22, 1999) (precluding evidence as to the value of damages because plaintiffs violated multiple court discovery orders and failed to produce any evidence of damages at all); *see also Daval Steel Prods., a Div. of Francosteel Corp. v. M/V Fakredine*, 951 F.2d 1357, 1362–63 (2d Cir. 1991) (finding that a court can impose Rule 37(b) sanctions where a party fails to comply with a court order); *Susana v. NY Waterway*, 662 F. Supp. 3d 477, 493 (S.D.N.Y. 2023) (denying the defendants' motion for sanctions under Rule 37 because it did "not stem from the violation of any court order").

As with Plaintiff's fraud claims, Plaintiff has demonstrated that he suffered damages due to Defendants' breaches of implied warranty and that Plaintiff has produced evidence that he has already replaced the defects and/or intends to remedy the defects, supported by expert reports estimating the remedial costs. (*See, e.g.*, Pl.'s 56.1 Reply ¶ 316 (Plaintiff has already replaced the pool deck); Pl.'s Opp'n 17–18 (discussing an expert report estimating damages and future work to remediate the defects).) Moreover, it does not appear that proof of damages is required to impose liability or if damages are inherent for breaches of implied warranty under GBL § 777-a. Therefore, the Court rejects Defendants' requested dismissal, request to disallow Plaintiff from offering evidence of damages, and motion for sanctions for any alleged discovery violation where Defendants never sought discovery through the Court. Because, as discussed below, the Court grants summary judgment on the issue of liability for several defects (as Plaintiff only seeks summary judgment on the issue of liability, not the amount of damages for any claims), the parties can address the issue of damages at trial where a jury will decide the amount of damages. *See supra* footnotes 32 and 41; *see also Zurich Am. Life Ins. Co.*, 590 F. Supp. 3d at 718 ("For purposes of summary judgment, plaintiffs need not, however, prove the exact amount of such damages.").

bearing portions of the home," defined as "foundation systems and footings, beams, girders, lintels, columns, walls and partitions, floor systems, and roof framing systems," that is "caused by failure of such load-bearing portions which affects their load-bearing functions to the extent that the home becomes unsafe, unsanitary or otherwise unliveable." *Id.* at § 777(4). Prior to commencing any action for breach of a housing merchant implied warranty, the plaintiff, owner and occupant of the home, must provide the defendant builder with notice and a "reasonable opportunity to inspect, test and repair the portion of the home to which the warranty claim relates." *Id.* at § 777-a(4)(a); *see also Rich v. Orlando*, 969 N.Y.S.2d 324, 325–26 (App. Div. 2013) (collecting cases). "The measure of damages shall be the reasonable cost of repair or replacement and property damage to the home proximately caused by the breach of warranty, not to exceed the replacement cost of the home exclusive of the value of the land, unless the court finds that, under the circumstances, the diminution in value of the home caused by the defect is a more equitable measure of damages." GBL § 777-a(4)(b). "In the procedural context of a motion for partial summary judgment, plaintiffs ha[ve] the threshold burden of establishing a breach of limited warranty and, if they do so, the burden then shift[s] to defendant to raise a triable issue of fact." *Horwitz v. Camelot Assocs. Corp.*, 888 N.Y.S.2d 241, 242–43 (App. Div. 2009) (citing *Zuckerman v. City of New York*, 49 N.Y.2d 557, 562 (1980)); *see also Biancone v. Bossi*, 806 N.Y.S.2d 694, 695–96 (App. Div. 2005) (applying the summary judgment standard of law, which requires that the moving party to first make a prima facie showing of entitlement to judgment as a matter of law and then, once the movant has met their threshold burden, the opposing party to present the existence of triable issues of fact, to a motion for summary judgment on GBL § 777-a claims); *Privilege Underwriters Reciprocal Exch. v. Boniello Land & Realty, Ltd.*, No. 69060/2016, 2019 WL 13204994, at *3–4 (N.Y. Sup. Ct. Aug. 21, 2019) (same).

**i. Pool deck**

Plaintiff argues that he is entitled to summary judgment on his breach of implied warranty claim relating to the pool deck under GBL §§ 777-a(1)(a) and (c). (Pl.'s Mem. 16–19.) In support, Plaintiff argues that the evidence establishes all of the elements, which Defendants fail to rebut: (1) the pool deck, which sits twenty feet above the ground, was constructed using "improper building materials," specifically the hangers and nails, in violation of the manufacturer's specifications, the Town of Southampton Building Code, and "the requirements set forth in the drawings for construction of the [R]esidence"; (2) the improper materials, which provide critical support for the deck, began rusting, deteriorating and compromising the wood; (3) these defects created a significant safety issue; (4) these defects were latent as they "appear[ed] slowly over time, on the underside of deck joists; and (5) Plaintiff provided timely notice to Defendants who took no action. (*Id.* at 16–17.) In response to Defendants' argument disputing the method of repair Plaintiff employed, Plaintiff argues that "the only plausible remediation was to remove and replace the pool deck itself with the code compliant construction materials, as the hangers and nails were not only rusted and difficult to remove generally, but impossible to remove without causing significant damage to the wood deck itself." (*Id*. at 17.) Plaintiff argues that Defendants "should not be permitted to object to the repair method" because they did not conduct an inspection until after the litigation commenced, and even if allowed, Defendants' expert "conceded that Defendants' [p]roposed [d]eck [r]epair was unworkable, and the deck needed to be replaced." (*Id.* at 17–18.) Therefore, Plaintiff argues he is also entitled to summary judgment on the issue of the method of repair.

Defendants argue that "[i]ssues of material fact exist concerning the method of repair Plaintiff used to replace the joist hangers for the exterior pool deck, and consequently, the cost of replacing these joist hangers." (Defs.' Opp'n 17.) They argue that the method of replacement

suggested by their expert engineer, Angelides, "would have been significantly less expensive than the method proposed by Plaintiff." (*Id.* at 18.) Therefore, "construing the evidence in light most favorable to the non-moving parties . . . Plaintiff's arguments concerning supposed flaws in [ ] Angelides's proposal amount to nothing more than questions of fact that must be evaluated by the jury." (*Id.* at 19.)

Plaintiff offers evidence to satisfy all of the elements for breach of implied warranty under GBL §§ 777-a(1)(a) and (c) regarding the pool deck. Plaintiff provided timely notice to Defendants and an opportunity to inspect and repair the latent defects in the deck, which Defendants failed to address. (Pl.'s 56.1 Reply ¶¶ 38–47.) *See Privilege Underwriters Reciprocal Exch.*, 2019 WL 13204994, at *3–4 (holding that the plaintiff provided timely notice of claims under GBL § 777-a by "sufficiently providing notice that its inspection revealed that damages to the home were as a result of defendants' negligent construction and renovation work, and offering the opportunity to conduct an investigation"); *see also Biancone*, 806 N.Y.S.2d at 696 (reviewing the trial court's decision on the defendants' motion for summary judgment based on the notice provisions of GBL § 777-a, dismissing one claim where the defendants established "that the plaintiffs failed to notify them of the[] [alleged] defects pursuant to the notice of claim provisions in General Business Law §777-a(4)(a)" and the "plaintiffs failed to raise a triable issue of fact in opposition"); *cf. Rich*, 969 N.Y.S.2d at 325–26 (affirming denial of the plaintiff's summary judgment motion where plaintiff "failed to provide written notice of the alleged defects" to the defendants); *Pinkus v. V.F. Builders, Inc.*, 705 N.Y.S.2d 283, 283 (App. Div. 2000) (same).

There is no dispute that the hangers and nails used in the deck: (1) were in violation of Town Code for Southhampton § 169-17(f), which requires that the metal connectors and fasteners used in exposed locations be of hot-dipped galvanized metal, and manufacturer

requirements on the length of specific nails found in hangers, and were present at the time of Plaintiff's purchase of the Residence, (Pl.'s 56.1 Reply ¶¶ 303, 307, 308, 311); (2) impacted the safety condition of the deck, (*id.* ¶¶ 312, 322, 324); and (3) rusted and were ultimately damaged, which impacted the structural integrity of the deck sitting twenty feet above the ground, within six years of the sale as Plaintiff commenced this litigation only four years later, (*id.* ¶ 304). Plaintiff has therefore established that the deck was not constructed in a skillful manner, as it did not meet applicable building codes,[42] and had a material defect which impacted the load-bearing portions of the deck causing it to become unsafe. GBL § 777-a(1)(a) and (c); *see Horwitz*, 888 N.Y.S.2d at 243 (finding that the district court did not err in granting the plaintiffs' partial summary judgment where the plaintiffs' proved, and the defendant failed to rebut, that the defect violated various codes and standards, which established the home was not constructed in a skillful manner, and the defects compromised the safety of the house, which constituted a material defect in the construction of the house); *cf. Gallup v. Summerset Homes, LLC*, 920 N.Y.S.2d 504, 507 (App. Div. 2011) (affirming denial of summary judgment where the plaintiff failed to establish that the defect "did not affect the load-bearing functions of the home" and therefore was not a material defect under Section 777-a(1)(c)); *Lantzy v. Advantage Builders, Inc.*, 876 N.Y.S.2d 184, 185 (App. Div. 2009) (same). Defendants fail to offer evidence to contradict Plaintiff's evidence. Therefore, as Defendants failed to comply with the applicable

[42] While the Court also finds that Plaintiff has established that the deck was not constructed in accordance with manufacturer specifications, the Court's grant of summary judgment is based on Plaintiff having established that the deck's construction did not meet applicable building codes. Defendants later argue that Plaintiff fails to establish that the radiant heating system was not constructed in a skillful manner where it was not installed in accordance with manufacturer specifications. (Defs.' Opp'n 22–24.) However, Defendants fail to make this argument in relation to the deck. Regardless, as discussed *infra* Section II.d.v, the Court finds this question raises a triable issue of fact. This issue, however, does not impact the Court's conclusion that the construction of the deck did not meet applicable building codes.

building code, the Court grants Plaintiff's summary judgment motion as to Defendants' liability for breach of implied warranty relating to the defects in the deck.

Plaintiff does not seek summary judgment on the amount of damages he incurred in connection with Defendants' breaches of implied warranty. *See supra* footnote 32. Despite this representation, Plaintiff argues the Court should grant his summary judgment motion "not only on the breach of warranty claim related to the admittedly improper materials used to construct the pool deck, but also on the corrective measures undertaken by Plaintiff to remedy it," "leaving a dispute over the expense of the repair as the only issue for trial." (Pl.'s Reply 15; Pl.'s Mem. 19.) Defendants' argument centers around the method of repair employed to fix the deck at the Residence and whether it was necessary. (Defs.' Opp'n 17–19.) The Court is confused by Plaintiff's self-contradiction — if the Court were to make a judgment on the corrective measures employed, as Plaintiff now requests, it would be determining the amount of damages Plaintiff is entitled to — something Plaintiff explicitly is not moving for in its *partial* motion for summary judgment. Moreover, given the clear dispute of material fact, whether the corrective measure undertaken by Plaintiff was necessary or whether there was another cheaper option available that Plaintiff should have employed is a fact question for the fact-finder to decide when determining the amount of damages to award. (*See* Pl,'s 56.1 Reply ¶¶ 317–37.) *See Leeward Constr., Inc. v. Sullivan W. Cent. Sch. Dist.*, No. 05-CV-8384, 2010 WL 1993842, at *10–12 (S.D.N.Y. Mar. 10, 2010) (denying summary judgment where questions of fact existed in relation to the damages incurred to remedy construction defects), *report and recommendation adopted*, 2010 WL 1993838 (S.D.N.Y. May 19, 2010); *Pesca v. Barbera Homes, Inc*, 942 N.Y.S.2d 313, 322 & n.3 (Sup. Ct. 2012) (finding that questions of fact precluded granting summary judgment regarding mitigation of damages, such as those related to breaches of limited warranties under GBL § 777-a); *see also Tang Cap. Partners, LP v. BRC Inc.*, 757 F. Supp. 3d 363, 418 (S.D.N.Y. 2024)

(“The reasonableness of [the plaintiff]’s actions and whether, to what extent, when, and how [the plaintiff] should have pursued an alternative strategy, if any, to reduce its damages are questions of disputed fact . . . [which] cannot be resolved on summary judgment.”). The Court therefore denies Plaintiff’s motion for summary judgement on the issue of corrective measures relating to the deck.

**ii. Structural defects in the first-floor hallway**

Plaintiff argues that he is entitled to summary judgment on his breach of implied warranty claim relating to structural issues in the first-floor hallway under GBL §§ 777-a(1)(a) and (c). (Pl.’s Mem. 19–25.) In support, Plaintiff argues that the evidence establishes all of the elements, which Defendants fail to rebut: (1) the “[s]tructural defects in the first floor hallway, leading to possible failure of both the center girder and the joists running along the east wall, caused the gradual appearance of a hump running down the first-floor hallway”; (2) the height of the created hump exceeds permitted deflection according to the applicable building code; (3) these defects impacted the load-bearing nature of the Residence; (4) these defects were latent as they were behind walls and under flooring and caused a “humped appearance that developed slowly as the floor deflected”; and (5) Plaintiff provided timely notice to Defendants who took no action. (*Id.* at 19–20.)

Defendants argue that the TT Report, TT Rebuttal Report and Cao’s conclusions, which support Plaintiff’s arguments regarding the purported structural defects in the first-floor hallway, are impermissible because the TT Report is unsworn, “a conduit for the admission of Moore’s hearsay description of the results of Minkoff’s inspection,” and Cao did not independently confirm the observations. (Defs.’ Opp’n 20–21.) Defendants do not advance any other argument or cite to any other facts to argue that a triable issue of fact exists to preclude summary judgment. (*See generally id.*)

Based on the Court's finding in *supra* Section II.b, the Court overrules Defendants' objection to the TT Report, TT Rebuttal Report, and Cao's conclusions and therefore finds Plaintiff can rely on all three.

Plaintiff offers evidence to satisfy all of the elements for breach of implied warranty under GBL §§ 777-a(1)(a) and (c) regarding the structural defects in the first-floor hallway, and Defendants fail to raise a disputed issue of fact. Plaintiff provided timely notice to Defendants and an opportunity to inspect and repair the latent defects in the deck, which Defendants failed to address. (Pl.'s 56.1 Reply ¶¶ 38–47.) *See Privilege Underwriters Reciprocal Exch.*, 2019 WL 13204994, at *3–4 (holding that the plaintiff provided timely notice of claims under GBL § 777-a by "sufficiently providing notice that its inspection revealed that damages to the home were as a result of defendants' negligent construction and renovation work, and offering the opportunity to conduct an investigation"); *see also Biancone*, 806 N.Y.S.2d at 696 (reviewing the trial court's decision on the defendants' motion for summary judgment based on the notice provisions of GBL § 777-a, dismissing one claim where the defendants established "that the plaintiffs failed to notify them of the[] [alleged] defects pursuant to the notice of claim provisions in General Business Law §777-a(4)(a)" and the "plaintiffs failed to raise a triable issue of fact in opposition"); *cf. Rich*, 969 N.Y.S.2d at 325–26 (affirming denial of the plaintiff's summary judgment motion where plaintiff "failed to provide written notice of the alleged defects" to the defendants); *Pinkus*, 705 N.Y.S.2d at 283 (same).

There is no dispute that: (1) Condon's structural drawings and S. Gaetano's framing drawings related to the first-floor hallway structure did not conform to M&C's architectural drawings which met the 2010 NYSBC requirements and were approved by the Town of Southhampton Building Department, (Pl.'s 56.1 Reply ¶¶ 158–75); (2) the Residence was framed by PDP in accordance with Condon's structural drawings and S. Gaetano's framing drawings

which made changes to M&C's architectural drawings, (*id.* ¶¶ 163–67); (3) these changes, made in an effort to save money, impacted the joists in the hallway and the center beam, (*id.* ¶¶ 171–200); (4) the first-floor hallway developed a hump which exceeded 2010 NYSBC regulations, (*id.* ¶¶ 170, 186, 221, 224); and (5) the changes to the center girder contributed to the impermissible height of the hump, (*id.* ¶¶ 173–90). Plaintiff has therefore established that the first-floor hallway was not constructed in a skillful manner, as the developed hump did not meet applicable building code, and had a material defect which impacted the load-bearing floor causing it to become unsafe. GBL § 777-a(1)(a) and (c); *see Horwitz*, 888 N.Y.S.2d at 243 (finding that the district court did not err in granting the plaintiffs' partial summary judgment where the plaintiffs' proved, and the defendant failed to rebut, that the defect violated various codes and standards, which established the home was not constructed in a skillful manner, and the defects compromised the safety of the house, which constituted a material defect in the construction of the house); *cf. Gallup*, 920 N.Y.S.2d at 507 (affirming denial of summary judgment where the plaintiff failed to establish that the defect "did not affect the load-bearing functions of the home" and therefore was not a material defect under GBL § 777-a(1)(c)); *Lantzy*, 876 N.Y.S.2d at 185 (same).

Defendants' only evidence (which they do not discuss in their opposition brief) to rebut the evidence proffered by Plaintiff is DiLandro's report and testimony on the floor joists. Even if the Court were to find a dispute of material fact based on DiLandro's deposition testimony,[43]

---

[43] *See infra* Section II.d.iv where the Court finds that an expert's report and testimony about the pool does not provide definitive evidence that controverts the TT Report's conclusion. As to the first-floor hallway, DiLandro's report and testimony is based on generic assumptions and does not make calculations or conclusions based on the data specifically from the Residence. (Pl.'s 56.1 Reply ¶¶ 228–31.) Moreover, when confronted with the TT Rebuttal Report that showed using DiLandro's tests but with Residence-specific data resulted in failing results, DiLandro was unable to provide any further testimony or an opinion to support his previous conclusions or Defendants' ultimate position. (*Id.* ¶¶ 237–41.)

this would create only a question of whether the floor joists contributed to the developed hump and impacted the load-bearing nature of the walls. There still exists no dispute of fact that the height of the hump is impermissible and the center girder of the first-floor hallway impacted a load-bearing structure of the Residence. The Court therefore grants Plaintiff summary judgment as to Defendants' liability for breach of implied warranty relating to the structural defects in the first-floor hallway.

**iii. The Residence's lateral system**

Plaintiff argues that he is entitled to summary judgment on his breach of implied warranty claim relating to the Residence's lateral system under GBL §§ 777-a(1)(a) and (c). (Pl.'s Mem. 25–28.) In support, Plaintiff argues that the evidence establishes all of the elements, which Defendants fail to rebut: (1) the components of the lateral system, including the shear walls, hold downs, tie downs, and strapping, were constructed and the house framed in violation of 2010 NYSBC requirements; (2) given the Residence lacked the required lateral stability systems, the structure imposed safety concerns on its inhabitants; (3) these defects are inherently latent, relating to the Residence's frame and inner structure; and (4) Plaintiff provided timely notice to Defendants who took no action. (*Id.*)

Defendants briefing is silent on these issues, failing to refer to the lateral system. (*See generally* Defs.' Opp'n; *see also* Pl.'s Reply 12–13.)

Plaintiff offers evidence to satisfy all of the elements for breach of implied warranty under GBL §§ 777-a(1)(a) and (c) regarding the Residence's lateral system and Defendants, both in their briefing and in their objections to Plaintiff's 56.1 statement, fail to raise a disputed issue of fact. Plaintiff provided timely notice to Defendants and an opportunity to inspect and repair the latent defects in the lateral system, which Defendants failed to address. (Pl.'s 56.1 Reply ¶¶ 38–47.) *See Privilege Underwriters Reciprocal Exch.*, 2019 WL 13204994, at *3–4 (holding

that the plaintiff provided timely notice of claims under GBL § 777-a by "sufficiently providing notice that its inspection revealed that damages to the home were as a result of defendants' negligent construction and renovation work, and offering the opportunity to conduct an investigation"); *see also Biancone*, 806 N.Y.S.2d at 696 (reviewing the trial court's decision on the defendants' motion for summary judgment based on the notice provisions of GBL § 777-a, dismissing one claim where the defendants established "that the plaintiffs failed to notify them of the[] [alleged] defects pursuant to the notice of claim provisions in General Business Law §777-a(4)(a)" and the "plaintiffs failed to raise a triable issue of fact in opposition"); *cf. Rich*, 969 N.Y.S.2d at 325–26 (affirming denial of the plaintiff's summary judgment motion where plaintiff "failed to provide written notice of the alleged defects" to the defendants); *Pinkus*, 705 N.Y.S.2d at 283 (same).

There is no dispute that: (1) the lateral system secures the structure and prevents movement or displacement due to forces like wind and seismic activity, (Pl.'s 56.1 Reply ¶ 244); (2) the Residence's lateral system was required to comply with 2010 NYSBC § 1609.2, (*id.* ¶¶ 245–47); (3) the components of the lateral system, including the shear walls, hold downs, tie downs, and strapping, were constructed and the house framed by PDP using only S. Gaetano's framing drawings and not Condon's structural drawings (*id.* ¶¶ 248–49, 252–59); (4) Condon's structural drawings included the requirements for the Residence to comply with NYSBC while S. Gaetano's framing drawings did not, instead including only a note that these were to be used in conjunction with Condon's structural drawings, (*id.* ¶¶ 251–55); and (5) the TT Report concludes that the lateral stability system in the Residence violates 2010 NYSBC, (*id.* ¶ 271; TT Report 9–10).

Defendants' evidence includes only one expert, DiLandro, that opined in his report only on the strapping of roof rafters and uplift, and not on any of the other aspects of the lateral

system. (*Id.* ¶¶ 273–75, 277.) However, DiLandro testified that his report analyzed Condon's structural drawings, finding they complied with 2010 NYSBC, and not how the lateral system was actually structured at the Residence. (*Id.* ¶¶ 279–82.) DiLandro ultimately conceded that he could not answer whether the Residence conformed with 2010 NYSBC requirements or whether it would be safe to occupy during a hurricane. (*Id.* ¶¶ 283–84.) Even if the Court were to find a dispute of material fact based on DiLandro's testimony,[44] this would create only a question about the strapping of the roof rafters and not about the other aspects of the lateral system, for which together there is no question that they were in violation of 2010 NYSBC, the applicable building code.

Lastly, the evidence shows that the Town of Southhampton's approval of the Residence cannot be relied upon to find that the Residence's construction met 2010 NYSBC requirements as it was based on the architectural drawings, which did not specify the lateral system requirements, and Condon's letter, which was based on the structural drawings. (*Id.* ¶¶ 285–87, 289, 291.) Condon testified that given the new information about how the Residence was not framed according to Condon's structural drawings, his affirmation in his letter that the Residence's structure was in accordance with the NYSBC, was not accurate. (Condon Tr. 180:4–182:9; *see also* Pl.'s 56.1 Reply ¶¶ 292–97.) Plaintiff has therefore established that the lateral system, at the time of Plaintiff's purchase of the Residence, was not constructed in a skillful manner, as it did not meet applicable building codes, and had a material defect which impacted the structure of the house, causing it to be unsafe to inhabitants. GBL § 777-a(1)(a)

---

[44] *See infra* Section II.d.iv where the Court finds that an expert's report and testimony about the pool does not provide definitive evidence that controverts the TT Report's conclusion. As to the lateral system, DiLandro's report and testimony is based on generic assumptions and does not make calculations or conclusions based on the data specifically from the Residence. (Pl.'s 56.1 Reply ¶¶ 273–84.)

and (c); *see Horwitz*, 888 N.Y.S.2d at 243 (finding that the district court did not err in granting the plaintiffs' partial summary judgment where the plaintiffs' proved, and the defendant failed to rebut, that the defect violated various codes and standards, which established the home was not constructed in a skillful manner, and the defects compromised the safety of the house, which constituted a material defect in the construction of the house); *cf. Gallup*, 920 N.Y.S.2d at 507 (affirming denial of summary judgment where the plaintiff failed to establish that the defect "did not affect the load-bearing functions of the home" and therefore was not a material defect under GBL § 777-a(1)(c)); *Lantzy*, 876 N.Y.S.2d at 185 (same). Defendants fail to offer evidence to contradict Plaintiff's evidence. The Court therefore grants Plaintiff's motion for summary judgment as to Defendants' liability for breach of implied warranty relating to the lateral system.

**iv. The pool structure**

Plaintiff argues that he is entitled to summary judgment on his breach of implied warranty claim relating to the pool under GBL § 777-a(1)(a). (Pl.'s Mem. 16–19.) In support, Plaintiff argues that the evidence establishes all of the elements, which Defendants fail to rebut: (1) the pool wall is too thin, in breach of the ACI requirements and was improperly waterproofed; (2) the concrete shell beneath the pool began leaking after Plaintiff came into possession of the Residence; (3) an extended period of water leaking through the concrete caused "rust stains, efflorescence, calcification and even stalactites"; (4) the defects of the thickness of the concrete and the absence of waterproofing is "clearly latent"; and (5) Plaintiff provided timely notice to Defendants who took no action. (*Id.* at 28.) In response to Defendants' arguments and their reliance on their expert's opinion, Plaintiff contends that "Defendants' opposition is based on a single statement contained in Angelides' report" which "is a tacit acknowledgement that [he] believes the concrete cover is insufficient [but] to an unknown extent." (Pl.'s Reply 17.) Moreover, Plaintiff argues that "Defendants fail to raise a disputed

issue of material fact merely by referring to potential results from a test their expert chose not to perform, particularly where Defendants' own subcontractor admitted he built the pool to the non-compliant plans," and where Angelides' conclusions were based on observations he made after the pool was already repaired. (*Id.*)

Defendants argue that material issues of disputed fact exist with respect to the pool. (Defs.' Opp'n 21–22.) First, Defendants rely on their expert, Angelides, and his report that states that while "insufficient concrete cover should have manifested in widespread rust staining," he only "observed efflorescence and rust staining on the exterior side of the drainage trough" and "did not observe any cracked stucco finishes or rust stains on the interior of the pool," or "[a]ctive leaks . . . .and organic growth." (*Id.* at 22.) Defendants argue this contradicts Plaintiff's expert's opinion. (*Id.*) Second, Defendants argue that Angelides rebuts Cao's recommendation "to remove the insufficient concrete cover and apply a cementitious repair mortar" because Angelides opined that "[b]efore removing concrete, the extent of insufficient concrete cover should be verified using nondestructive methods . . . to determine the extent of that meets or does not meet the ACI requirements and scope of needed corrective work." (*Id.*)

Plaintiff offers evidence to satisfy all of the elements for breach of implied warranty under GBL § 777-a(1)(a) regarding the pool structure, and Defendants fail to raise a disputed issue of fact. Plaintiff provided timely notice to Defendants and an opportunity to inspect and repair the latent defects in the deck, which Defendants failed to address. (Pl.'s 56.1 Reply ¶¶ 38–47.) *See Privilege Underwriters Reciprocal Exch.*, 2019 WL 13204994, at *3–4 (holding that the plaintiff provided timely notice of claims under GBL §777-a by "sufficiently providing notice that its inspection revealed that damages to the home were as a result of defendants' negligent construction and renovation work, and offering the opportunity to conduct an investigation"); *see also Biancone*, 806 N.Y.S.2d at 696 (reviewing the trial court's decision on

the defendants' motion for summary judgment based on the notice provisions of GBL § 777-a, dismissing one claim where the defendants established "that the plaintiffs failed to notify them of the[] [alleged] defects pursuant to the notice of claim provisions in General Business Law §777-a(4)(a)" and the "plaintiffs failed to raise a triable issue of fact in opposition"); *cf. Rich*, 969 N.Y.S.2d at 325–26 (affirming denial of the plaintiff's summary judgment motion where plaintiff "failed to provide written notice of the alleged defects" to the defendants); *Pinkus*, 705 N.Y.S.2d at 283 (same).

There is no dispute that: (1) the pool's drawings, created by Bennett, called for 1 inch concrete cover for the exterior shell and 3/4 of an inch cover for the exterior shell, (Pl.'s 56.1 Reply ¶¶ 359–60); (2) Pristine constructed the pool "in accordance with Bennett's drawings," (*id.* ¶ 360); (3) the ACI requires that for high corrosive environments such as the Residence, the minimum concrete cover must be 2 inches for the interior shell and 2.5 inches for the exterior shell, (*id.* ¶¶ 355–56); (4) prior to being fixed, the pool showed signs of active leaks, organic growth, corrosion, rust bleeding, cracked stucco finishes, efflorescence, and staining, as confirmed by both Angelides and Cao, (*id.* ¶¶ 364, 366–67); and (5) Cao concluded these issues were caused by "a combination of insufficient thickness of the pool shell and inadequate installation of the waterproofing," (*id.* ¶¶ 367, 368). Plaintiff has therefore established that the pool was not constructed in a skillful manner, as it did not meet applicable ACI requirements. GBL § 777-a(1)(a); *see Horwitz*, 888 N.Y.S.2d at 243 (finding that the district court did not err in granting the plaintiffs' partial summary judgment where the plaintiffs' proved, and the defendant failed to rebut, that the defect violated various codes and standards, which established the home was not constructed in a skillful manner, and the defects compromised the safety of the house, which constituted a material defect in the construction of the house); *cf. Gallup*, 920 N.Y.S.2d at 507 (affirming denial of summary judgment where the plaintiff failed to establish

that the defect "did not affect the load-bearing functions of the home" and therefore was not a material defect under GBL § 777-a(1)(c)); *Lantzy*, 876 N.Y.S.2d at 185 (same).

Defendants' only evidence to rebut the evidence proffered by Plaintiff is the Angelides' report and testimony. However, these do not provide definitive evidence that controverts the TT Report's conclusion that the pool breached ACI requirements, leading to numerous issues. Angelides' first conclusion that the "sufficiency of the concrete cover should be verified using non-destructive methods . . . to determine the extent of that meets or does not meet the ACI requirements and scope of needed corrective work" expresses his lack of knowledge and for which he did not do anything to remedy, such as running the suggested tests or finding out more information. (Angelides Report 3; Pl.'s 56.1 Reply ¶¶ 370–71.) Further, Angelides' report does not elaborate on why or point to specific evidence to support his suggestion to verify the sufficiency of the concrete cover. An expert's contradicting opinion, and an opinion that only questions and does not expressly contradict, that is unsupported by factual evidence, does not create a triable issue of fact. *See Jackson v. Bederman*, No. 12-CV-1338, 2014 WL 2805242, at *17 (S.D.N.Y. June 20, 2014) (noting "that expert affidavits may be rejected if the 'expert's opinions rest on pure speculation or are directly contradicted by the factual record'" (quoting *Langle v. Coughlin*, 715 F. Supp. 2d 522, 541 (S.D.N.Y. 1989))); *WE Media, Inc. v. Gen. Elec. Co.*, 218 F. Supp.2d 463, 468 (S.D.N.Y. 2002) ("An expert's affidavit may raise a material question of fact so long as the expert, in his affidavit, sets forth more than mere conclusory opinions." (citing *Iacobelli Constr., Inc. v. Cnty. of Monroe*, 32 F.3d 19, 25–26 (2d Cir. 1994)), *aff'd sub nom. WE Media, Inc. v. Cablevision Sys. Corp.*, 94 F. App'x 29 (2d Cir. 2004)); *In re Agent Orange Prod. Liab. Lit.*, 611 F. Supp. 1223, 1258 (E.D.N.Y. 1985) ("The inability to defeat a motion for summary judgment with conclusory allegations extends to use of an expert opinion . . . [and a] plaintiff's 'position that an expert's opinion that lacks *any* credible support

creates an issue of "fact" is clearly untenable.'" (quoting *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666, 673 n.27 (D.C. Cir. 1977))), *aff'd,* 818 F.2d 187 (2d Cir. 1987); *see also Genger v. Genger*, 76 F. Supp. 3d 488, 493 n.8 (S.D.N.Y. 2015) ("A party cannot create a *genuine* issue of material disputed fact through mere say-so and the hiring of an expert."). In fact, Angelides testified that he had no reason to believe that the pool was not built in conformity with Pristine's documents, which called for an inch inside and three-quarters of an inch outside, and he had not spoken to anyone at Pristine to confirm otherwise. (Pl.'s 56.1 Reply ¶ 372; Angelides Tr. 214:16–23.)

Angelides' second conclusion that "[c]onsidering the age of the pool, insufficient cover should have manifested in widespread rust staining" is undermined by the fact that his conclusions and report were based on his personal observations during his visits which occurred after the pool was repaired. (Angelides Report 3; *see also* Pl.'s Reply 17 n.21 (explaining that Angelides' lack of observation of any cracked stucco finishes on the interior of the pool were likely "because the interior had previously been drilled out and replaced because it was deficiently constructed and leaking so significantly.").) At his deposition, when confronted with photographs of the pool prior to being fixed, Angelides testified to the presence of calcification, efflorescence, rust stains, and cracked stucco and concluded that these conditions, given the newness of the pool's construction, would require investigation, need to be repaired, and could constitute a defective condition in a pool constructed less than eight years prior. (Pl.'s 56.1 Reply ¶¶ 374–78; Angelides Tr. 216:18–229:3; Angelides Report 3.) The Court finds that Defendants fail to establish a genuine dispute of material fact. The Court therefore grants Plaintiff's motion for summary judgment as to Defendants' liability for breach of implied warranty relating to the defects in the pool.

**v. Radiant heating system**

Plaintiff argues that he is entitled to summary judgment on his breach of implied warranty claim relating to the radiant heat system under GBL § 777-a(1)(a). (Pl.'s Mem. 30–32.) In support, Plaintiff argues that the evidence establishes all of the elements, which Defendants fail to rebut: (1) the radiant heat system "was not designed or installed in a skillful manner, including because its installation directly violated the manufacturer's installation specifications"; (2) the defects were latent, initially being discovered in the winter after Plaintiff purchased the Residence and later confirmed when the defective floor was removed; and (3) Plaintiff provided timely notice to Defendants but they took no action. (*Id.* at 30.) Plaintiff contends that Defendants fail to cite to "a single case" to support their argument that failing to install the radiant heat system based on manufacturer instructions does not constitute failure to construct in a skillful manner "because it is not the law." (Pl.'s Reply 18.) To the contrary, Plaintiff argues that "disregarding a manufacturer's installation instruction is definitionally failing to construct in a skillful manner" and "a system installed in violation of manufacturer specifications could not be constructed in accordance with 'locally accepted building practices.'" (*Id.*) Plaintiff contends that Angelides' admission that the heating system was not installed pursuant to the manufacturer specifications and the "poor performance experienced by Plaintiff . . . was precisely what Uponer warned would occur as a result of such improper installation," establishes no dispute of material fact to preclude awarding summary judgment. (*Id.*)

Defendants argue that "whether or not the system was installed in compliance with the manufacturer's instructions is not the determining factor in whether the system was installed in a skillful manner for purposes of GBL § 777-a." (Defs.' Opp'n 22.) Defendants contend that "nothing in Plaintiff's motion cites any controlling building codes or locally accepted building practices that dictate how radiant heating systems for flooring are to be installed." (*Id.* at 23.)

Moreover, Defendants argue that "Angelides has opined that the installed radiant heating system *is* suitable for floor conditioning purposes" and therefore, "it is irrelevant whether the piping was covered by a concrete underlayment or not" because "[t]he system, as installed, serves its intended purpose." (*Id.*) Defendants contend that "Plaintiff's submissions in support of their motion show, at most, an issue of material fact that must be resolved by a jury."[45] (*Id.* at 24.)

The Court notes both parties' failure to cite to any case law in support of their arguments. In researching the relevant law, the Court was only able to find two cases that address questions of whether conduct arose to failure to construct in a "skillful manner" under GBL § 777-a when something was not installed in accordance with manufacturer specifications. *See Fireman's Fund Ins. Co. v. Montanari Constr., Inc.*, No. 5378/12, 2014 WL 6707039 (N.Y. Sup. Ct. May 9, 2014); *Bd. of Managers of Wood Point Plaza Condo. v. Woodpoint Plaza LLC*, 901 N.Y.S.2d 897 (Sup. Ct. 2009). The Court's reading of both cases indicates that the courts contemplated granting summary judgment for breach of implied warranty where the plaintiff established that a housing component was not installed according to manufacturer instructions, but neither ultimately imposed liability due to disputed questions of fact. *See Fireman's Fund Ins. Co.*, 2014 WL 6707039 (denying summary judgment and finding "that there exist[ed] triable issues of fact including . . . whether the hose bib and the pipe to which it had been connected had been properly installed and/or insulated in accordance with manufacturer's requirements and in compliance with the [r]esidential [b]uilding [c]ode and industry standards"); *Bd. of Managers of Wood Point Plaza Condo.*, 901 N.Y.S.2d at 897 (denying summary judgment where the

[45] Defendants also argue that "questions of fact exist as to the expense claimed by Plaintiff for changes to the installed system" and contends that such "failure warrants not only denial of Plaintiff's motion for summary judgment as to this issue, but preclusion of Plaintiff from presenting evidence of the amount of damages for this claim." (Defs.' Opp'n 24.) As discussed *supra* footnotes 32 and 41, the Court rejects Defendants' argument.

"plaintiffs ha[d] not demonstrated how the windows failed to meet the [manufacturer] specifications").

While the Court agrees that a common sense meaning of "failing to construct in a skillful manner" would include failing to install in accordance with manufacturer instructions, especially where failure to do so would result in hampered performance, and the evidence establishes and both experts concede that the radiant heating system was not installed in accordance with manufacturer instructions, (*see* Pl.'s 56.1 Reply ¶¶ 348, 350; Angelides Tr. 123:14–125:13), whether such conduct defies "locally accepted practices" is a question of fact for the jury. *See Prince v. Cnty. of Nassau*, 563 F. App'x 13, 18 (2d Cir. 2014) (holding the "district court did not err by reiterating the correct legal standard and letting the jury make up its own mind about whether the alleged conduct met that standard"); *Allen v. Antal*, No. 12-CV-8024, 2014 WL 2526977, at *20 (S.D.N.Y. Mar. 13, 2014) ("The question of whether [the defendant] breached a legal practice standard is a question of fact more appropriate for resolution by a jury."), *aff'd*, 665 F. App'x 9 (2d Cir. 2016); *Hemrie v. City of New York*, No. 96-CV-213, 2000 WL 1234594, at *3 (S.D.N.Y. Aug. 31, 2000) (finding the question of "[w]hether the conduct of the defendants . . . meets [the applicable legal] standard [ ] is best determined by the jury"). The Court's conclusion is supported by Angelides' testimony that the radiant heating system, as installed, was "inefficient" if it was being used as the "primary means of heat in the building," (Angelides Tr. 123:14–125:13) — Plaintiff has not presented any evidence regarding whether the radiant heating system was being used as the primary means of heating the Residence. A jury could find that the radiant heating system was installed in accordance with locally accepted practices if it was not being used as the primary heating source for the Residence. The Court therefore denies Plaintiff's motion for summary judgment as to Defendants' liability for breach of implied

warranty relating to the defects in the radiant heating system. The Court finds that there are disputed issues of fact to be decided by a jury.

**vi. Wood siding panels and WRB**

Plaintiff argues that he is entitled to summary judgment on his breach of implied warranty claim relating to the wood siding panels and WRB under GBL § 777-a(1)(a).[46] (Pl.'s Mem. 32–34.) In support, Plaintiff argues that the evidence establishes all of the elements, which Defendants fail to rebut: (1) "the wood siding panels and [WRB] beneath those panels were not properly installed in accordance with [RCNYS § R702.2.2], manufacturer's instructions or in a skillful manner"; (2) the wood siding defects created open gaps which resulted in water intrusion and excessive light exposure to the WRB; (3) these defects were latent; and (4) Plaintiff provided timely notice to Defendants who took no action. (*Id.* at 32; Pl.'s Reply 19–20.) In response to Defendants' argument that these raise a triable issue of fact, Plaintiff contends that Angelides' report and testimony does not raise a triable issue of fact as it is "grossly deficient" because "Angelides admitted at his deposition that he did not even look at two sides of the Residence, and that although the wood lap siding starts at the base of the Residence and continues all the way to the roof, he did not make any effort to observe the siding other than at eye level." (Pl.'s Reply 19–20 (internal quotation marks and emphasis omitted).) In addition, Angelides "admitted that it would 'have been helpful' if boards were removed so he could have viewed the WRB and flashing, but never even made the request," "never reviewed the photographs exchanged in discovery revealing the WRB and the lack of flashing, nor did he

[46] Plaintiff's briefing also cites to GBL § 777-a(1)(b) in one place, while neglecting to include an argument about this provision. (Defs.' Mem. 32.) The Court is unsure how the wood siding panels and WRB implicates "the plumbing, electrical, heating, cooling and ventilation systems of the home." (Pl.'s Mem. 32–34.) Therefore, the Court only addresses GBL § 777-a(1)(a) in this section.

speak to Roboco (the [general contractor]), [S.] Gaetano, [M.] Gaetano or anyone else involved in the construction regarding the installation of the WRB or the wood lap siding." (*Id.* at 19 n.25.)

Defendants contend that they raise material issues of disputed fact regarding the wood lap siding and WRB which prevent granting summary judgment to Plaintiff. (Defs.' Opp'n 24–25.) Defendants point to: (1) Angelides' testimony and report where he "examined the siding on both May 4, 2023 and March 30, 2024, and did not observe the [WRB] to be visible through the lap joints"; and (2) Angelides, when reviewing the photographs of the TT Report, did not observe sill flashing missing at the window openings or siding gaps that allowed the WRB to be visible. (*Id.*) Angelides' report "found no evidence to support the claim that all of the wooden siding needs to be removed and replaced." (*Id.* at 25 (quoting Angelides Report 4).)

The Court finds that Defendants have raised a genuine dispute of material fact. With regard to the wood siding panels, Defendants' expert, Angelides, provides conclusions as supported by evidentiary proof that directly contradicts the TT Report's conclusions, (*see* Pl.'s 56.1 Reply ¶¶ 394–396; Angelides Report 3–4) — this is a classic battle of the experts. *See In re: Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, No. 14-MD-2542, 2025 WL 354671, at *4 n.3 (S.D.N.Y. Jan. 30, 2025) ("Once experts are qualified, then 'trial courts should not arrogate the jury's role in evaluating the evidence and the credibility of expert witnesses by simply choosing sides in the battle of the experts' in a context like summary judgment." (quoting *In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d 1124, 1135 (2d Cir. 1995))); *Knight v. N.Y. State Dep't of Corr.*, No. 18-CV-7172, 2022 WL 1004186, at *12 (S.D.N.Y. Mar. 30, 2022) ("[S]ummary judgment is inappropriate when there is a battle of the experts."); *Realtime Data, LLC v. Stanley*, 897 F. Supp. 2d 146, 153 (S.D.N.Y. 2012) ("[W]hen there are dueling experts, both of whom have put forward opinions in contradiction with each other, and when those

opinions are important to resolution of a material factual dispute, summary judgment may not be appropriate."); *see also Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc*, 596 F.3d 112, 136 (2d Cir. 2010) (affirming that a "battle [of experts] bespeaks of a dispute of material fact for purposes of [ ] liability").

Plaintiff points out potential limitations and inadequacies with Angelides' conclusions that could potentially undermine his conclusions and argues this "confirms that [Angelides'] report was grossly deficient and insufficient to raise a material question of fact to defeat summary judgment." (Pl.'s Reply 20; *see* Pl.'s 56.1 Reply ¶¶ 397–402, 404; Angelides Tr. 230:23–238:5.) Nevertheless, Plaintiff cites to no case law to support the Court disregarding Angelides' conclusions for the purposes of summary judgment. This is an issue for the jury to weigh against his report and testimony. *See Saeli v. Chautauqua Cnty.*, 36 F.4th 445, 456 (2d Cir. 2022) (holding "that courts must refrain from assessing competing evidence in the summary judgment record and avoid making credibility judgments" such as assessing a witness's credibility or weighing his testimony against the evidence offered by the defendants); *Proctor v. LeClaire*, 846 F.3d 597, 607–08 (2d Cir. 2017) ("In reviewing the evidence and the inferences that may reasonably be draw, [we] may not make credibility determinations or weigh the evidence . . . . Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." (alterations in original) (internal quotation marks omitted) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010))). The Court therefore cannot conclude, as a matter of law, that the wood siding panels at the Residence violate RCNYS § R702.2.2 which requires a minimum of 1/2 inch to prevent air, water and moisture infiltration. *See* RCNYS § R702.2.2. With regard to the WRB, Angelides also provides conclusions that directly contradict the TT Report's conclusions

that sill flashing was missing at window openings.[47] (*See* Pl.'s 56.1 Reply ¶¶ 395–96; Angelides Report 3.) Even if Plaintiff can establish no genuine dispute of material fact as to whether or not the WRB violates manufacturer installation requirements because of the alleged missing flashing, as discussed *supra* Section II.d.v, the Court cannot conclude that that violation of manufacturer specifications satisfies a "failure to have been constructed in a skillful manner" under GBL § 777-a(1)(a). The Court therefore denies Plaintiff's motion for summary judgment as to Defendants' liability for breach of implied warranty relating to the defects in the wood siding panels and WRB.

**vii. Generator**

Plaintiff argues that he is entitled to summary judgment on his breach of implied warranty claim relating to the generator under GBL §§ 777-a(1)(a) and (1)(c). (Pl.'s Mem. 34–35.) In support, Plaintiff argues that the evidence establishes all of the elements, which Defendants fail to rebut: (1) the location and installation of the generator violates the 2010 Fuel Gas Code ("FGCNYS"), violates the manufacturer's installation specifications, and presents a serious health and safety issue for Plaintiff and his family; (2) the generator is included in the electrical systems of the Residence; (3) these defects were latent as "[n]o purchaser would have any idea where a particular generator may be located or whether it could be vented"; and (4) Plaintiff provided timely notice to Defendants who took no action. (*Id.* at 34.) In response to Defendants' argument that Plaintiff fails to specify where the generator should have been located, Plaintiff argues that "Defendants' position is preposterous and illogical, as it is not incumbent on Plaintiff to 'offer [a] . . . reasonable alternative,' but rather for Defendants to

[47] "Angelides admitted and agreed that if the WRB is exposed to . . . sunlight, it would deteriorate over time resulting in water penetration and leaks into the Residence." (Pl.'s 56.1 Reply ¶ 405; Angelides Tr. 232:24–233:14.)

comply with applicable building code and accepted building practice." (Pl.'s Reply 20.) Moreover, Plaintiff contends Defendants' cited case is "easily distinguishable" and there is "no legal obligation to offer an alternative location of the generator on a breach of warranty claim." (*Id.* (citing *Mathis-Kay v. McNeilus Truck & Mfg.*, No. 06-CV-815, 2011 WL 4498386 (W.D.N.Y. Sep. 24, 2011)).)

Defendants argue that the Court should deny Plaintiff's motion for summary judgment because Plaintiff "fails to specify where the generator *should* have been located" and therefore has not met his burden to show the absence of any material fact. (Defs.' Opp'n 25 (citing *Mathis-Kay*, 2011 WL 4498386).) Defendants also contend that "Plaintiff cannot accurately determine any damages associated with the relocation of the generat[or] — an essential element of Plaintiff's claim."[48] (*Id.*)

Plaintiff offers evidence to satisfy all of the elements for breach of implied warranty under GBL § 777-a(1)(a) regarding the generator, and Defendants fail to raise a disputed issue of fact. Plaintiff provided timely notice to Defendants and an opportunity to inspect and repair the generator, which Defendants failed to address. (Pl.'s 56.1 Reply ¶¶ 38–47.) *See Privilege Underwriters Reciprocal Exch.*, 2019 WL 13204994, at *3–4 (holding that the plaintiff provided timely notice of claims under GBL § 777-a by "sufficiently providing notice that its inspection revealed that damages to the home were as a result of defendants' negligent construction and renovation work, and offering the opportunity to conduct an investigation"); *see also Biancone*, 806 N.Y.S.2d at 696 (reviewing the trial court's decision on the defendants' motion for summary judgment based on the notice provisions of GBL § 777-a, dismissing one claim where the

[48] As discussed *supra* footnotes 32 and 41, the Court rejects Defendants' argument about Plaintiff's alleged failure to provide satisfactory evidence of damages related to his breach of implied warranty claims.

defendants established "that the plaintiffs failed to notify them of the[] [alleged] defects pursuant to the notice of claim provisions in General Business Law §777-a(4)(a)" and the "plaintiffs failed to raise a triable issue of fact in opposition"); *cf. Rich*, 969 N.Y.S.2d at 325–26 (affirming denial of the plaintiff's summary judgment motion where plaintiff "failed to provide written notice of the alleged defects" to the defendants); *Pinkus*, 705 N.Y.S.2d at 283 (same).

There is no dispute that: (1) the generator was located inside, fully enclosed, utilized vent pipes, and sat on non-fireproof material, (Pl.'s 56.1 Reply ¶¶ 406, 407, 411, 417); (2) FGCNYS § 616.1 requires that "permanently installed equipment powered by internal combustion engines and turbines shall be installed in accordance with the manufacturer's installation instructions and NFPA 37," (*id.* ¶ 408); (3) the generator was an internal combustion generator, (*id.* ¶ 409); (4) Kohler's installation manual "explicitly and repeatedly states that the subject generator should be installed outdoors only and provides no alternate solution for using vent pipes for indoor installation" as was done by Defendants, (*id.* ¶¶ 410–11); (5) FGCNYS § 616.1 and Kohler's installation manual requires that the generator be installed in accordance with NFPA 37, which requires "the generator must be set over a noncombustible surface and a minimum distance of 5 feet from combustible material," (*id.* ¶¶ 408, 416 (internal quotation marks omitted)); (6) Kohler confirmed the "generator's illegal placement" when they "would not service the generator due to its interior location and the installation of an illegal exhaust pipe," (*id.* ¶ 413 (internal quotation marks omitted)); (7) the Gaetanos were aware in or around July 2016 that the generator could not be vented and was not meant to have a ducted flue system, (*id.* ¶ 414); and (8) the Residence previously experienced a fire on the back utility deck due to the generator's improper venting, (*id.* ¶ 415).

Plaintiff has therefore established that, at the time of purchase, the generator was not constructed in a skillful manner as it did not meet FGCNYS § 616.1 (which also required the

generator to meet manufacturer installation requirements and NFPA regulations and it did not[49]) and the Residence was not "free from defects due to a failure by the builder to have installed [the electrical] system[] in a skillful manner." GBL § 777-a(1)(a) and (b); *see Horwitz*, 888 N.Y.S.2d at 243 (finding that the district court did not err in granting the plaintiffs' partial summary judgment where the plaintiffs' proved, and the defendant failed to rebut, that the defect violated various codes and standards, which established the home was not constructed in a skillful manner, and the defects compromised the safety of the house, which constituted a material defect in the construction of the house); *cf. Gallup*, 920 N.Y.S.2d at 507 (affirming denial of summary judgment where the plaintiff failed to establish that the defect "did not affect the load-bearing functions of the home" and therefore was not a material defect under GBL § 777-a(1)(c)); *Lantzy*, 876 N.Y.S.2d at 185 (same).

In rebuttal of the evidence proffered by Plaintiff, Defendants argue that Plaintiff is legally required to offer an alternative location for the generator which Plaintiff fails to do. (Defs.' Opp'n 25.) In support, Defendants cite to *Mathis-Kay v. McNeilus Truck & Manufacturing*, where, they argue, the "court held that New York law 'requires a plaintiff to prove the existence of a feasible alternative.'" (*Id.* (quoting 2011 WL 4498386, at *7).) Defendants' argument has no merit. The cited case involves a products liability claim for a design defect where the court found that New York law requires that, to prove his claim, a plaintiff must "prove the existence of a feasible alternative design that would have prevented the accident." 2011 WL 4498386, at

---

[49] Unlike Defendants' argument with regard to the radiant heat system that failure to conform with manufacturer specifications are insufficient to establish a failure to construct in a skillful manner, *see supra* Section II.d.v, applicable building codes for the Residence's generator require that the generator be installed in accordance with manufacturer specifications. *See* FGCNYS § 616.1. The Court therefore grants summary judgment, in part, considering the generator's installation did not abide by manufacturer requirements.

*7. In addition to this case involving an entirely different area of law, Defendants do not cite to any case involving a claim for breach of implied warranty under GBL § 777-a that imposes this requirement nor can the Court find any cases. The Court declines to impose a requirement onto Plaintiff that is not supported by case law. *See Vanderwoude v. City of New York*, No. 12-CV-9046, 2014 WL 2592457, at *11 n.6 (S.D.N.Y. June 10, 2014) (declining to "impose a burden on [the d]efendants that does not exist under the law" despite the plaintiff's arguments to the contrary" on a motion for summary judgment); *Open Hous. Ctr., Inc., v. Kessler Realty, Inc.*, No. 96-CV-6234, 2001 WL 1776163, at *8 (E.D.N.Y. Dec. 21, 2001) (granting summary judgment to plaintiff where "defendants' proffered explanations [were not] sufficient to shift the burden of proof back on plaintiffs and the uncontroverted fact[s] remain[ed]" despite the "[d]efendants [ ] attempt[] to create a genuine issue of material fact where there is none by using creative language"); *see also Spring v. Allegany-Limestone Cent. Sch. Dist.*, No. 14-CV-476, 2024 WL 385013, at *3 n.3 (W.D.N.Y. Feb. 1, 2024) ("The [c]ourt [ ] declines [the d]efendant's invitation to impose on [the p]laintiff a rigid evidentiary requirement not specifically imposed by the regulations or the Second Circuit." (internal quotation marks omitted)), *aff'd*, No. 23-7821, 2025 WL 1077347 (2d Cir. Apr. 10, 2025); *Gilead Scis., Inc. v. Teva Pharms. USA, Inc.*, No. 10-CV-1796, 2011 WL 2462764, at *3 (S.D.N.Y. June 13, 2011) (declining to impose an alleged requirement where the defendants cited no case law in support of the proposition). The Court therefore finds that Defendants fail to raise a material issue of fact and grants Plaintiff's motion for summary judgment as to Defendants' liability for breach of implied warranty relating to the generator.

## III. Conclusion

For the foregoing reasons, the Court grants in part and denies in part both Plaintiff's partial motion for summary judgment and Defendants' motion for summary judgment.

Specifically the Court: (1) denies both Plaintiff's and Defendants' motions for summary judgment on Plaintiff's fraudulent concealment and inducement claims against Defendants related to both the floors and glass of the windows and doors; (2) grants Plaintiff's motion for summary judgment on Defendants' liability[50] for his claims under GBL § 777-a related to the deck, structural defects of the first-floor hallway, lateral system, pool, and generator; (3) denies Plaintiff's motion for summary judgment on Defendants' liability for his claims under GBL § 777-a related to the radiant heating system and wood siding panels/WRB; (4) denies Defendants' motion to exclude or deem inadmissible the TT Report, TT Rebuttal Report and Cao's testimony; (5) grants Defendants' motion for summary judgment regarding Plaintiff's claim for punitive damages against 65 Dune and denies Defendants' motion for summary judgment as to Plaintiff's claim for punitive damages against the Gaetanos in their individual capacities; (6) grants Defendants' motion for summary judgment of Plaintiff's claim for recission; and (7) denies Defendants' motion for summary judgment of Plaintiff's claims due to a failure to provide evidence of damages.

Dated: September 4, 2026
Brooklyn, New York

SO ORDERED:

/s/MKB
MARGO K. BRODIE
United States District Judge

[50] Plaintiff did not move for summary judgment on the issue of damages for his claims under GBL § 777-a. *See supra* footnote 32.